IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES ROYALL, | \| |
| | \| |
| Plaintiff, | \| |
| | \| |
| v. | \| Civil Action No. 1:05cv01711 (RBW) |
| | \| |
| NATIONAL ASSOCIATION OF | \| |
| LETTER CARRIERS, AFL-CIO, | \| |
| | \| |
| Defendant. | \| |

**DEFENDANT NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO'S
STATEMENT OF MATERIAL FACTS
<u>AS TO WHICH THERE IS NO GENUINE ISSUE</u>**

Pursuant to Local Civil Rules 7(h) and 56.1, defendant National Association of Letter Carriers, AFL-CIO ("NALC") submits the following Statement of Material Facts as to Which There is No Genuine Issue in support of its Motion for Summary Judgment:

**<u>The Parties and NALC Officers Young and Broendel</u>**

1.  Plaintiff Charles Royall is African-American. (Compl. ¶¶ 1,3, at 1).

2.  NALC is a national union which maintains a headquarters in Washington, D.C. NALC is the exclusive collective bargaining representative of all employees in the craft of city letter carriers employed nationwide by the United States Postal Service. (Answer ¶ 5, at 1).

3.  William H. Young has served as the President of NALC since December 2002. (Declaration of Peter Herman [hereinafter "Herman Decl."], filed herewith, Ex. A

[Deposition Transcript of William Young [hereinafter "Young Tr."]], at 4:16-22[1]). Prior to that date, Young served as Executive Vice President of NALC. (*Id.* at 5:7-13).

4. Jane E. Broendel has served as the Secretary-Treasurer of NALC since February 2002. (Herman Decl., Ex. B [Deposition Transcript of Jane Broendel [hereinafter "Broendel Tr."]], at 4:16-21).

**Plaintiff is Hired as an At-Will Accounting Manager at NALC in February 2002**

5. In or about January 2002, NALC's outside accounting firm, Bond Beebe, placed an advertisement in *The Washington Post* seeking applications for the job position of accounting manager at NALC. (Herman Decl., Ex. E [Royall Tr.], at 20:13-21:3).

6. Royall, who was unemployed at the time, responded to the newspaper advertisement, and was subsequently invited to interview at NALC. (Herman Decl., Ex. E [Royall Tr.], at 29:8-10; 30:15-31:11).

7. On February 12, 2002, Royall had an interview at NALC with Executive Vice President Young, Secretary-Treasurer Broendel, and Ronald Stubblefield, NALC's Director of Finance. (Herman Decl., Ex. E [Royall Tr.], at 32:8-14).

8. During this time, NALC President Vincent R. Sombrotto, who was in last year of his presidency, had delegated to Executive Vice President Young certain powers to hire and fire. (Herman Decl., Ex. A [Young Tr.], at 5:22-6:10).

9. Royall had a subsequent interview with Young at which time he was offered, and he accepted, the position of Accounting Manager at the annual salary of $52,000. (Herman Decl., Ex. E [Royall Tr.], at 35:2-22).

---

[1] NALC's citations to deposition transcripts include the page number, followed by a colon, and then the line numbers. For example, "25:11 to 26:13" represents a citation to page 25, line 11, to page 26, line 13.

10. The decision to hire Royall was made by Young, with the concurrence of Broendel and Stubblefield. (Herman Decl., Ex. A [Young Tr.], at 9:22-10:13; Ex. B [Broendel Tr.], at 11:17-12:17).

11. NALC selected Royall in part because he stated in his interview that he was familiar with J.D. Edwards, the accounting and payroll software program used by NALC. (Herman Decl., Ex. B [Broendel Tr.], at 12:13-13:14 [testifying that Royall stated in his interview that he had familiarity with J.D. Edwards software, and that "he would pick up very quickly on the way [NALC] operated."]; Ex A [Young Tr.], at 28:2-6 [testifying that Royall stated in his interview that "he was familiar with [J.D. Edwards], that he was a quick study, and he would be right up and running with it"]).

