# Exhibit A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                              :
CHARLES ROYALL,               :
                              :
          Plaintiff,          :
                              :
v.                            :   Civil Action No.
                              :   1:05cv01711 (RBW)
NATIONAL ASSOCIATION OF       :
LETTER CARRIERS, AFL-CIO,     :
                              :
          Defendant.          :
                              :
- - - - - - - - - - - - - - - x

                         Thursday, June 29, 2006

                         Washington, D.C.

DEPOSITION OF:

                    WILLIAM YOUNG

     a Witness in the above-entitled cause,

called for examination by counsel for the Plaintiff,

pursuant to notice and to agreement of counsel as to

time and place, at the law offices of Sherman, Dunn,

Cohen, Leifer & Yellig, P.C., 900 Seventh Street,

Northwest, Suite 1000, Washington, D.C. 20001,

commencing at 9:24 a.m., before Marney Alena

Mederos, RPR, a Notary Public in and for the

CHARLES ROYALL                                                WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                    June 29, 2006

Page 4

1                    P R O C E E D I N G S

2    Whereupon,

3                    WILLIAM YOUNG

4        a Witness, called for examination by counsel

5    for the Plaintiff, having first been duly sworn, was

6    examined and testified as follows:

7           EXAMINATION BY COUNSEL FOR PLAINTIFF

8              BY MR. GAGLIARDO:

9        Q    Good morning.

10       A    Good morning.

11       Q    Would you give us your name and

12   business address, please?

13       A    My name is William H. Young, and my

14   business address is 100 Indiana Avenue, Northwest,

15   Washington, D.C.

16       Q    And you're the president of the

17   National Association of Letter Carriers, correct?

18       A    Yes, sir.

19       Q    How long have you been the president,

20   Mr. Young?

21       A    I was installed on December the 13th,

22   2002.

ARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 5

1          Q      And prior to that, did you hold office

2     or hold a position of employment with the Letter

3     Carriers?

4          A      Yeah.  I've been employed by the Letter

5     Carriers for twenty-eight years -- full time for

6     twenty-eight years.

7          Q      And what was your position immediately

8     prior to becoming the president?

9          A      Executive vice president.

10          Q      Now, at the time Mr. Royall was

11     employed here, you were the executive vice

12     president; is that correct?

13          A      That is correct.

14          Q      Now, in either your capacity as

15     executive vice president or president, did you have

16     any responsibility for personnel matters?

17          A      In Mr. Royall's case, the answer is

18     yes.

19          Q      All right.  And you're saying in

20     Mr. Royall's case.  Is that because of the specific

21     position that he held?

22          A      No.  Basically what happened is,

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS          June 29, 2006

Page 6

1    sometime in early 2002, my predecessor, Vince

2    Sombrotto, decided that he was not going to seek

3    reelection as the president of the union.  And so

4    from that point forward, we had discussions and he

5    knew that I was going to run as his successor.

6              And from that point forward, he started

7    giving responsibilities that heretofore would have

8    been handled by the president himself to me, and

9    this just happens to be the time frame that

10   Mr. Royall was hired and fired.

11        Q    All right.  So it wasn't particular to

12   Mr. Royall but to all employees of the headquarters

13   staff?

14        A    No.  I wouldn't even say that, man.  We

15   had significant problems in our finance department,

16   and basically what happened is we had a director of

17   finance and an account manager.  The director of

18   finance left to go to a new position with Ernst &

19   Young, and the person that was the account manager,

20   in essence, assumed all of the responsibilities.

21   They never really had the position but assumed all

22   the responsibilities of both jobs.

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 7

1      Q      All right.   Before you go too far, let

2   me just get some names.   The director of finance

3   that you referred to --

4      A      Vince DeSandro.

5      Q      Do you know how to spell Mr. DeSandro's

6   last name?

7      A      I think it's D-e-S-a-n-d-r-o.

8      Q      All right.

9      A      I believe that's right.

10      Q      And who was the account manager that

11   you referred to?

12      A      The account manager was Greg Santiago.

13      Q      I think I can do that one at least

14   phonetically.   I should have been able to do

15   DeSandro.

16      A      Oh, no.   You never know.

17      Q      All right.   So Mr. DeSandro leaves and

18   Mr. Santiago takes over.   When approximately was

19   this?

20             MR. HERMAN:   I object to the form of

21   the question because it misstates his testimony, but

22   you can answer.

Page 8

1              BY MR. GAGLIARDO:

2         Q    Well, you can correct me.  I certainly

3    didn't mean to misstate it.

