CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

JANE BROENDEL
June 29, 2006

Page 67

1    adjustment took a little longer.

2        Q    Okay.  Now, you said the -- is there

3    anything else on the COLA adjustments that you spoke

4    specifically with Mr. Royall about?

5        A    Not that I recall.

6        Q    All right.  The final thing that you

7    told me about was lack of learning the payroll

8    system.

9            What was the specific discussion or

10   discussions you had with Mr. Royall about that?

11       A    That it was taking too long for him to

12   learn that, that he was with Suk quite a bit over at

13   her desk sitting there learning from Suk how to do

14   it.

15       Q    This is the J.D. Edwards program,

16   correct --

17       A    Yes.

18       Q    -- that other people had problems with?

19           MR. HERMAN:  Object to the form of the

20   question.

21           BY MR. GAGLIARDO:

22       Q    Did other people have problems with the

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 73

1    some degree, but let me ask you about

2    Ms. Neidlinger.

3            Did you talk to her about Mr. Royall's

4    job performance and conduct --

5        A    No.

6        Q    -- at any time, either during

7    Mr. Royall's employment or after?

8        A    During, yes.

9        Q    During his employment, you talked to

10   her?

11       A    Yes.  I did not approach her.  She

12   approached me.

13       Q    All right.  One time or more than one

14   time?

15       A    At least one time.

16       Q    All right.  And what did she tell you?

17       A    That they were not getting along, that

18   she didn't know why she needed to go over this stuff

19   over and over again, because it slowed her down too

20   getting what she needed done.

21       Q    All right.  When you say this stuff,

22   what are you talking about?  What are you referring

CHARLES ROYALL                                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                       June 29, 2006

Page 74

1    to?

2         A    The payroll system.

3         Q    All right.  So we're back on the

4    payroll system issue that we just talked about?

5         A    Yeah.

6         Q    Did she come --

7         A    Suk does payroll.

8         Q    Did she come to you with any other

9    issues about Mr. Royall other than not getting along

10   and the payroll system?

11        A    Are you talking about concrete issues?

12        Q    Any kind of issues.

13        A    She just -- yeah, she expressed some

14   displeasure with working with Charles.

15        Q    All right.  And specifically what did

16   she say?

17        A    Specifically what did she say?

18        Q    Yes.

19        A    I don't -- I can't -- I can only

20   paraphrase.

21        Q    Yes.  I don't mean word for word.

22        A    That he wasn't very smart and that he

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

JANE BROENDEL
June 29, 2006

Page 75

1    couldn't catch on to this.

2        Q    Meaning the payroll system?

3        A    Yes.

4        Q    Okay.  When she said she didn't get

5    along with him, did she specify anything?

6        A    No.

7        Q    All right.  So there's this vague

8    complaint about not getting along with him and --

9            MR. HERMAN:  Objection.

10           BY MR. GAGLIARDO:

11       Q    There's a complaint about not getting

12   along with him and a complaint about his inability

13   to learn the payroll system.

14           Is there anything else that Suk spoke

15   to you about regarding Charles Royall?

16       A    There could have been over that time

17   period, but I don't recall it.

18       Q    The next person you have listed is

19   Chris Tarbrake?

20       A    Yes.

21       Q    Is that a man or a woman, Chris?

22       A    A man.

SLR REPORTING
(301) 340-0042

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

JANE BROENDEL
June 29, 2006

Page 76

1    Q    Was he working there when Mr. Royall

2 was working there?

3    A    Yes.

4    Q    Okay.  Did he speak to you at that time

5 about Mr. Royall about anything?

6    A    Yes.

7    Q    Okay.  How about after Mr. Royall was

8 employed there?  Did he speak to you about

9 Mr. Royall after Mr. Royall was terminated?

10    A    No.  Chris was gone by then.

11    Q    Okay.  What did he tell you while he

12 was employed there?  Forget the -- what did

13 Mr. Tarbrake tell you about Mr. Royall's job

14 performance and conduct?

15    A    That he wasn't getting any sort of

16 guidance, that Charles couldn't answer the questions

17 when Chris posed them to him -- Chris was accounts

18 payable -- and he felt that the department was

19 falling apart because of Charles.

20    Q    Did he use that terminology, the

21 department is falling apart?