12. Royall commenced employment at NALC on February 25, 2002. (Herman Decl., Ex. E [Royall Tr.], at 35:16-36:6).

13. Royall was an at-will employee, and he had no written or implied employment contract with NALC. (Herman Decl., Ex. E [Royall Tr.], at 54:15-22; 55:14-20). Nor was he covered by a collective bargaining agreement while he was employed at NALC. (Herman Decl, Ex. A [Young Tr.], at 45:10-18).

**NALC's Finance Department**

14. During the time that plaintiff was employed at NALC, the finance department consisted of approximately seven employees, five of whom were African-American, according to Royall. (Herman Decl, Ex. E [Royall Tr.], at 58:14-22).

15. At the time that Royall was hired, the position of accounting manager was vacant, and there was a backlog of work in the finance department. (Herman Decl., Ex. A [Young Tr.], at 6:14-9:14; 10:11-13).

3

16. Plaintiff's job duties primarily related to payroll. (Herman Decl., Ex. B [Broendel Tr.], at 11:6-8; Ex. E [Royall Tr.], at 38:13-20). Generally speaking, he was obligated to produce payroll timely and accurately, file timely and accurately all tax reports and payment of payroll-related taxes, assist the Director of Finance with duties related to supervision of employees, and learn the Accounts Payable software system in order to assist the Director of Finance and the Accounts Payable clerk in their duties. (Herman Decl., Ex. F [Responses of NALC to Plaintiff's First Set of Interrogatories and Request for Production of Documents [hereinafter "NALC's Discovery Responses"]], at 3-4). More specific examples of Royall's responsibilities were ensuring that the correct deductions were taken from paychecks, and that NALC made timely payment of Postal Service premiums for benefits for NALC officers.[2] (Herman Decl., Ex A [Young Tr.], at 32:9-33:3).

17. Although there was no written job description for Royall's position, his duties were made clear to Royall, and Royall indicated that he understood his responsibilities. (Herman Decl., Ex. A [Young Tr.], at 51:21-53:16).

18. Plaintiff was under the supervision of Stubblefield, NALC's Director of Finance. (Herman Decl., Ex. B [Broendel Tr.], at 11:4-5; 14:17-20). According to plaintiff, Stubblefield is African-American. (Herman Decl., Ex. E [Royall Tr.], at 32:15-19).

19. Stubblefield reported to Broendel. (Herman Decl., Ex. B [Broendel Tr.], at 11:4-6).

---

[2] As letter carriers who are on leave from the Postal Service, NALC officers continue to receive health, pension, and life insurance benefits through the Postal Service, and the Postal Service bills NALC on a quarterly basis for the cost of those benefits. (Herman Decl., Ex. A [Young Tr.], at 11:5-12:7).

**Complaints About Plaintiff's Job Performance By Stubblefield and Neidlinger**

20.     Finance Director Stubblefield advised Broendel that he could not assign a task to Royall and have it completed accurately and timely. (Herman Decl., Ex. B [Broendel Tr.], at 82:11-14). He also told her that Royall was not taking into account Stubblefield's recommendations, that Royall wanted to do things his own way, and that Royall would not follow directions. (*Id.* at 84:7-14).

21.     Young had between five and ten meetings with Stubblefield regarding why things were not getting done. Stubblefield told Young in those meetings "that Royall wasn't doing his job, that he had to do what Royall was supposed to do and what he was supposed to do and that he was right back where he was before." (Herman Decl., Ex. A [Young Tr.], at 17:8-14; 46:14-16 ["Stubblefield told me that he had many discussions with [Royall] attempting to improve his performance and that the guy wasn't getting it."]).

22.     Young specifically talked to Stubblefield about penalties that NALC had to pay due to late-paid taxes, and was told by Stubblefield that Royall was "struggling." (Herman Decl., Ex. A [Young Tr.], at 23:4-15).