4         A    I'm really not sure of the dates.  This

5    has been so long ago, and I haven't really focused

6    on it.  I just know it was sometime during 2002 and

7    clearly prior to the hiring of Mr. Royall and

8    actually Mr. Stubblefield.

9         Q    All right.  I cut you off, so

10   continue.

11        A    Okay.  So basically what happened is

12   the president -- the previous -- my predecessor

13   decided it wasn't necessary to hire an account

14   manager, that we could run the union with just a

15   director of finance.

16             I participated in a decision to hire a

17   gentleman named Ron Stubblefield, and Ron

18   Stubblefield was hired as the director of finance,

19   and actually I'm the one that authorized the hiring.

20        Q    And at that point, you were the

21   executive vice president?

22        A    That is correct.

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 9

1          Q       Okay.

2          A       Now, Stubblefield had been in the

3     position for some time, a number of months, and

4     things were just getting worse.  They weren't

5     getting better, and I kept going to my predecessor

6     suggesting that we had to get an account manager,

7     that there was just too much work there for one

8     person.

9               But to be candid with you, for a

10    significant period of time I couldn't move the guy.

11    I couldn't get him to agree.  And then there finally

12    came a point where I won him over and he said,

13    "Okay.  Go ahead and hire an account manager."  So

14    we went through that process.

15               I'm not positive of this, but if my

16    memory serves me correctly, our auditor,

17    Bond-Beebee, the people that we contract with to do

18    our audit work, I think he collected the resumes of

19    people, culled them down, and he sent us what he

20    thought were the four or five best of whatever he

21    had there.

22               And then with Mr. Royall, I have a

CHARLES ROYALL                                                WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                   June 29, 2006

Page 10

1    very clear memory of how that occurred.

2    Mr. Stubblefield, Jane Broendel, the

3    secretary-treasurer, and myself interviewed

4    Mr. Royall and two other candidates.  And then after

5    we had the initial interview with them, we had an

6    internal discussion.

7              I'll be candid about it.  Basically, I

8    made the decision, but I let Stubblefield decide

9    because I knew that he had to have somebody that he

10   was compatible with in order for us to get back,

11   because not only was there a lot of work to do, but

12   there was a backlog there.  There were things that

13   should have been done that weren't done, and so --

14        Q    That included taxes and tax returns?

15        A    Not that I'm aware of, not at that

16   point, but it certainly included stuff like savings

17   bonds.  People, you know, were having deductions

18   taken out of their savings bonds and they weren't

19   getting the bonds.  I recall that problem.  The

20   officers were having all kinds of issues with their

21   benefits.

22              I don't know how much detail you want,

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS          June 29, 2006

Page 11

1    man, but --

2         Q    I'm listening.  If it's too much, I'll

3    tell you.  If it's too little, I'll tell you.

4         A    Okay.  Okay.  Okay.  That's fair.

5              As an officer of the NALC, all of the

6    officers are letter carriers.  We are on leave

7    without pay from the Postal Service.  We fund the

8    employees' contribution to our retirement and to our

9    health benefits and life insurance.

10        Q    Which are all through the Postal

11   Service?

12        A    That is correct.

13             We fund our share -- just like if I was

14   working for the Postal Service, that's the same

15   price that I would pay each week or each pay period

16   to the post office.  The way that works is they bill

17   us once a quarter, and that bill is significant.

18   It's several thousand dollars per employee, and

19   we're supposed to remit -- the union pays what the

20   Postal Service's share would have been.

21             If I'm working out in San Luis Obispo

22   as a letter carrier like I used to, then I would pay

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 12

1    this amount and the Postal Service would pay their

2    amount.  Because I'm not working for the Postal

3    Service, the NALC, the union, picks up the Postal

4    Service's share of that annuity.

5              So the essence of it is I still get the

6    retirement that I would have had had I stayed

7    working for the Postal Service.

8         Q    All right.

9         A    So there were significant problems with

10   officers receiving letters from the data center --

11   the payroll data center in Minnesota saying that if

12   your benefits aren't paid, we're going to take your

13   benefits away, and there was a lot of chaos and a

14   lot of people upset.

15        Q    How many officers are there when you

16   refer to the officers?

17        A    There are twenty-eight full-time

18   national officers.  There are fifteen national

19   business agents, three national trustees --

20        Q    All right.  You're a little too fast

21   for me.

22        A    Okay.  I'm sorry.

CHARLES ROYALL

vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG

June 29, 2006

Page 17

1    performance of his duties?  Did you have any direct

2    interaction with him?

3         A     No.  The only personal knowledge I have

4    is when I would get these notices that we were

5    having to pay penalties because he didn't file taxes

6    timely that he should have filed.  I have personal

7    knowledge of that.