22    A    Words to that effect, yes.

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 77

1          Q       And he said because of Charles?

2          A       Yes.

3          Q       And Mr. Tarbrake left the employment of

4    the NALC why?

5                  MR. HERMAN:   Objection.   Calls for

6    speculation.

7                  MR. GAGLIARDO:   Well, it may not.

8                  MR. HERMAN:   If you know, you can

9    answer.

10                 BY MR. GAGLIARDO:

11         Q       Did he get fired or did he quit?

12         A       He found a different job.

13         Q       Because he was asked to leave?

14         A       Oh, no.   Huh-uh.   We didn't ask him to

15   leave.

16         Q       Now, Mr. Tarbrake comes to you and

17   tells you that Mr. Royall -- that the department is

18   falling apart because of Mr. Royall, yet that's not

19   one of the specific things you came and talked to

20   Mr. Royall about, correct?

21         A       No.

22         Q       It's not correct?

CHARLES ROYALL                                                      JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 79

1          Q     Okay.  Number 2 says that he didn't

2     properly follow direction from his immediate

3     supervisor, Mr. Stubblefield.

4                It may be my memory, but I don't recall

5     any allegation that he didn't do what

6     Mr. Stubblefield told him to do.  What supports item

7     number 2 in answer to interrogatory 7?

8          A     What documents?

9          Q     No.  What information?  What evidence?

10         A     Some of the memorandums that I have

11    from Mr. Stubblefield where he's doing some of the

12    payroll department work, because when he would try

13    to guide Mr. Royall into doing these, they didn't

14    get done.  Stubblefield wanted them done, so he did

15    them, which pulled him away from resolving some of

16    the other issues in the department.

17         Q     And you're saying that those matters

18    are contained in memoranda that Mr. Stubblefield

19    sent to you?

20         A     Yes.

21         Q     And those are the documents or the

22    memoranda that you gave to Mr. Herman which he then

CHARLES ROYALL                                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                       June 29, 2006

Page 81

1      A      The only thing that I can think of that

2   would support that would be one of the memorandums

3   to me on the audit, which is held in May by

4   Bond-Beebee.  Ron would have to have Frank do some

5   of the spreadsheets that Charles should have been

6   able to do by then to give to the auditors.

7      Q      Okay.  Did you ever bring that to

8   Mr. Royall's attention?

9      A      I don't remember if I did or not.

10     Q      All right.  Again, in that same answer

11  to number 7, it says that you, Stubblefield, and

12  Young participated in the decision to terminate

13  Plaintiff in one way or another.

14            Did the three of you ever meet on the

15  issue of whether or not to terminate him?

16     A      Not an official meeting that I recall.

17  I can't say for sure that the three of us were in

18  the same room talking about it.

19     Q      Well, let me ask you this:  It says

20  that you recommended that Mr. Royall be terminated

21  and participated in the decision.

22            Tell me what your involvement was.

CHARLES ROYALL                                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                        June 29, 2006

Page 82

1        A       Sharing through those months with Bill

2   Young what was going on in the finance department,

3   who was doing what, who was picking up the workload,

4   and how payroll was going or not going in this case,

5   those were my discussions with Bill Young.

6               And occasionally Ron Stubblefield

7   would, of course, through the memorandums let me

8   know, but the memorandums are just like job

9   listings.  They're not he said this, he said that

10  sort of thing, nor are they true recommendations.

11              But, yes, Ron Stubblefield let me know

12  that his working relationship as far as being able

13  to assign the accounting manager a task and have it

14  completed accurately and on time wasn't happening.

15       Q       All right.  I understand that there

16  were things that happened leading up to Mr. Royall's

17  termination.  I'm more interested in how did it get

18  to the point where it was ultimately decided, you

19  know, we've got to fire this guy.

20              Did Stubblefield ever come to you and

21  say we need to fire Charles Royall?

22       A       Yes.

CHARLES ROYALL                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS            June 29, 2006

Page 83

1       Q     All right.  Did you ever go to

2   Mr. Young and say, you know, we've got to fire

3   Charles Royall?

4       A     Yes.

5       Q     All right.  And who made -- who

6   actually pulled the trigger, as they say?  Whose

7   decision was it to actually do the firing?  Was it

8   reserved to Mr. Young as the president?