23.     Sukja Neidlinger has been employed at NALC for 25 years, the last 10 as a payroll clerk. (Herman Decl., Ex. C [Deposition Transcript of Sukja Neidlinger [hereinafter "Neidlinger Tr."]], at 4:13-20 and errrata sheet).

24.     Royall was responsible for supervising Neidlinger. (Herman Decl., Ex. E [Royall Tr.], at 49:17-18; Ex. A [Young Tr.], at 32:18-19).

25.     Neidlinger thought that Royall was "very incompetent" because he did not have much knowledge of what they were doing, and she testified that it took her over two

5

months to teach plaintiff basic payroll. (Herman Decl., Ex. C [Neidlinger Tr.], at 13:3-15). Neidlinger testified that payroll can easily be learned within a few days. (*Id.* at 16:2-3).

26.   Neidlinger had to explain payroll "over and over and over" to Royall. (Herman Decl., Ex. C [Neidlinger Tr.], at 15:6-20). For example, he could not convert minutes into fractions of hours and he could not input information into the payroll system. (*Id.* at 20:18-21:3). Royall was "constantly" going to Neidlinger with questions because he did not know the payroll system. (*Id.* at 23:13-20; Ex. E [Royall Tr.], at 50:18-21 [testifying that Neidlinger "absolutely" was required to give plaintiff a fair amount of instruction on NALC's accounting software program]).

27.   Neidlinger felt that she was doing Royall's job. (Herman Decl., Ex. C [Neidlinger Tr.], at 18:6-11).

28.   Neidlinger told Broendel that she thought Royall was "very incompetent." (Herman Decl., Ex. C [Neidlinger Tr.], at 13:3-6; Ex. B [Broendel Tr.], at 73:11-75:6 [testifying that Neidlinger told Broendel that having to go over things with plaintiff "over and over again" was slowing Neidlinger down, that plaintiff was not very smart, and that he could not catch on to the payroll system]). Neidlinger also told Broendel that she was going through a "very bad time," that she could not get things out because Royall had not done the part he was supposed to do, and that payroll had gotten backed up. In fact, because Neidlinger felt that she was performing Royall's job, she asked Broendel for a raise. (*Id.*, Ex. C [Neidlinger Tr.], at 29:12-30:2).

**Complaints About Royall and Payroll Problems By NALC Officers and Employees**

29.   NALC officers complained about various payroll problems during the time Royall worked at NALC. (Herman Decl., Ex. B [Broendel Tr.], at 20:19-21:6). Payroll

problems were occurring "almost every single day." (Herman Decl., Ex. A [Young Tr.], at 54:6-7; 59:13-16 ["It seemed like every day I came to work, there was another issue with somebody complaining about lack of performance out of that finance department"]).

30. Al Ferranto, a NALC officer, complained that he had made voluntary contributions to the federal thrift savings plan ("TSP"), but that Royall was not forwarding the contributions to the TSP, and, thus, the contributions were not placed in his account. (Herman Decl., Ex. A [Young Tr.], at 54:21-55:11).

31. Two or three other NALC officers complained to Young that they had received notices from the Postal Service that NALC had not paid the cost for their benefits, and that they were in jeopardy of losing their benefits. (Herman Decl., Ex. A [Young Tr. ], at 56:6-17).

32. Young himself received a notice from the Postal Service during the time that plaintiff worked at NALC that NALC had not paid the cost for his benefits, and that he was in jeopardy of losing his benefits. (Herman Decl., Ex. A [Young Tr.], at 56:13-17).

33. Stephen Hult, a NALC employee, complained to Broendel about a problem with his benefits during plaintiff's employment. (Herman Decl., Ex. B [Broendel Tr.], at 98:11-99:5).

34. James Sauber, a NALC economist, complained to Young during the time Royall was employed that money was being deducted from his paycheck for a bond, but that he had not received a bond for several months. (Herman Decl., Ex. A [Young Tr. ], at 53:17-54:4; Ex. B [Broendel Tr.], at 99:10-12).

35. Broendel received a complaint from NALC employee Sean McCormally that he was not receiving his savings bonds during the time that plaintiff worked at NALC.