8               I also have personal knowledge of at

9    least five to ten meetings with Stubblefield where I

10   would ask Stubblefield why things weren't done and

11   he would say that Royall wasn't doing his job, that

12   he had to do what Royall was supposed to do and what

13   he was supposed to do and that he was right back

14   where he was before.

15        Q     All right.  Let's slow down.

16        A     Okay.

17        Q     Did Ms. Broendel ever report to you on

18   Mr. Royall's performance, whether it was positive or

19   negative?

20        A     Oh, yeah.  There came a time when Jane

21   was reporting to me that the problems were

22   continuing and that we didn't seem to be making any

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 20

1    hadn't been paid.

2              When did that occur?

3        A    Again, it was occurring -- the first I

4    became aware of it is after he was there.  Greg

5    Santiago when he was there was excellent at that.

6    That's what he had been doing, and we never had a

7    problem with the tax -- late tax when Greg Santiago

8    was there.

9              I am not absolutely positive, so I will

10   not testify whether there were problems after Greg

11   left while Stubblefield was there before Charles was

12   hired.  That's possible, but I'm not sure.

13       Q    Bear with me just a second.

14       A    Sure.

15       Q    If I told you that Mr. Royall was

16   employed from approximately February 24 of '02 to

17   August 29 of '02, does that refresh your

18   recollection as to when this issue of tax penalties

19   occurred?

20       A    Yes.  Again, let me make this clear,

21   because maybe I didn't do it the first time, and I

22   apologize if I didn't.  I know that a number of

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 21

1    occasions after Royall was hired there were tax

2    penalties that had to be paid.

3              What I'm not sure of is if there were

4    occasions prior to when he was hired after Greg

5    Santiago left while Stubblefield was there but

6    before he got there, because there was a period when

7    Stubblefield was there by himself and I didn't -- I

8    don't know whether there were penalties or not.  I

9    wouldn't be surprised if there was, to be honest

10   with you, because, again, he was trying to do two

11   jobs, but I am not sure.

12        Q    Is it possible that the penalties

13   accrued for unpaid taxes or unfiled forms during the

14   time when Mr. Royall was not employed by the union?

15        A    It's possible that they were there

16   before he got there, yes, but they continued after

17   he was there, and I know that was made clear to him

18   that that was his responsibility by Stubblefield to

19   take care of those taxes on a number of occasions.

20        Q    Do you personally have any documents

21   that would support that contention?

22        A    No.

CHARLES ROYALL                                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                        June 29, 2006

Page 23

1          Q      Do you have notes or any --

2          A      No.

3          Q      Okay.  Do you have any --

4          A      Listen, let me -- the answer is no.

5      Let me explain it to you.  The only reason I got

6      involved in this at all is because there's penalties

7      here, and the union has got to pay the penalties.

8                 So it got up to my attention that we

9      were paying these penalties because we weren't

10     keeping these taxes current, and I said, "We've got

11     to stop that.  That's why we hired this guy."

12                And I went to Stubblefield and said,

13     "What's going on here?"

14                He said, "He's struggling with it."

15                And after he left -- let me tell you

16     this:  After he left and we hired Carol Estabrook,

17     we had more penalties from taxes that were during

18     the period that Charles was there that weren't paid

19     that came in afterwards that we had to pay, and we

20     negotiated some of them down.  We were able to do

21     that, to negotiate some relief on the penalty part

22     of it from the IRS for these -- for the failure to

CHARLES ROYALL                                             WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                  June 29, 2006

Page 24

1    keep current with these taxes.

2          Q      These are payroll taxes?

3          A      That is correct.

4          Q      Nothing else?  Just payroll taxes?

5          A      I'm not saying that, but the ones that

6    I saw were payroll taxes.

7          Q      All right.  Were there any other

8    matters concerning Mr. Royall that Mr. Stubblefield

9    brought to your attention during these five or ten

10   meetings other than the tax situation?

11         A      No.  Not to me, no.

12         Q      Okay.  Was Mr. Broendel present at any

13   of those meetings?

14         A      No.

15         Q      These were one on one between you

16   and --

17         A      Most of them were on the phone.  I told

18   him that I had to be informed anytime that we had to

19   pay penalties because this was wrong.  We had a

20   finance department for years and we never paid a

21   penalty, all of our bills were paid on time, and we

22   never had these issues.  And my whole thing was

CHARLES ROYALL                                            WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 June 29, 2006

Page 25

1    let's get this thing back to the way it was.  We

2    finally achieved that now.