9       A     Yes.

10      Q     All right.  Based on your

11  recommendation and Mr. Stubblefield's

12  recommendation?

13      A     Right.

14      Q     Did Mr. Sclafani also participate in

15  that decision?

16      A     In firing Charles Royall?

17      Q     Yes.

18      A     No.

19      Q     All right.  Tell me exactly what -- was

20  it that point blank, Mr. Stubblefield said that

21  we've got to fire him?

22      A     Like putting his foot down and saying

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

JANE BROENDEL
June 29, 2006

Page 84

1    he has to go?

2        Q    I don't care about the drama, but, I

3    mean, was it I don't know what to do with this guy,

4    let's talk about it, blah, blah, blah, blah, gee, I

5    guess we have to fire him, or did he just come to

6    you one day and say it's time to fire him?

7        A    No.  It was more of I don't know what

8    to do about it, I've discussed this, I've discussed

9    that, my recommendations are not being taken into

10   consideration, he still wants to do things his own

11   way, and even though I'm telling him you should do

12   this, you should do that, you should back up this,

13   whatever, he's not doing it, he's not following

14   directions, it's not working.

15       Q    All right.  And then were you the one

16   that said, well, then let's fire him or let's

17   recommend to Mr. Young that we fire him?

18       A    Yes.

19       Q    All right.  So Stubblefield stated it

20   as a general problem, you're the one who suggested

21   that the correct action or the appropriate action

22   was to fire Mr. Royall, and Mr. Young being general

CHARLES ROYALL                                              JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                  June 29, 2006

Page 85

1   president was the person who actually had the

2   authority to do it; is that correct?

3          A     No.

4          Q     Okay.  Tell me what is correct.

5          A     Stubblefield wanted to fire Charles

6   Royall, and I agreed.  I said, "Yes, I understand

7   it's not working, I can see it's not working, and

8   something has to be done.  We've had discussions,

9   you've talked to him, you don't get anywhere, I

10  don't get anywhere, so let's go talk to President

11  Young."

12         Q     All right.  Was any of this put in

13  writing?  Were any of the recommendations -- I'll

14  rephrase that.

15               Was your recommendation to President

16  Young ever put in writing?

17         A     No.

18         Q     Was Mr. Stubblefield's recommendation

19  to President Young or you put in writing?

20         A     I was not provided anything in writing

21  from Ron Stubblefield.

22         Q     And you don't know of any written

Page 86

1    recommendation from Stubblefield to Young?

2          A     No, I don't know of any.

3          Q     All right.  Just to be sure, was there

4    anybody other than yourself, Stubblefield, or Young

5    who participated in the recommendation to fire

6    Mr. Royall?

7          A     Not that I recall, no.

8          Q     Okay.  All right.

9          MR. HERMAN:  I'll let that answer

10   slide, but I'm not sure that Mr. Young participated

11   in the recommendation.

12          You understand that?

13          MR. GAGLIARDO:  Yes, I understand

14   that.

15          THE WITNESS:  And, see, I'm not sure --

16          MR. HERMAN:  There's no question

17   pending.

18          MR. GAGLIARDO:  Your lawyer is not

19   going to let you speak without a question.

20          Why don't we take a two-minute break.

21          (Recess.)

22          BY MR. GAGLIARDO:

CHARLES ROYALL                                           JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS        June 29, 2006

Page 88

1          Q      Did she ever complain to you about

2     anything about Mr. Royall?

3          A      No.

4          Q      All right.

5          A      Not that I recall.

6          Q      Is there any other basis for including

7     her in this answer other than the fact that she

8     worked there during that time?

9          A      She would have knowledge of the

10    accounts payable system, and -- I would have to stop

11    and think.  There was a reason she's named in this

12    interrogatory.  She replaced Chris Tarbrake, so she

13    would have come in maybe June of '02.  No, I don't

14    recall why she's in there.

15         Q      What about Dale Molina?

16         A      Dale worked in the information

17    technology department, and she was responsible, in

18    part, for the annuity trust fund payments from the

19    branches.  She would make sure that those came in,

20    that those were given to accounts payable or to the

21    accounting manager, rather, because those had to do

22    with -- when those came in, they were calculated,

CHARLES ROYALL                                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                       June 29, 2006

Page 89

1    and then the money was sent to the annuity trust

2    fund in Ashburn, Virginia.