7

(Herman Decl., Ex. B [Broendel Tr.], at 19:2-18). Because savings bonds are dated, it was important that the bonds be obtained timely. (*Id.* at 59:2-16).

36. Other NALC employees also complained about payroll deductions that should have been, but were not, placed in the AFL-CIO credit union. (Herman Decl., Ex. A [Young Tr.], at 57:22-58:4).

37. Chris Tarbrake, who was employed by NALC in accounts payable at the time of Royall's employment with NALC, told Broendel that Royall did not give Tarbrake any guidance and could not answer any of his questions, and that he felt that the finance department was falling apart because of plaintiff. (Herman Decl., Ex. B [Broendel Decl.], at 75:18-77:2).

38. Dale Molina, who was employed by NALC in the information technology department and was responsible for the Annuity Trust Fund payments from NALC locals, complained about Royall to Broendel. Specifically, Molina complained that the locals were not getting information in time and that the payments were not timely being made to the Annuity Trust Fund. (Herman Decl., Ex. B [Broendel Tr.], at 88:15-90:12).

**Complaints About Late-Paid Bills By a Vendor**

39. Mark Eagen, one of NALC's vendors, complained to Young at the time that Royall was employed that "NALC was losing its reputation as being an organization that paid its bills on time" and that other purveyors were saying that NALC was not paying its bills. The vendor's complaint was consistent with Young's personal knowledge that bills were not being paid as timely as they used to be. (Herman Decl., Ex. A [Young Tr.], at 29:15-31:6).

**Plaintiff's Errors Had to Be Corrected By Other Employees**

40. Although Broendel specifically talked to Royall about McCormally's savings bond problem, he did not take care of this problem, and it ultimately was resolved by a temporary employee (Frank Sclafani). (Herman Decl., Ex. B [Broendel Tr.], at 59:6-60:6).

8

Other problems with savings bonds and payment for Postal Service benefits were not resolved by Royall, but by someone else. (*Id.* at 26:3-27:1).

      41.    Broendel discussed problems with Postal Service benefits with plaintiff, and advised him that such payments had to be made as they came in. However, Stubblefield took care of resolving this problem. (Herman Decl., Ex. B [Broendel Tr.], at 61:22-64:22).

      42.    Stubblefield would do payroll work himself, which pulled him away from resolving other issues in the finance department, because he was unable to guide Royall to do the work. (Herman Decl., Ex. B [Broendel Tr.], at 79:1-16).

      43.    Stubblefield had to have a temporary employee (Frank Sclafani) prepare spreadsheets that Royall should have been, but was not, able to prepare for NALC's annual audit in May 2002 that is performed by NALC's outside accounting firm. (Herman Decl., Ex. B [Broendel Tr.], at 81:1-6).

      44.    During the time that plaintiff was employed by NALC, Frank Sclafani worked as a temporary employee at NALC. Sclafani, an accountant, had specific experience in troubleshooting and turning organizations around. (Herman Decl., Ex. B [Broendel Tr.], at 40:6-21). Sclafani had been retained on the recommendation by NALC's outside accounting firm that NALC obtain additional personnel to work on NALC's annual audit. In addition to assisting Stubblefield, Sclafani did a number of payroll duties. (*Id.* at 39:7-40:5).

      45.    While employed at NALC, Sclafani personally observed Stubblefield receive telephone calls from NALC employees complaining about errors in their paychecks regarding the amounts withheld or the amounts received, including errors regarding TSP deductions and income tax withholdings. (Herman Decl., Ex. D [Deposition Transcript of Francis Sclafani [hereinafter "Sclafani Tr."]], at 51:2-53:19).

9

46. Neidlinger conveyed her concerns about Royall to Sclafani. (Herman Decl., Ex. C [Neidlinger Tr.], at 40:7-18; 41:9-12; 42:7-8; 45:9-46:5).