3          Q     All right.  Let me go on to this thing

4    with Ms. Broendel about Suk.

5                Do you remember about when that was?

6          A     Again, sometime during the period --

7    this is getting closer -- the Suk incident was

8    closer to the tail end of Charles's career with us

9    than it was the beginning, for sure.  I would have

10   to -- and I'm only guessing now.  But trying to

11   quantify it, I would say sometime June after.

12         Q     All right.

13         A     All right.

14         Q     All right.  Were any of these matters

15   brought to Mr. Royall's attention by you?

16         A     No.  Absolutely not.

17         Q     To your knowledge, were any of these

18   matters brought to his attention by Ms. Broendel?

19         A     I was led to believe that they were,

20   but I'm not sure.

21         Q     All right.  When you say led to

22   believe, how so?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 26

1      A      Because I was ranting and raving to her

2   that we had to get these things fixed.

3      Q      Well, did she make any report to you

4   that she had discussed these matters directly with

5   Mr. Royall?

6      A      Informally, I think that her -- she has

7   reported on occasion that her and Royall had

8   discussions about various things, but I don't recall

9   the nature of it or the time of it or the specific

10  nature of what it was.

11     Q      All right.  Do you know if

12  Mr. Stubblefield ever brought these matters to

13  Mr. Royall's attention?

14     A      Again, firsthand, no, I don't know.

15  I'm led to believe that he did, but I don't know

16  that.

17     Q      All right.  So there came a time when

18  it was decided that Mr. Royall's employment should

19  be terminated, correct?

20     A      Yes.

21     Q      All right.  Who made the decision?

22     A      I did.

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

                                                        Page 27

1          Q       All right.   You were advised by

2     Ms. Broendel?

3          A       And Stubblefield.   What Stubblefield --

4          Q       All right.   You have to say yes or no

5     for the record.   I saw you nod, but --

6          A       I'm sorry.   Ask it again.

7          Q       Did Ms. Broendel advise you about

8     Mr. Royall's termination of employment?

9          A       Ms. Broendel brought a request to me

10    that something had to be done and asked me to decide

11    what that was.

12         Q       All right.   Did she ever recommend to

13    you that Mr. Royall be terminated?

14         A       I don't believe so.   I think what she

15    said is disciplined.

16         Q       Was any discipline other than discharge

17    considered?

18         A       No, because I came to the conclusion

19    after talking with Stubblefield that this man was

20    not capable of fulfilling the position.   He was

21    absolutely incapable of fulfilling the position.

22         Q       And that was based on what

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 28

1    Mr. Stubblefield told you?

2         A    That and some things I saw.  When we

3    hired Mr. Royall, we told him that we had J.D.

4    Edwards.  He indicated to us that he was familiar

5    with that, that he was a quick study, and he would

6    be right up and running with it, but he never did

7    grasp J.D. Edwards.  We had chaos with the W-2's

8    because he didn't make entries in there that would

9    make the W-2's automatic at the end of the year.

10        He just -- look, I'm not shooting at

11   him, because I will tell you that's been the most

12   significant problem we've had as a union, is finding

13   people with the right skills that also understand

14   the J.D. Edwards software.  That was a big lift.  It

15   runs General Motors.  This is the software that

16   General Motors uses.  It's probably way more

17   sophisticated, to be candid with you, than what we

18   need, but we're there now and we're not going to

19   switch over just, you know, for no reason.

20        Q    Did you ever offer Mr. Royall training

21   on the software?

22        A    I didn't personally, no.

SLR REPORTING
(301) 340-0042

CHARLES ROYALL                                              WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 June 29, 2006

Page 29

1        Q      Do you know if anybody did?

2        A      No, I don't.

3        Q      All right.

4        A      Again, I didn't run that unit.

5        Q      So Mr. Stubblefield, if I understood

6   your prior testimony correctly, on five or ten

7   occasions complained about Mr. Royall's work.

8               And based on that you decided to

9   terminate him or based on something else?

10       A      No, no, no.  Based on that, plus Jane

11  telling me the problems she was having, plus my

12  knowledge of all of this, plus people were starting

13  to complain.

14       Q      All right.  Who was complaining?

15       A      Okay.  Let me give you an example.  We

16  have a vendor, and his name is Mark Eagen, and Mark

17  Eagen does a lot of different stuff for the union.

18  And around the time that Charles was employed, we

19  had a national convention, and Eagen does -- he

20  makes stuff for like the store and stuff.  We have

21  shirts and -- anyway, we run up bills with the guy.