3         Q    Did she ever complain to you about

4    Mr. Royall?

5         A    Yes.  Yes, she did.

6         Q    You didn't tell us about that before.

7    What did she talk about?  What did she complain

8    about?

9         A    That the --

10             MR. HERMAN:  I don't think she was

11   asked about it before.

12             MR. GAGLIARDO:  She was asked about

13   everything.  I don't understand how you get to 17 --

14   you know, 17 should be nobody after you've answered

15   2, but let's not argue.

16             MR. HERMAN:  Well, I disagree with

17   that.

18             BY MR. GAGLIARDO:

19        Q    All right.  What did Dale Molina

20   complain about?

21        A    That the branches were not getting the

22   information in on time.  But then when she would

CHARLES ROYALL                                                JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                   June 29, 2006

Page 90

1    give it to Charles, then the ATF was calling, the

2    annuity trust people in Ashburn.

3          Q       I'm glad you spelled that out, because

4    ATF means something else to me.

5          A       Yeah.  It's our pension.

6          Q       Yes, I got it.  The Annuity Trust Fund,

7    not the Alcohol, Tobacco and Firearms people?

8          A       Exactly.

9          Q       Go ahead.  So what did she complain

10   about Charles Royall about?

11         A       That the payments were not going over

12   to ATF on time, so ATF was calling.

13         Q       Did you ever bring that to Mr. Royall's

14   attention?

15         A       Yes.

16         Q       Specifically you did, right?

17         A       Yes.

18         Q       So which does that come under, United

19   Way, savings bonds, payroll problem, Postal Service

20   benefit program, COLA adjustments, or lack of

21   learning the payroll system?  Because I asked you

22   about all the specific things you brought to

CHARLES ROYALL                                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                        June 29, 2006

Page 92

1    director of finance.

2              But also in that same complaint -- it

3    wasn't really a complaint.  It was more a point of

4    information that you need to do something about

5    this -- were the payroll checks, which are drawn off

6    of a different account.  They're SunTrust.  At that

7    time, Crestar.

8         Q    What was the point of information about

9    the payroll checks from SunTrust, that they were

10   laying around?

11        A    Yeah.  They were -- yeah.

12        Q    Who would cut the check?  Who would

13   actually produce the physical check?

14        A    The payroll department.

15        Q    A clerk?  Not Mr. Royall, but a clerk?

16        A    The payroll department was overseen by

17   the accounting manager.

18        Q    Right.  But it wasn't his

19   responsibility to produce the check or to put it in

20   the mail or to give it to somebody else for

21   signature?

22        A    No.  But basically something like

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 93

1    checks lying around are under the jurisdiction of

2    the accounting manager for payroll and the director

3    of finance for accounts payable.

4         Q    And the secretary-treasurer of the

5    union?

6         A    Exactly.

7         Q    Right.  But you got an A from the

8    president and he got an F, okay.

9              Keith Proctor, what does he know?

10             MR. HERMAN:  Can you just try to

11   control your argumentation?  We're getting towards

12   the end of this.

13             MR. GAGLIARDO:  It is controlled.  I'm

14   doing this very intentionally.

15             BY MR. GAGLIARDO:

16        Q    What about Keith Proctor?

17        A    Keith Proctor at the time that Charles

18   Royall was there was being trained by Dale Molina.

19        Q    In the IT department?

20        A    Correct.

21             He was also involved in the check

22   incident where the memo was sent.

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              June 29, 2006

Page 98

1          Q      Well, here's my question, and maybe

2     this will clarify it:   Did Mr. Stubblefield ever

3     tell you that he spoke to Mr. Dorsey about

4     Mr. Royall?

5          A      He may have.

6          Q      But you don't recall at this time?

7          A      No.

8          Q      All right.   Anything else from

9     Mr. Dorsey?

10          A      No.

11          Q      How about Stephen Hult?

12          A      Steve worked on the sixth floor in the

13     contract administration unit.   He was an employee,

14     formerly a letter carrier.