47. Sclafani had to work with Royall to get the tax filings completed timely. (Herman Decl., Ex. D [Sclafani Tr.], at 102:20-104:8; 106:13-107:13; 103:18-104:7 [testifying that Sclafani had to intervene so that state taxes for approximately 20 to 24 different states would be filed timely in April 2002 and July 2002]).

48. Sclafani had to assist Royall in printing out reports, and selecting which report to print out. (Herman Decl., Ex. D [Sclafani Tr.], at 108:5-9).

49. Royall did not prepare required audit schedules by their due dates. (Herman Decl., Ex. D [Sclafani Tr.], at 66:18-67:15).

50. At the request of Stubblefield, who noticed that Royall was not completing Forms 941s, Sclafani had to either assist Stubblefield in completing the tax filings or prepare them from scratch. (Herman Decl., Ex. D [Sclafani Tr.], at 16:17-17:3).

51. Stubblefield had told Sclafani that Royall was "not responding" to Stubblefield's instructions, "was not completing the assignments on time," that Stubblefield "had to spend an inordinate amount of time following up," and that "Royall was not giving him the support that he needed to accomplish whatever he was trying to accomplish." Sclafani believed that Stubblefield's assessments were correct "because it was clear that those assignments had not been completed." (Herman Decl., Ex. D [Sclafani Tr.], at 46:3-18).

52. Sclafani advised Broendel that things in payroll were not getting done either correctly or timely, and he showed her spreadsheets with incorrect information. (Herman Decl., Ex. B [Broendel Tr.], at 47:20-48:13).

53. Sclafani also advised Broendel of his overall views concerning NALC's finance department in a memorandum drafted and delivered to Broendel in the summer of 2002. (Herman Decl., Ex. I [Memo from Frank Sclafani to Jane Broendel [hereinafter "Sclafani Mem."]]; Ex. B [Broendel Tr.], at 39:7-11; 45:2-46:3; Ex. D [Sclafani Tr.], at 70:2-13 [Sclafani identifying memorandum]).

54. With respect to Royall, Sclafani's memorandum stated:

Accounting Manager:

> This number two position is currently held by Mr. Charles Royall whose accounting abilities, in my opinion, are suspect. His work, unless actively supervised is often incomplete or not timely, and in too many cases, inaccurate. He has a demonstrated unwillingness to take on, much less complete the tasks assigned to him by the Director of Finance or anyone else. His analytical skills are poor, as is his attention to detail unless directly pointed out by a supervisor. Over the period of observation, the Director of Finance has relied on him less and less. Mr. Royall's lack of ability, real or feigned has had, and will continue to have, a major detrimental effect on the work flow in the department.

(Herman Decl., Ex. I [Sclafani Mem.], at 3).

55. The evaluation of Royall in Sclafani's memo was based on Sclafani's own actual observations. (Herman Decl., Ex. D [Sclafani Tr.], at 98:13-99:3 ["Based on my actual observations, the fundamental abilities would be, one, his accounts were not cross-footed, in other words, footed, totalled, columns totalled with rows. He never prepared journal entries for his transactions. Those always had to be done for him. Some of the work was incomplete, and as I say, not timely."]).

56. Broendel was already aware of the issues regarding plaintiff raised in Sclafani's memo, and she was not surprised by the memo. (Herman Decl., Ex. B [Broendel Tr.], at 52:13-17).

11

**NALC Had to Pay Penalties to the IRS Due to Plaintiff's Late Tax Filings**

57.  NALC was required to pay a penalty of $1,163.00 to the Internal Revenue Service (the "IRS") for late-paid federal employment taxes for the tax period ending June 30, 2002.  The payment should have been made on April 29, 2002 but was instead paid late on April 30, 2002.  (Herman Decl., Ex. G [IRS Request for Payment, dated September 2, 2002]).  Royall was employed at NALC at the time of the late-made payment.  (Herman Decl., Ex. E [Royall Tr.], at 51:4-52:1).