22              Eagen called and said that the NALC was

CHARLES ROYALL                                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                       June 29, 2006

Page 30

1    losing its reputation as being an organization that

2    paid its bills on time, that he was hearing from

3    other purveyors that we weren't paying our bills and

4    what was going on.

5              I told him that we were having trouble

6    in the finance department, that Vince wouldn't let

7    us hire an account manager, that I was trying to get

8    on top of it, that I was aware that there were some

9    issues, but that I thought we were working towards

10   resolving those issues, and so that fell into it

11   too.

12        Q    Did Mr. Eagen say he wasn't being paid

13   or that others weren't being paid?

14        A    He said he and others.  He said he, and

15   he had heard from others.

16        Q    Did he ever tell you who the others

17   were?

18        A    No.  I never asked, because I knew it

19   was true, man.  I knew that the bills were not being

20   paid as timely as they used to be.  I could tell

21   from my expenses.  It's not a big deal, but I put

22   expenses in and it might be two or three weeks

CHARLES ROYALL                                           WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 31

1    before I would get them back.  It used to be the

2    same week.

3         Q    Well, how long did Mr. Eagen say it

4    took to get himself paid?

5         A    He didn't say.  He just said that they

6    were late and that people were starting to talk.

7         Q    Okay.

8         A    This guy is a friend of mine.

9         Q    How long have you known Mr. Eagen?

10        A    Sixteen years.

11        Q    How are you friends?

12        A    Well, I mean, we played golf a couple

13   of times together.  I wouldn't call -- I shouldn't

14   say friends.  I'm just -- I'm familiar with him, and

15   he would say things to me that maybe an ordinary

16   business relationship person wouldn't.

17        Q    What did you do after Mr. Eagen told

18   you that?

19        A    I went down and told Jane.  She said

20   that she was aware of it, that they were working on

21   it, that Ron was working with Charles on, I think, a

22   spreadsheet issue, but I could be wrong about that

CHARLES ROYALL                                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                        June 29, 2006

Page 32

1    too.

2            Q      Well, how do you apportion the

3    responsibility here?  I mean, it seems to me that

4    there are at least three principal players as well

5    as the supporting cast, the principal players being

6    Broendel, Stubblefield, and Royall.

7            A      Well, Broendel doesn't do any of the

8    technical work, okay.

9            Royall's position as the account

10   manager -- and this was made pretty clear to him --

11   is he handles the payroll, all the deductions, all

12   of the stuff that comes from the payroll, which

13   means the benefits, the taxes, the savings bonds,

14   some people have child-support payments that come

15   out.  Whatever deductions are made from that

16   payroll, it was his responsibility to keep that up

17   and right.  To keep the officers' benefits in order,

18   to supervise Suk and her activities, those were his

19   primary responsibilities.

20           To pay the bills as they come in, to

21   enter them all in the J.D. Edwards software so that

22   we could get the W-2's and everything else done and

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 33

1    the 1099's at the end of the year, that was his

2    primary responsibility and that's the stuff we were

3    having all the problems with.

4              Q      Some of that was backlogged before he

5    got there, right?

6              A      I think that's accurate.  Again, I

7    can't say that for sure, sir, but I want to be fair

8    here because I wouldn't be surprised if it was,

9    because we had no one in his position for a period

10   of time.  So that would not shock me if when he came

11   in there there was a backlog.

12             But what I'm telling you is, even if

13   that's so, after he left, there were plenty more tax

14   problems that we had that directly fell while he was

15   there.  You can't blame that on anyone else.  It was

16   his responsibility, they didn't get paid, and we had

17   to pay the taxes and the penalties on them after we

18   terminated his employment.

19             Q      How do you know specifically that those

20   were taxes or penalties that accrued during his

21   time?

22             A      Because Carol Estabrook showed it to me

CHARLES ROYALL                                      WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 34

1    on a couple three of those sheets.  One of them was

2    from Arizona, as I recall, and she showed me where

3    it hadn't been paid back through the time that he

4    was there.

5         Q     So how do you apportion the

6    responsibility?

7         A     I just tried to tell you.

8         Q     Nothing on Broendel?

9         A     Broendel is --

10        Q     Zero?

11        A     No.  Broendel is overall responsible

12   for the entire department, but what I'm saying is,

13   she doesn't do the work.

14        Q     I understand.

15        A     This guy and Stubblefield, they do the

16   actual work.  They're the accountants.  Broendel is

17   not an accountant.  She's a letter carrier.

18        Q     All right.  So give her a grade

19   between, you know, A, B, C, D, F.