15          Q      Okay.

16          A      So even though he was not an officer,

17     those people who worked for us that were letter

18     carriers, they're on leave without pay from the

19     Postal Service so they're still under that USPS

20     benefit thing.

21          Q      I understand.

22          A      Steve had problems with his benefits.

CHARLES ROYALL                                    JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS          June 29, 2006

Page 99

1    He was one of the people that would come and

2    complain about his check.

3         Q    When did he do this, while Mr. Royall

4    was employed there?

5         A    Yes.

6         Q    Would that be his only knowledge of

7    Mr. Royall's performance or conduct?

8         A    Yes.  His knowledge would only be how

9    his paycheck was affected and his benefits.

10        Q    How about James Sauber?

11        A    He was the one that had the savings

12   bond problem.

13        Q    Mr. Young talked about him?

14        A    Yes.

15        Q    Is there any other knowledge that he

16   would have other than that?

17        A    No.

18        Q    Sean McCormally, we talked about?

19        A    (Witness nods head.)

20        Q    Other than his complaint about his

21   savings bond or whatever it was, does he have any

22   other knowledge?

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 101

1    CASE:   Royall v. NALC
     DATE:   June 29, 2006
2

3               ACKNOWLEDGMENT OF DEPONENT

4          I, Jane Broendel, do hereby acknowledge

5    that I have read and examined pages 4 through 100,

6    inclusive, of the transcript of my deposition and

7    that:

8    (Check appropriate box)

9

10         [   ]   The same is a true, correct, and
     complete transcript of the answers given by me to
11   the questions therein recorded.

12         [X ]   Except for the changes noted in the
     attached Errata sheet, the same is a true, correct,
13   and complete transcription of the answers given by
     me to the questions therein recorded.

14

15

16         Date  8-1-06              Signature
                                     Jane E. Broendel
17

18         Sworn to and subscribed to before me on

19   this  1st   day of  August          , 2006

20         Linda M Giordano

21                                 NOTARY PUBLIC
     LINDA M. GIORDANO
     NOTARY PUBLIC DISTRICT OF COLUMBIA
22   My Commission Expires May 31, 2011


                    SLR REPORTING
                    (301) 340-0042

0757f60e-8cf0-47ad-89b8-61f7890a7ca6

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

JANE BROENDEL
June 29, 2006

Page 102

1                          SLR REPORTING
2                       12208 SELINE WAY
                     POTOMAC, MARYLAND  20854
3                          (301) 340-0042

4                   CASE:  ROYALL V. NALC
               DEPOSITION OF:  JANE BROENDEL
5
            Enclosed is the transcript of your
6   deposition testimony.  Please review the transcript,
    complete and distribute the signed errata sheet and
7   acknowledgment page to all parties, including this
    office, within 30 days.  Any changes and/or
8   corrections should be listed below and not made upon
    the transcript itself.
9
    PAGE   LINE   CHANGE OR CORRECTION                 REASON
10

11  Page
12   39     9    change(correct) "deserved" to
                              "observed"          reporter misunderstood
13   63     19   change "correct" to "incorrect"   misspoke or was
14   63     20   change "incorrect" to "correct"    misunderstood
15

16

17

18

19

20   DATE: 8-1-06          SIGNATURE:
21                         Jane E. Broendel
22

SLR REPORTING
(301) 340-0042

0757f60e-8cf0-47ad-89b8-61f7890a7ca6

CHARLES ROYALL                                          JANE BROENDEL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                June 29, 2006

Page 103

CERTIFICATE OF NOTARY PUBLIC

1

2          I, Marney Alena Mederos, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly sworn

6    by me to testify to the truth, the whole truth, and

7    nothing but the truth concerning the matters in this

8    case.

9          I further certify that the testimony of

10   said witness was taken by me in stenotype and

11   thereafter reduced to typewriting under my

12   direction; that said deposition is a true record of

13   the testimony given by said witness.

14         I further certify that I am neither

15   attorney nor counsel, nor related to or employed by

16   any of the parties to the action in which this

17   deposition is taken; and furthermore, that I am not

18   a relative or employee of any attorney or counsel

19   employed by the parties hereto, nor financially or

20   otherwise interested in the outcome of this action.

21                        Marney Alena Mederos
22                        Notary Public for D.C.