58.  NALC was required to pay a penalty of $2,796.79 to the IRS for late-paid federal employment taxes for the tax period ending March 31, 2002.  The payment should have been made on March 29, 2002 but was instead paid late on April 4, 2002, at a time Royall was employed by NALC.  (Herman Decl., Ex. H [IRS Request for Payment, dated June 3, 2002]).

59.  Young had specifically asked to be informed of any tax penalty assessments.  (Herman Decl., Ex. A [Young Tr.], at 24:17-25:2 ["I told him that I had to be informed anytime that we had to pay penalties because this was wrong.  We had a finance department for years and we never paid a penalty, all of our bills were paid on time, and we never had these issues.  And my whole thing was let's get this thing back to the way it was.  We finally achieved that now."]).  Young believes that there were additional instances of late tax filings by plaintiff.  (*Id.* at 17:3-7 [stating that he has personal knowledge of NALC having to pay penalties because Royall did not file taxes timely]; 20:22-21:2 ["I know that a number of occasions after Royall was hired there were tax penalties that had to be paid."]; 21:15-19 [stating that tax penalties continued after Royall was hired]; 23:15-24:6; 33:13-18 ["After [Royall] left, there were plenty more tax problems that we had that directly fell while he was there.  You can't blame that on anyone else.  It was his responsibility, they didn't get paid, and we had to pay the

taxes and the penalties on them after we terminated his employment."]; 33:19-34:4 [testifying as to Young's specific knowledge that penalties were for payments that were due during Royall's employment, including penalties for an Arizona state tax filing]).

**Problems With COLA Adjustments, DBA Codes, Checks Left Lying Around**

60. Plaintiff failed to timely make required cost of living adjustments ("COLAs") to certain NALC employees' pay as required under collective bargaining agreements between NALC and two labor unions. (Herman Decl., Ex. B [Broendel Tr.], at 65:10-66:7).

61. Plaintiff was responsible for overseeing the entry of the DBA codes by the payroll clerk into the system. (Herman Decl., Ex. B [Broendel Tr.], at 17:17-18:4). There were errors in payroll DBA codes during plaintiff's employment with NALC, with the result that required deductions were not made from paychecks. (*Id.* at 16:5-11). DBA codes represent authorized paycheck deductions for items such as United Way contributions, savings bonds, political education, taxes, and other benefits. (*Id.* at 17:6-12).

62. Problems with certain payroll deductions, such as deductions for savings bonds and the United Way, continued throughout plaintiff's employment. (Herman Decl., Ex. B [Broendel Tr.], at 22:16-18). For example, Royall failed to remit any payroll deductions to United Way for some period of time. (*Id.* at 57:2-15).

63. NALC payroll checks were left lying around in open spaces during the time of plaintiff's employment. (Herman Decl., Ex, B [Broendel Tr.], at 92:2-93:3).

**Royall's Inability to Learn J.D. Edwards Software**

64. Although plaintiff had indicated during his hiring interview that he was familiar with J.D. Edwards software and would learn the program quickly (Herman Decl., Ex. B [Broendel Tr.], at 13:12-14; Ex. A [Young Tr.], at 28:2-6), he never grasped the program. (*Id.*,

Ex. A [Young Tr.], at 28:6-7). As a result, NALC had "chaos with the W-2s" because plaintiff had not made entries that would have made the W-2s automatic at year end. (*Id.* at 28:7-9).

**Broendel's Dissatisfaction with Plaintiff's Job Performance
and Her Communications with Plaintiff Regarding Same**

65. By May of 2002, Broendel believed that plaintiff was not performing his job in a satisfactory manner. (Herman Decl., Ex. B [Broendel Tr.], at 15:16-20).

66. In fact, the only area in which Broendel did not have any complaints with respect to plaintiff's job performance was in the area of attendance. (Herman Decl., Ex. B [Broendel Tr.], at 15:7-15).

67. NALC expects its professional employees, such as Royall, to correct performance problems, if necessary, and addresses problems by having discussions with employees and pointing out areas that require correction. (Herman Decl., Ex. B [Broendel Tr.], at 53:22-54:4). NALC does not have disciplinary procedures for its staff. (*Id.* at 53:11-12).