20             MR. HERMAN:  Object.

21             BY MR. GAGLIARDO:

22        Q     How did she do?

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 43

1          THE WITNESS:  Again, I'm not the right

2    person to ask about that.  I mean, I assume he did,

3    because the payroll got out.

4          BY MR. GAGLIARDO:

5      Q     Did anybody ever report to you that he

6    was doing well in any aspect of his job?

7      A     No, no.  Never.

8      Q     Is there a formal evaluation system --

9      A     No.

10     Q     -- for NALC staff?

11     A     No.

12     Q     What written policies or contracts or

13   collective bargaining agreements, if you want to

14   make a difference, would apply to or did apply to

15   Mr. Royall?

16     A     Well, clearly the EEO document.

17     Q     Do you have an internal EEO document?

18     A     Yes.

19     Q     Okay.

20     A     Yes.  It's posted everywhere.  All the

21   employees get it.

22     Q     Is it the standard --

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 45

1  document which are circulated, but it's the same

2  document.

3          MR. GAGLIARDO:  All right.  Thank you.

4          BY MR. GAGLIARDO:

5      Q    Mr. Young, just to pick up on this

6  theme and make sure we cover everything, putting

7  aside the EEO posting, is there a handbook or a set

8  of personnel policies that the NALC has?

9      A    No.

10     Q    Was Mr. Royall during the term of his

11  employment covered by the OPEIU Local 2 contract?

12     A    No.

13     Q    Okay.  Is it correct that there are no

14  written personnel policies or regulations or

15  contracts or collective bargaining agreements which

16  applied to Mr. Royall during the term of his

17  employment?

18     A    That's absolutely correct, other than

19  the hiring letter that he gets does define some

20  entitlements that he has, and I don't know whether

21  that would be considered a contract or not.

22     Q    All right.

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 46

1        A       I guarantee you that we would abide by

2   that.

3        Q       All right.  I appreciate your bringing

4   that to my attention.

5                Did you ever -- I think I asked this

6   somewhat before, so forgive me, but did you ever

7   counsel Mr. Royall on his job performance?

8        A       No, no.

9        Q       Do you know if anybody else did?

10       A       No.

11       Q       You don't know, or, no, you know they

12   didn't?

13       A       Again, if you're talking firsthand,

14   no.  Stubblefield told me that he had many

15   discussions with him attempting to improve his

16   performance and that the guy wasn't getting it.

17       Q       All right.

18       A       Now, if you consider that -- that's all

19   I know.  I know there were innumerous times.  We've

20   been saying five to ten.  I think it's closer to

21   five than it is to ten, just so you have that as a

22   frame of reference.

b63bc7d7-378b-4392-9f4e-b311b9d0dfc0

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 50

1          MR. HERMAN:  Object to the form of the

2    question.

3          THE WITNESS:  If I didn't read it, how

4    could I respond to it?  Come on, man.

5          MR. GAGLIARDO:  Off the record.

6          (Discussion off the record.)

7    BY MR. GAGLIARDO:

8    Q    Were there any other documents that you

9    reviewed?

10   A    Oh, gosh, I just don't remember.  I

11   don't think so.

12   Q    Was there any reason for terminating

13   Mr. Royall's employment that we haven't discussed

14   today?

15   A    No.  The reason Royall's -- the only

16   reason Royall's employment was terminated is he was

17   not able to do all of the functions of the position

18   that he was hired to do, and we couldn't get the

19   finance department in order without someone who was

20   able to do the things that he was supposed to do.

21          MR. GAGLIARDO:  All right.  Let me talk

22   to my client for a moment.

CHARLES ROYALL                                           WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 51

1              (Recess.)

2              BY MR. GAGLIARDO:

3        Q     Are there any written performance

4   standards that were applicable to Mr. Royall during

5   the term of his employment?

6        A     No, not that I'm aware of.

7        Q     All right.  So the performance

8   standards were as defined by -- other than yourself,

9   who determined whether or not he was performing?

10        A     Stubblefield and Broendel were the ones

11   directly responsible for his performance.

12        Q     But there was nothing in writing?

13        A     I don't know what you're saying.

14        Q     Well, some places have performance

15   standards.

16        A     No, no.  So many files a minute or

17   something?  No, we didn't do that.

18        Q     Or even, you know, performs average,

19   meets standards, exceeds standards, or any of that

20   kind of stuff?

21        A     No.  As far as I know, Charles didn't

22   even have a job description, but he understood what

CHARLES ROYALL                                              WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                    June 29, 2006

Page 52

1    the work was because it was explained to him during

2    the interview.  And during the hiring process when

3    he came up and talked with me, he indicated that he

4    understood what his position was.