68. NALC does not have a formal evaluation system for its staff. (Herman Decl., Ex. A [Young Tr.], at 43:8-11).

69. Broendel had discussions with Royall during his tenure at NALC about various performance issues, including problems with deductions for United Way, savings bonds, Postal Service benefits, COLA adjustments, Annuity Trust Fund payments, complaints raised by NALC officers, and his "lack of learning the payroll system" within a reasonable amount of time, and that he was spending too much time with Neidlinger. (Herman Decl., Ex. B [Broendel Tr.], at 54:5-16; 58:9-12; 59:6-16; 65:10-67:4; 67:6-17; 90:9-17).

70. Because Stubblefield was plaintiff's immediate supervisor, Broendel also conveyed some payroll complaints to Stubblefield, and requested that Stubblefield address these matters with plaintiff. (Herman Decl., Ex. B [Broendel Tr.], at 14:12-20).

71. NALC did not take any disciplinary action against plaintiff prior to termination. (Herman Decl., Ex. B [Broendel Tr.], at 52:21-53:14). Young did not consider discipline other than discharge because, based on his discussions with Stubblefield and Young's own observations, he concluded that Royall was "absolutely incapable of fulfilling the position." (Herman Decl., Ex. A [Young Tr.], at 27:16-28:2).

**The Decision to Terminate Plaintiff's Employment**

72. Stubblefield eventually told Broendel that NALC needed to fire plaintiff. (Herman Decl., Ex. B [Broendel Tr.], at 82:20-22). Broendel agreed with Stubblefield that plaintiff should be fired, and agreed to discuss the matter with Young. (*Id.* at 85:5-11). Broendel told Young that Royall should be fired. (*Id.* at 83:1-4). Young also believed that Royall should be terminated. (*Id.*, Ex. A [Young Tr.], at 26:17-27:3).

73. Thus, the decision to terminate Royall was concurred in by the same three individuals who interviewed Royall -- Young, Broendel, and Stubblefield -- and the decision was ultimately made by Young, the person who decided to hire Royall. (Herman Decl., Ex. B [Broendel Tr.], at 81:10-86:7; Ex. A [Young Tr.], at 26:17-22).

74. On August 27, 2002, Broendel advised plaintiff that his employment was terminated. According to plaintiff, Broendel stated that Royall was being terminated because he was not doing his job, he was not qualified to do his job, and he was unhappy at NALC. (Herman Decl., Ex. E [Royall Tr.], at 63:3-10; Answer ¶ 8, at 2).

75. Broendel did not mention plaintiff's race when he was terminated or at any other time. (Herman Decl., Ex. E [Royall Tr.], at 64:19-65-2).

76. At no time did Broendel, Young or Stubblefield ever make any comments about plaintiff's race or make any derogatory comments about African-Americans. (Herman Decl., Ex. E [Royall Tr.], at 64:22-65:16).

77. Young testified that "the only reason Royall's employment was terminated is he was not able to do all of the functions of the position that he was hired to do, and we couldn't get the finance department in order without someone who was able to do the things that he was supposed to do." (Herman Decl., Ex. A [Young Tr.], at 50:15-20).

Dated: September 18, 2006
     New York, New York

                        Respectfully submitted,

                        /s/ Peter Herman
                        Peter Herman
                        Elizabeth O'Leary
                        Cohen, Weiss and Simon LLP
                        330 West 42nd Street
                        New York, NY 10036
                        (212) 563-4100

                        /s/ Victoria L. Bor
                        Victoria L. Bor (Bar No. 288852)
                        Sherman, Dunn, Cohen, Leifer & Yellig, P.C.
                        900 Seventh Street, N.W., Suite 1000
                        Washington, D.C. 20001
                        (202) 785-9300

                        Attorneys for Defendant National Association
                        of Letter Carriers, AFL-CIO