5         Q    You anticipated me.  I was going to ask

6    if there was a job description.

7         A    No, there wasn't.

8              MR. HERMAN:  Do you mean a written job

9    description?

10             MR. GAGLIARDO:  A written job

11   description, yes.  I'm sorry.

12             THE WITNESS:  No, no.

13             BY MR. GAGLIARDO:

14        Q    You said it was explained to him during

15   the hiring process or the hiring interview?

16        A    Especially during the interview,

17   Stubblefield went over very carefully during that

18   interview with him what his duties -- what his main

19   duties and responsibilities would be.

20             I remember Broendel telling him that he

21   would have human resource responsibilities during

22   that meeting.  That's the only contribution -- she

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS            June 29, 2006

Page 53

1    may have made more, but that's the one that I

2    remember for whatever reason.

3            Q    And what did -- I'm sorry, go ahead.

4            A    That's it.

5            Q    What did Mr. Stubblefield say his

6    principal duties were?

7            A    Well, you know, again, you're talking

8    to a guy that's not an account man.

9            Q    I know.  I'm just asking for your

10   recollection and your understanding.

11           A    Basically, the payroll, making sure

12   that all of the deductions of the payroll were taken

13   care of, that it was processed timely, that the

14   bills were paid timely, that the benefits that

15   people were receiving -- and basically to stop the

16   complaints -- like I said, I'll give you just one.

17   The guy that's now my chief of staff, at the time he

18   was just the economist in the building, he has a

19   savings bond.  Well, he came to me during the time

20   Royall was employed and said, "Look, they're taking

21   this money out of my bond, but I haven't got a bond

22   for several months."

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 54

1              So I asked Jane to look into it.  She

2      got back to me after some time telling me that he

3      hadn't been forwarding the stuff the way he was

4      supposed to, that Stubblefield had given him some

5      direction, and that it would be taken care of.

6      Those kinds of things were happening, I hate to tell

7      you this, almost every single day.

8              Q       All right.  One step at a time.

9              A       Okay.

10             Q       What's the name of the person who is

11     now the chief of staff?

12             A       S-a-u-b-e-r is his last name.  His

13     first name is James.

14             Q       Sauber?

15             A       That is correct.

16             Q       All right.  And tell me -- this is

17     tedious and I know you're not going to like it, but

18     tell me as many of the complaints as you remember.

19             A       I remember him talking about the

20     savings bonds not being out.

21              We had an officer who was the director

22     of safety and health, and he was freaked out because

SLR REPORTING
(301) 340-0042

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

WILLIAM YOUNG
June 29, 2006

Page 55

1    his thrift savings contribution wasn't being

2    forwarded.

3         Q    And his name?

4         A    Al Ferranto, F-e-r-r-a-n-t-o.

5         Q    I'm sorry, the thrift plan?

6         A    Yeah.  He had a -- he made

7    contributions -- voluntary contributions to the

8    thrift savings plan through his Post Office

9    retirement, and Charles wasn't forwarding those

10   contributions, and they didn't get in, and he didn't

11   get them in his account.

12        Q    All right.  Any other complaints?

13        A    Matty Rose, a national business agent

14   down in Florida, was all upset over the way that

15   Charles prepared the W-2 -- excuse me, not the W-2.

16   What am I talking about?

17        Q    The LM-2?

18        A    No, it wasn't the LM-2.  Charles didn't

19   do the LM-2.  I'm trying to remember.

20             Matty Rose called me and he was all

21   upset about that.  It was something to do with the

22   taxes, the way the taxes were being -- I'm not sure.

CHARLES ROYALL                                              WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                   June 29, 2006

Page 56

1          Q     All right.   Something with taxes?

2          A     I'm not sure.

3          Q     All right.

4          A     I'm not sure.

5          Q     Other complaints?

6          A     At least three of the national resident

7     officers indicated that they had received these

8     notices about their benefits not being paid.

9     Ferranto was one, I believe Tom Young, the director

10    of health benefits -- no, no, not Tom Young.  I'm

11    sorry, that wasn't right.  I don't know.

12               Two or three of the officers came to me

13    and were complaining because they had -- I had

14    actually received a letter from the Postal Service

15    telling me that my benefits were not paid timely and

16    that if they weren't paid timely I would jeopardize

17    losing those benefits.  And I just took it and gave

18    to it Broendel, she gave it to somebody, and the

19    next thing I knew I got a thing saying they had been

20    paid, so I stopped worrying about it.

21          Q     How much time elapsed between when you

22    discovered -- from the time you got the letter and

CHARLES ROYALL                                      WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 57

1   the time it got cleared up?

2        A     Oh, maybe -- I'm not sure.  Maybe a

3   month.

4        Q     Okay.

5        A     See, what happens is, they send you a

6   letter telling you that you owe, and then they send

7   you a letter showing it's paid.

8        Q     Right.

9        A     I got the letter saying if it's not

10  paid you're gone, and then I got a letter showing it

11  was paid.

12       Q     Okay.

13       A     How that happened and when that

14  happened, I don't know.  I can probably produce

15  those, though, because I have a file at home where I

16  keep all of that stuff.

17       Q     All right.  I'm going to make a

18  supplemental request that will spell that out.

19             Any other complaints?

20       A     Yeah, there were lots, but I'm trying

21  to sit here and think.  Just different stuff.

22  People would have things -- I think there were some

CHARLES ROYALL                                    WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 58

1    problems with the AFL-CIO savings account.  Some of

2    the employees have money that they put in the

3    AFL-CIO credit union, and I believe there were

4    issues with that.

5         Q     Do you remember any specific people who

6    complained?

7         A     No, I'm sorry, I don't.

8         Q     Okay.

9         A     I'm sorry, I don't.

10             Let me think what else.  I told you

11   about the vendors and them not being paid timely.

12        Q     Let me ask you one question.  Other

13   than the man that you knew whose name escapes me,

14   Mark Eagen, did any other vendors complain

15   directly?

16        A     Not to me.

17        Q     To anybody that you know of?

18        A     I don't know, man, because they

19   wouldn't come to me normally.

20        Q     I don't know is an okay answer as long

21   as it's honest.

22        A     Yeah, it is honest.  I really don't

CHARLES ROYALL                                          WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 June 29, 2006

Page 59

1    know.

2          Q     I wasn't implying that it wasn't.  I'm

3    just saying that I want to be clear.  I'm asking you

4    what you remember.  I mean, I understand there are a

5    lot of things that happen that I certainly don't

6    remember in my own life, so it's not like I'm trying

7    to trap you or trick you.

8          A     You know, I've got to tell you what I

9    know.

10         Q     Right.

11         A     I'm just saying that there were --

12   there were definitely other complaints.

13              Look, here is how I felt about this,

14   man:  It seemed like every day I came to work, there

15   was another issue with somebody complaining about

16   lack of performance out of that finance department,

17   and I felt like I was -- I was having Broendel up to

18   my office, it seemed like, almost every day.  It

19   probably wasn't, but that's what it seemed like.

20              It would be one thing right after

21   another after another, and I just kept saying the

22   same thing, and she was very sympathetic to this

CHARLES ROYALL                                         WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 June 29, 2006

Page 62

1    CASE:  Royall v. NALC
     DATE:  June 29, 2006
2

3                ACKNOWLEDGMENT OF DEPONENT

4           I, William Young, do hereby acknowledge

5    that I have read and examined pages 4 through 60,

6    inclusive, of the transcript of my deposition and

7    that:

8    (Check appropriate box)

9

10          [ ✗ ]    The same is a true, correct, and
     complete transcript of the answers given by me to
11   the questions therein recorded.

12          [   ]    Except for the changes noted in the
     attached Errata sheet, the same is a true, correct,
13   and complete transcription of the answers given by
     me to the questions therein recorded.

14

15

         Date                           Signature
16
         7/18/06                         William H. Young
17

18           Sworn to and subscribed to before me on

19   this 18th day of July                    , 2006

20

21      LINDA M. GIORDANO                  Linda M Giordano
     NOTARY PUBLIC DISTRICT OF COLUMBIA
     My Commission Expires May 31, 2011    NOTARY PUBLIC
22

b63bc7d7-378b-4392-9f4e-b311b9d0dfc0

CHARLES ROYALL                                              WILLIAM YOUNG
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                    June 29, 2006

Page 64

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, Marney Alena Mederos, the officer

3      before whom the foregoing deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly sworn

6      by me to testify to the truth, the whole truth, and

7      nothing but the truth concerning the matters in this

8      case.

9              I further certify that the testimony of

10     said witness was taken by me in stenotype and

11     thereafter reduced to typewriting under my

12     direction; that said deposition is a true record of

13     the testimony given by said witness.

14             I further certify that I am neither

15     attorney nor counsel, nor related to or employed by

16     any of the parties to the action in which this

17     deposition is taken; and furthermore, that I am not

18     a relative or employee of any attorney or counsel

19     employed by the parties hereto, nor financially or

20     otherwise interested in the outcome of this action.

21                          Marney Alena Mederos
                            Notary Public for D.C.
22