# Exhibit C

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

CHARLES ROYALL,                   :

            Plaintiff,            :

        vs.                       :   Civil Action

NATIONAL ASSOCIATION OF           :   No. 05-1711 (RBW)

LETTER CARRIERS,                  :

            Defendant.            :

- - - - - - - - - - - - - - - - x

                        Washington, D.C.

                        Tuesday, July 11, 2006

Deposition of:

        SUKJA NEIDLINGER,

the Witness, called for examination by counsel for

Plaintiff, pursuant to notice, commencing at 9:50

a.m., at the offices of Sherman, Dunn, Cohen, Leifer &

Yellig, P.C., 900 Seventh Street, Northwest,

Washington, D.C., before Karen Young, Notary Public in

and for the District of Columbia, when were present on

behalf of the respective parties:



CHARLES ROYALL                                    SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 4

1                          PROCEEDINGS

2                          Whereupon,

3       SUKJA NEIDLINGER,

4       was called as a witness and, having been duly sworn,

5       was examined and testified as follows:

6                          -   -   -

7           EXAMINATION ON BEHALF OF THE PLAINTIFF

8               BY MR. GAGLIARDO:

9       Q.      Would you please give us your name and

10      address?

11      A.      My name is Sukja Neidlinger.  Address is

12      8525 Washington Avenue, Alexandria, Virginia 22309.

13      Q.      And you're employed by the National

14      Association of Letter Carriers?

15      A.      Yes.

16      Q.      And what is your job title?

17      A.      Payroll clerk.

18      Q.      Ms. Neidlinger, how long have you been the

19      payroll clerk at NALC?

20      A.      Twenty-five years.

21      Q.      Have you held any other positions at NALC

22      other than payroll clerk?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 13

1    it after Mr. Royall left NALC?

2        A.    No.

3        Q.    Okay.  While he was employed, what did you

4    talk to Mrs. Broendel about regarding Mr. Royall's

5    work performance?

6        A.    I thought he was very incompetent.

7        Q.    You thought he was very incompetent?

8        A.    Incompetent.

9        Q.    Uh-huh.

10        A.    Because he didn't have much knowledge of

11    what we were doing.

12        Q.    In what regard?

13        A.    For instance, he wants to learn my payroll,

14    and he took like over two months for me to teach him

15    my payroll, basic payroll.

16        Q.    Every -- did you work with him every day,

17    did you?

18        A.    Every day for a while when --

19        Q.    That's not true.  You worked with him once a

20    week, didn't you?

21            MR. HERMAN:  Don't interrupt, Tom.

22            BY MR. GAGLIARDO:

CHARLES ROYALL                                        SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 11, 2006

Page 15

1    interrupt the witness.

2         A.    I remember.

3         Q.    What do you remember, Ms. Neidlinger?

4         A.    I remember that he was very incompetent I

5    thought, you know.  I'm not smart either, but I

6    thought, and then also there's so many things that I

7    have to explain over and over and over.

8         Q.    Like what?

9         A.    He wrote it down.  He remembers, he wrote it

10   down, the steps, how to do.  It's not even details of

11   the payroll.  It's just basic payroll.

12        Q.    Tell me what you had to repeat over and over

13   and over.

14        A.    Would you know if I tell you?  I mean, in

15   payroll, you have to get the -- you know, process of

16   the whole thing of a payroll.

17        Q.    What did you tell Mr. Royall over and over

18   and over?

19        A.    Tell him how to get the time card, how to

20   fix -- how to calculate the times.  We count by

21   minutes.  That took him very long time too.

22        Q.    What else did you tell him over and over and

CHARLES ROYALL                                    SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS        July 11, 2006

Page 16

1    over?

2         A.    Over and over, it took two months.  You can

3    learn easily few days.

4         Q.    What else did you teach him -- did you tell

5    him -- have to tell him over and over and over?  That

6    was your prior testimony.  I want to know what.

7         A.    Lost time, we have to code, many, many

8    codes.

9         Q.    Okay.  What else?

10        A.    Whole process of the payroll, you know, how

11   to do finalize and how to do, you know, all the whole

12   process of payroll.

13        Q.    All right.  How many times did you have to

14   tell him how to get time cards?

15        A.    Many.

16        Q.    Well, how many?

17              MR. HERMAN:  I think you're arguing with the

18   witness.

19              BY MR. GAGLIARDO:

20        Q.    I'm not arguing.  How many?

21        A.    That is kind of -- you can't say exactly a

22   number because you know, I don't write it down how

CHARLES ROYALL                                          SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 17

1    many times, but I can tell you many times.

2         Q.    What -- tell me what you explained to him

3    about getting the time cards that he couldn't master.

4         A.    See, we have a time card, you punch 15

5    minute before.

6         Q.    Uh-huh.

7         A.    And you -- you know, you have a time limit,

8    and people come in like 9:02.  That two minute is, you

9    know, late.  We calculate two minute.  He didn't even

10   know how to calculate those two minutes of 60.  For

11   instance, if we're, say, point 78, it's not 78

12   minutes, you know?

13        Q.    He didn't know what point 78 hours was?

14        A.    He didn't.  I have to explain that you got

15   to divide by, you know, if it's six minute, divide by

16   60, it's point 10.

17        Q.    Uh-huh.

18        A.    That even I had to explain.  That's why I

19   thought, you know, how did he got that job, and not

20   only that -- well, you can ask another question.

21        Q.    Go ahead.  What else did -- you wondered how

22   he got the job, and did you say that -- did you tell

CHARLES ROYALL                                          SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 11, 2006

Page 18

1    anybody or ask anybody how did this man get the job?

2        A.    No, I don't.

3        Q.    Did you tell Ms. Broendel that he didn't

4    know how to get the time cards or how to calculate

5    fractions of an hour?

6        A.    Few times I -- because I went through a very

7    hard time.  Myself was doing his job, and that part,

8    you know, I'm a clerk, payroll clerk.  Basically I

9    supposed to generate checks, and instead, I had to

10   look around every -- they had no clue about how it's

11   set up either.

12       Q.    Who is they?

13       A.    We have a DBA.  They meaning him and also

14   Stubblefield.  They were new.  In that case, they were

15   new, so you know, they didn't have anybody at -- we

16   didn't have anybody at the time to -- as far as

17   payroll goes, to explain, and I've been there for a

18   long time and -- but as far as accounting manager's

19   part, it's new to me too, so --

20       Q.    You said you -- I'm sorry.  Go ahead.

21       A.    So I had to, you know, lot of sheets that I

22   save over the years, that calculations and how to

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 20

1    convert minutes to fractions of hours; is that

2    correct?  And then you have to enter that information

3    into a computerized system?

4        A.    Right.

5        Q.    And is that the J.D. Edwards system?

6        A.    Uh-huh.

7        Q.    You have to say yes or no for the court

8    reporter.

9        A.    Yes, yes.

10        Q.    All right.  And you knew how to do that but

11    Mr. Stubblefield didn't know how to do that?

12        A.    No.

13        Q.    Did Mr. Stubblefield know how to do that?

14        A.    No.

15        Q.    Did Mr. Royall know how --

16        A.    He wasn't directly involved in payroll

17    anyway.

18        Q.    Right.  Did Mr. Royall know how to do that?

19        A.    No.

20        Q.    He didn't know how to convert minutes to

21    fractions of hours?

22        A.    Right, yes.

CHARLES ROYALL                                      SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS         July 11, 2006

Page 21

1       Q.      And he didn't know how to input the

2   information into the computer system.

3       A.      Right.

4       Q.      And it took him two months to learn.

5       A.      Right.

6       Q.      Do you know what Mr. Royall's background is?

7       A.      He said he's accounting something, he had

8   Howard University, the copy of his diploma was hanging

9   on his wall.  That much I know.

10      Q.      Uh-huh.

11      A.      But I suppose he has accounting background

12  of some kind.

13      Q.      Uh-huh.  But you expect people to believe

14  that he didn't know how to convert minutes to

15  fractions of hours.

16              MR. HERMAN:  Objection.  It's argument.  You

17  can answer again.

18              BY MR. GAGLIARDO:

19      Q.      Is that what you expect?

20              MR. HERMAN:  Her testimony is what her

21  testimony is.  You can answer.

22              BY MR. GAGLIARDO:

CHARLES ROYALL                                              SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                    July 11, 2006

Page 23

1          THE WITNESS:  I really don't know.

2          MR. GAGLIARDO:  -- all her answers are what

3     she knows.  If you don't know, you can tell me you

4     don't know.

5          THE WITNESS:  I don't know.

6          BY MR. GAGLIARDO:

7     Q.    How old are you?

8     A.    I'm 63.

9     Q.    Are you sole support for your family?

10    A.    No.  I have a husband too.

11    Q.    Is your testimony that there were times when

12    you had to do Mr. Royall's job?

13    A.    You know, you can say Mr. Royall's job.  I

14    mean, when he comes to me constantly, constantly

15    because I had a question, because he -- I mean, I can

16    say he didn't even know the system that well, J.D.

17    Edwards system that well.  He had no clue about how

18    it's set up.  I had -- that wasn't my job, but I had

19    much more knowledge and keen sense through that time.

20    I learned so much myself too.

21    Q.    How long -- go ahead.  I'm sorry.

22    A.    Go ahead.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 29

1    is not minor.

2         Q.    Okay.

3         A.    Somebody's pay, you know.

4         Q.    Uh-huh, but it got fixed right away?

5         A.    Can be fixed, yes.  Even now it can be

6    fixed.  I mean --

7         Q.    Well, I'm talking specifically about the

8    time when Mr. Royall was in charge of the payroll when

9    you were gone.  Whatever had to be fixed got fixed

10   right away, didn't it?

11        A.    Yes.

12        Q.    Now, tell me about your conversations with

13   Mrs. Broendel about Mr. Royall.  What did you tell

14   her?

15        A.    I told her that I went through very bad time

16   because there are times that I couldn't even get

17   things out because the part he's supposed to is not

18   done.  Then my payroll get backed up, and so try to

19   figure, you know, all those things out and I went

20   through very bad time, very bad time, and tried to

21   figure their part and my part and doing -- you know,

22   it feels like I'm doing, you know, his job in such a

CHARLES ROYALL                                      SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 30

1    way -- some way, and I even -- I remember and even

2    asking for the raise, ask her for the raise because --

3        Q.    What did she tell you when you asked for the

4    raise?

5        A.    She understands and -- well --

6        Q.    What did she say about the raise you asked

7    for?  Did you get it?  Did you get the raise?

8        A.    Yeah, I did get step raise, step raise.

9        Q.    All right.  What is -- how much money is

10   that?

11       A.    Not that much.  600 a year or something, a

12   year.

13       Q.    Okay.  So you asked for a step increase and

14   you got a step increase.

15       A.    Yes.

16       Q.    And that was in response to your going to

17   Mrs. Broendel saying that you had a difficult time?

18       A.    You know, raise wasn't the reason I actually

19   went to her.

20       Q.    Uh-huh.

21       A.    I tried to tell -- I was -- because it

22   wasn't easy for me that time.  I mean, when you have

CHARLES ROYALL                                          SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 11, 2006

Page 31

1    two new people supposed to be -- help you, give me the

2    information, can give me the information properly,

3    there were few times that I stayed very late, and I

4    had and even my accounting manager, I mean, there were

5    times that I was allowed to do even overtime because

6    of all those things held up, you know?  It's not

7    smoothly moving like before, before he came.

8        Q.    Well, there was no accounting manager right

9    before Mr. Royall came; isn't that true?  Right?

10       A.    Short period of time I think.  I don't know.

11       Q.    And things were backed up because there was

12   no accounting manager for a short period of time.

13       A.    Well, some part of it could be true, but

14   that's -- I don't think so.  I don't think that that

15   was the reason.  I thought that the system we have,

16   maybe they didn't have much knowledge on that.

17       Q.    When you refer to the system, are you

18   referring to the J.D. Edwards system?

19       A.    Edwards system, yes.

20       Q.    A lot of people had problems with that

21   system, didn't they?

22       A.    Well, I don't know about problems per se.

CHARLES ROYALL                                              SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 July 11, 2006

Page 40

1     Q.     Okay.

2     A.     I don't know who's going on what training.

3     Q.     I understand.  I'm just asking you what you

4  know.  Did Mr. Stubblefield and you ever discuss

5  Mr. Royall's work performance?

6     A.     I don't remember.

7     Q.     So to the best of your recollection, the

8  only person you ever talked to was Mrs. Broendel about

9  Mr. Royall's work performance?

10    A.     Yes, and Sclafani, Mr. Sclafani too.

11    Q.     Okay.  When did you talk to Mr. Sclafani?

12    A.     When?

13    Q.     Yes.

14    A.     I don't know, sir.

15    Q.     I'm not asking you for a date.  What I'm

16  asking you is was it while Mr. Royall was still

17  employed there?

18    A.     Yes.

19    Q.     Was it before or after you talked to

20  Mrs. Broendel?

21    A.     We don't -- we don't talk -- I haven't

22  talked about him.  I mean, he's -- after he left, what

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 41

1    they got to say?

2        Q.    Okay.

3        A.    I mean --

4        Q.    All right.  Let's talk about your

5    discussions with Mr. Sclafani.  Were they before or

6    after you went to Mrs. Broendel and talked about

7    Mr. Royall?

8        A.    Before.

9        Q.    Before, all right.  What did you tell

10   Mr. Sclafani?  Did you tell him the same thing you

11   told Mrs. Broendel or did you tell him different?

12       A.    Same thing, same thing.

13       Q.    Same thing.  What was Mr. Sclafani -- at

14   that time, Mr. Sclafani was a temporary employee?  He

15   was working for ACSYS and was detailed or assigned to

16   work at NALC?

17       A.    Right.

18       Q.    And why did you tell Mr. Sclafani about

19   Mr. Royall when he was a temporary employee?

20       A.    He came aboard -- I don't know -- I don't

21   mean to, you know.

22       Q.    All right.  So he came aboard at some point

CHARLES ROYALL                                              SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                 July 11, 2006

Page 42

1     and --

2          A.    I can't remember.

3          Q.    Well, regardless of when he came aboard, why

4     were you talking to Mr. Sclafani about Mr. Royall?

5          A.    Because he was --

6          Q.    He was what?

7          A.    I think because I believe an incompetent

8     person got the job.

9          Q.    But why Mr. Sclafani?  Why were you talking

10    to Mr. Sclafani?  Was he hired by NALC to evaluate the

11    finance department?

12         A.    I don't know, sir.

13         Q.    Why was Mr. Sclafani there?

14         A.    Why is he there?

15         Q.    Why was he there at that time when

16    Mr. Royall was also employed there?  He was there as a

17    clerk, wasn't he?

18               MR. HERMAN:  Objection.

19         A.    I have no idea, sir.  Those things, I don't

20    know why he's there or anything that's --

21         Q.    All right.  Let's do it this way.  During

22    the time when Mr. Royall's employed at NALC, you're

CHARLES ROYALL                                          SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 45

1      A.      Whole time?

2      Q.      I believe he was full time.

3      A.      Whole time.

4      Q.      Oh, the whole time that Mr. -- no, it was

5    not the whole time; is that correct?  Sclafani came

6    after you were hired.

7              MR. ROYALL:  Yeah, after I was hired.

8              BY MR. GAGLIARDO:

9      Q.      All right.  After Mr. Royall was hired,

10   Mr. Sclafani comes on board as a temporary employee of

11   ACSYS.  I understood your testimony -- we'll go back

12   and look at the record -- to say that you talked to

13   Mr. Sclafani about Mr. Royall's work performance.  You

14   told me you told him the same thing you told

15   Mrs. Broendel, and my question --

16     A.      I can -- there's a time limit on these

17   things, like you know, you tried to pinpoint, but --

18     Q.      I don't care about the time.

19     A.      I'm thinking his work performance was -- you

20   know, when you hire somebody, when you -- the person

21   supposed to be your superior and do what -- they

22   supposed to give me the information, and when they

CHARLES ROYALL                                    SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS        July 11, 2006

Page 46

1    don't know how to do anything, I mean, I can just say

2    zip my mouth and I can't even maybe talk to my

3    colleague, mention about his performance, nothing

4    else, you know, and say I can't believe that, you

5    know, he didn't know that or things like that nature.

6         Q.    So is that why you were talking to

7    Mr. Sclafani, because he was just your colleague?

8         A.    Maybe so.

9         Q.    Maybe so, but you don't know.  You don't

10   remember?

11        A.    I don't remember.

12        Q.    Are you aware that Mr. Sclafani wrote a

13   memorandum to Mrs. Broendel about the finance

14   department?

15        A.    That's still thing, they don't tell clerks

16   about everything they do, sir.  I don't know, sir.

17        Q.    Do you know that he wrote a memorandum to

18   Mrs. Broendel?  Yes or no?

19        A.    No, sir.

20        Q.    You never saw it.

21        A.    I never saw it.

22             MR. HERMAN:  While you're looking, can I

CHARLES ROYALL                                    SUKJA NEIDLINGER
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 47

1    just take a quick bathroom break?

2              MR. GAGLIARDO:  Sure.

3                   (Recessed at 10:30 a.m.)

4                   (Reconvened at 10:38 a.m.)

5              (Sclafani memo to Broendel, marked for

6    identification as Deposition Exhibit No. 1.)

7              BY MR. GAGLIARDO:

8         Q.    Ms. Neidlinger, I've given you a copy of

9    what's been marked as Neidlinger Deposition Exhibit

10   Number 1.  These are marked -- this is a document

11   given to me in response to my discovery request and is

12   marked by Bates stamp pages 51 through 56 inclusive.

13   I asked you a moment ago if you were aware that

14   Mr. Sclafani had written a memorandum to Ms. Broendel

15   regarding the finance department.  This purports to be

16   that memorandum.  I'm going to ask you to take a

17   minute, take a look at it, and the question is have

18   you ever seen this before, but you don't have to

19   answer until you've had a chance to look through it.

20        A.    Do I need to read the whole thing?

21        Q.    No, you don't have to read it.  Have you

22   ever seen that memorandum before?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

SUKJA NEIDLINGER
July 11, 2006

Page 53

1   ROYALL VS. NATIONAL ASSOCIATION OF LETTER CARRIERS

2

3          ACKNOWLEDGEMENT OF DEPONENT

4

5          I, SUKJA NEIDLINGER, do hereby acknowledge

6   that I have read and examined pages 4 through 52,

7   inclusive, of the transcript of my deposition taken on

8   Tuesday, July 11, 2006, and that:

9          (check appropriate box)

10

11          [] the same is a true, correct, and complete

12   transcription of the answers given by me to the

13   questions therein recorded.

14

15          [✓] except for the changes noted in the

16   attached errata sheet, the same is a true, correct,

17   and complete transcription of the answers given by me

18   to the questions therein recorded.

19

20

21   _____          _8-4-06_____

22          signature                        date

SLR REPORTING
(301) 340-0042

5c3d4c74-901b-4430-962c-c8274773545f

# ERRATA SHEET

### 7/11/06 DEP: SUKJA NEIDLINGER

Review the transcript, complete and distribute signed errata sheet
and acknowledgement to all parties, including SLR Reporting, within
30 days.  Any changes should be listed below and not made upon the
transcript itself.

| PAGE | LINE | CHANGE/REASON |
|------|------|---------------|
| 4 | 20 | "Twenty-five" to "Ten" |
| 5 | 1 | ""Payroll" to "Payable" |
| 10 | 13 | add "when" before "they" |
| 20 | 16 | "He" refers to Stubblefield |
| 31 | 2 | "can" to "can't" |

SIGNATURE /DATE

*SLR REPORTING  (301) 340-0042*

```
1              CERTIFICATE OF NOTARY PUBLIC
2          I, Karen Young, a Notary Public in and for
3    the District of Columbia, before whom the foregoing
4    deposition was taken, do hereby certify that the
5    witness whose testimony appears in the foregoing pages
6    was duly sworn by me; that the testimony of said
7    witness was taken by me in shorthand at the time and
8    place mentioned in the caption hereof and thereafter
9    reduced to typewriting under my supervision; that said
10   deposition is a true record of the testimony given by
11   said witness; that I am neither counsel for, related
12   to, nor employed by any of the parties to the action
13   in which this deposition is taken; and, further, that
14   I am not a relative or employee of any attorney or
15   counsel employed by the parties thereto, nor
16   financially or otherwise interested in the outcome of
17   the action.
18
19
20   Karen Young
     Notary Public in and for
21   The District of Columbia
22   My commission expires:  July 31, 2009
```

SLR REPORTING
(301) 340-0042

# Exhibit D

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x

CHARLES ROYALL,                        :

            Plaintiff,        :

       vs.                          :   Civil Action

NATIONAL ASSOCIATION OF                :   No. 05-1711 (RBW)

LETTER CARRIERS,                       :

           Defendant.        :

- - - - - - - - - - - - - - - x

                Washington, D.C.

                Tuesday, July 11, 2006

Deposition of:

       FRANCIS ALEXANDER SCLAFANI,

the Witness, called for examination by counsel for

Plaintiff, pursuant to notice, commencing at 12:24

p.m., at the offices of Sherman, Dunn, Cohen, Leifer &

Yellig, P.C., 900 Seventh Street, Northwest,

Washington, D.C., before Karen Young, Notary Public in

and for the District of Columbia, when were present on

behalf of the respective parties:

COPY

CHARLES ROYALL                                FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                  July 11, 2006

Page 16

1       Q.    Did you assist him on anything else?

2       A.    I may have.

3       Q.    Okay.

4       A.    I don't recall specifics at this point.

5       Q.    Okay.  Now, tell me how you assisted him

6    regarding tax preparation.

7       A.    I actually prepared the taxes.

8       Q.    All right.  Which taxes are you referring

9    to?

10      A.    These were state taxes.

11      Q.    I'm sorry?

12      A.    State taxes.

13      Q.    State withholding taxes?

14      A.    State withholding taxes, state unemployment

15   taxes.

16      Q.    Anything else?  Any other kinds of taxes?

17      A.    There may have been form 940 and 941 federal

18   taxes.  I know I shared those also with Ron.

19      Q.    When you say shared, what do you mean?

20   Shared the job of preparing them?

21      A.    Right.  Mr. Stubblefield noticed that after

22   a point, that Mr. Royall was not completing the 941s,

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 17

1    therefore, he took it upon himself to file them and

2    asked me for assistance in either completing them or

3    filing them from scratch.

4        Q.    All right.  And when was this point in time?

5        A.    This would have been probably the end of the

6    second quarter, roughly July.

7        Q.    Second quarter of '02.

8        A.    Of '02.

9        Q.    And when you say they weren't being

10   completed by Mr. Royall, what do you know about the

11   returns?

12       A.    What do I know about the returns?

13       Q.    Yes.  What do you know about Mr. Royall's --

14       A.    It's a question of workload.  Mr. Royall was

15   busy doing other things and there were deadlines, and

16   Mr. Stubblefield felt that he needed to either assist

17   or complete them himself to get -- to get these things

18   filed on time.

19       Q.    When you say himself, Mr. -- you're

20   referring to --

21       A.    Mr. Stubblefield.

22       Q.    Mr. Stubblefield, all right, because

CHARLES ROYALL                                          FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                          July 11, 2006

Page 46

1       Q.      All right.   Tell me everything you recall

2    about that.

3       A.      There were issues that -- Mr. Stubblefield

4    would issue instructions to Mr. Royall, and he had

5    told him privately that Mr. Royall was not responding,

6    or was not completing the assignments on time, or that

7    he had to spend an inordinate amount of time following

8    up on it.   There were -- he had indicated to me that

9    he felt that Mr. Royall was not giving him the support

10   that he needed to accomplish whatever he was trying to

11   accomplish.

12      Q.      Do you think he was correct in those

13   assessments?

14      A.      Yes.

15      Q.      Why?  How?  How did you know if he was

16   correct or not in those assessments?

17      A.      Because it was clear that those assignments

18   had not been completed.

19      Q.      Well, it's true, is it not, that there was a

20   backlog that had to be cleared out from the time

21   before Mr. Royall was employed.

22      A.      Correct.

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                      July 11, 2006

Page 51

1    last filed or placed.

2         Q.    Okay, all right.  Let's talk about phone

3    calls from the field that Mr. Stubblefield got

4    regarding income tax withholding.  Were there any?

5         A.    Yes.

6         Q.    How many?

7         A.    I don't know.  I recall a number of them.

8         Q.    Well, how many do you actually recall?

9         A.    You mean as far as specific names?

10        Q.    Specific instances, whether you know of a

11   name or --

12        A.    Specific instances?

13        Q.    Yeah.

14        A.    I recall let's say in a general way.

15        Q.    Yeah, go ahead.

16        A.    That I remember.

17        Q.    In a general way.

18        A.    At least two or -- at least three or four.

19        Q.    Three or four?

20        A.    Correct.

21        Q.    All right.  Now, tell me about the three or

22   four income tax withholding calls that you recall.

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                      July 11, 2006

Page 52

1    Tell me what you recall.

2         A.    They were errors in paychecks.  In other

3    words, paychecks were received by the national

4    business agents or RAAs or field secretaries where the

5    amounts withheld or the amounts received were

6    incorrect.

7         Q.    All right.  So the total number of calls

8    that you recall regarding errors in paycheck, whatever

9    the errors were, were three or four.

10        A.    That I recall.

11        Q.    Yes, yes.  There weren't three or four for

12   TSP and three or four for income tax withholding to

13   total six to eight.  There were three or four total.

14        A.    No, there may have been.

15        Q.    What do you recall, because I'm going to ask

16   you about any one of these.  I'm going to as you to

17   tell me what you recall about each one.

18        A.    I'm sorry, but I don't recall about each

19   instances.

20        Q.    Do you recall any names?  Do you recall any

21   names?

22        A.    Oh, gosh.  No.

CHARLES ROYALL                              FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 53

1        Q.      Okay.  Do you recall the character or the --

2    not the character, but the issue of any -- of any --

3        A.      Yes.

4        Q.      Regarding any of these calls?  What are the

5    issues that you recall?

6        A.      Issues, incorrect TSP withholdings.

7        Q.      Okay.

8        A.      Incorrect tax withholdings.

9        Q.      Okay.

10       A.      Incorrect net amounts.

11       Q.      Debt amounts?

12       A.      In other words, the net pay, the check.

13       Q.      Okay, net pay wasn't correct.

14       A.      Correct, and --

15       Q.      Okay.

16       A.      Those are in general what I --

17       Q.      Okay.  Do you recall anything else about

18   those phone calls?

19       A.      No.

20       Q.      Do you recall if upon getting those phone

21   calls, what Mr. Stubblefield did?

22       A.      Yes.

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                   July 11, 2006

Page 66

1      if it was the fact that Royall was spitting on the

2      floor or couldn't add two and two?

3           A.    It would have been work related, not

4      spitting on the floor.  It would have been involved --

5      the timeliness of his assignments, the completeness of

6      his assignments, the accuracy of his assignments.

7           Q.    But you do recall what it was?

8           A.    Specifics, no.

9           Q.    Do you recall any specifics of any criticism

10     you made to Stubblefield about Royall?

11          A.    That I made to Stubblefield?

12          Q.    Uh-huh.

13          A.    No.

14          Q.    Do you recall any of the specifics of any

15     criticism that Stubblefield made to you?

16          A.    Yes, I do recall one.

17          Q.    Okay.  What is that?

18          A.    They were audit schedules that Mr. Royall

19     had to prepare by certain due dates.

20          Q.    Okay.

21          A.    And they were not prepared on time.

22          Q.    All right.  Can you tell me anything more

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 11, 2006

Page 67

1    about that, for example, which audit schedules?

2        A.    No, I can't get into detail.  I don't

3    remember.  It's been four years ago.

4        Q.    Okay.  Do you recall how much time

5    Mr. Stubblefield said they were; I didn't get them

6    this morning, I didn't get them yesterday, I didn't

7    get them last month?

8        A.    He indicated -- had indicated to me that he

9    had given what he felt was adequate time for

10   Mr. Royall to complete the schedules, and we were

11   receiving pressures from Bond Beebe to complete all

12   the schedules.  The schedules were not complete, and

13   he indicated to me that he felt that they should have

14   been complete by this time.  That's as far as I

15   remember.

16       Q.    He didn't say what action should be taken or

17   what action he had taken?

18       A.    I don't recall.

19       Q.    Did you ever tell Mr. Royall about this

20   conversation?

21       A.    Don't believe I did.

22       Q.    Did you ever witness Mr. Stubblefield

CHARLES ROYALL                                          FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                        July 11, 2006

Page 70

1        BY MR. GAGLIARDO:

2        Q.      I've given you what has been previously

3    marked as Neidlinger Exhibit Number 1.  It's Bates

4    stamped NALC 51 through 56 inclusive.  This document

5    says that it's from Frank Sclafani, comma, ACSYS.

6    That's you, correct?

7        A.      Correct.

8        Q.      And you are in fact the author of this

9    document, correct?

10        A.      Correct.

11        Q.      Okay.  And you sent this document to Jane

12    Broendel?

13        A.      Correct.

14        Q.      Who was then secretary/treasurer of NALC.

15        A.      And still is, correct.

16        Q.      And still is.  Did Ms. Broendel ask you to

17    prepare this memorandum?

18        A.      She may have.

19        Q.      Well, did she or didn't she?

20        A.      She may have.  I don't recall.

21        Q.      Well, then let me ask you differently.  Why

22    did you write this memorandum?

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                      July 11, 2006

Page 98

1      Q.    All right.  Do you remember about when you

2   took each vacation?

3      A.    I'm guessing June and September.

4      Q.    Okay, all right.  Let's go to the

5   memorandum, specifically page 3, the top of the page

6   where you're talking about Mr. Royall.  Are you there?

7      A.    Yes.

8      Q.    All right.  In the first sentence, you say

9   that his accounting -- quote, "Whose accounting

10  abilities in my opinion are suspect."  Do you see that

11  phrase?

12     A.    I do.

13     Q.    All right.  Now, other than what's specified

14  elsewhere in this memorandum, what cause -- what did

15  you -- well, first of all, let me ask you this.

16  Strike that.  Let me start all over.  What did you

17  mean when you said -- in this sentence, what did you

18  mean that his accounting abilities are suspect?

19     A.    Based on my actual observations, the

20  fundamental abilities would be, one, his accounts were

21  not cross-footed, in other words, footed, totalled,

22  columns totalled with rows.  He never prepared journal

CHARLES ROYALL                              FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 99

1    entries for his transactions.  Those always had to be

2    done for him.  Some of the work was incomplete, and as

3    I say, not timely.

4        Q.    Now, tell me again when you wrote this.

5        A.    Probably late August I'm guessing.

6        Q.    All right.  And when -- what work did you

7    notice was not cross-footed?

8        A.    I don't recall specifics.

9        Q.    What -- when you say he didn't make journal

10   entries, somebody else did it for him?

11       A.    Correct.

12       Q.    Did you ever bring the cross-footing to his

13   attention, or the lack of cross-footing?

14       A.    It would have been Mr. Stubblefield.

15       Q.    So you did not.

16       A.    I don't recall.

17       Q.    And you never witnessed Mr. Stubblefield

18   doing that?

19       A.    I may have.  I don't recall.

20       Q.    Did you ever bring to Mr. Royall's attention

21   the fact that he wasn't making journal entries and

22   that somebody else was doing --

CHARLES ROYALL                                          FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                          July 11, 2006

Page 102

1    point.  It's been a long time.

2        Q.    Well, who had to go over the audit

3    schedules?  You said we.

4        A.    Mr. Stubblefield and I would go over them.

5        Q.    So your testimony now is that you did review

6    or double-check --

7        A.    I may have.  I don't recall specifics.

8        Q.    Okay.  You say he's demonstrated an

9    unwillingness to take on, much less complete, the

10   tasks assigned to him by the director or anyone else.

11   What tasks?

12       A.    As I recall, there were tasks that were

13   assigned to him by Mr. Stubblefield, and he would give

14   him deadlines.  The feedback that I got from

15   Mr. Stubblefield was that those tasks were not

16   completed, or completed inaccurately and not on time.

17       Q.    Do you have any information of your own

18   observation, that is, other than what Mr. Stubblefield

19   told you?

20       A.    Well, in that respect, I worked with

21   Mr. Royall on his tax filings, and one of the reasons

22   why I did his tax filings is because they wouldn't

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                          July 11, 2006

Page 103

1    have been filed on time if I hadn't interfered.

2        Q.    Well, before, you told us you were assisting

3    him because he had other work to do.

4        A.    Well, I was assisting him on occasion on

5    other projects, but in these cases here, the taxes --

6    we were at our due date and I was asked by

7    Mr. Stubblefield to file these taxes as quickly as

8    possible because otherwise it would not get filed.

9        Q.    All right.  Which taxes?

10       A.    These were state taxes, and we filed a

11   number of them, actually, to about 30 states.

12       Q.    Well, how many times was this -- did it

13   occur that on the due date, the taxes weren't filed

14   and that you had to intervene in order to get them

15   filed on time?

16       A.    I recall doing this in April and I also

17   recall doing it in July.

18       Q.    And for all 30 states?

19       A.    No.

20       Q.    No.  For how many states in April?

21       A.    I would say at least a couple of dozen.

22       Q.    Couple of dozen.

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 104

1    A.    Yeah.

2    Q.    Like 24 roughly?

3    A.    Yeah, 20 or 24, correct.

4    Q.    Out of 30?

5    A.    Or more.

6    Q.    And what about in July?

7    A.    Same thing.  Again, my recollection is

8    imperfect in these matters.

9    Q.    Did you ever witness Mr. Royall saying I

10   won't do this or I won't do what you want me to do?

11   A.    I recall asking Mr. Royall to do something

12   in a certain fashion and he initially said no.

13   Q.    All right.  In a certain fashion.

14   A.    In a certain fashion.

15   Q.    Not that he wouldn't do it.  He just didn't

16   want to do it the way you suggested.

17   A.    Correct.

18   Q.    And at that time, you were a temporary

19   employee --

20   A.    Correct.

21   Q.    -- tasked to help out on stuff.

22   A.    Correct.

CHARLES ROYALL                                    FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                      July 11, 2006

Page 106

1     A.     That's speculation.  I don't know.

2     Q.     Well --

3     A.     Mr. Stubblefield --

4     Q.     What is unwilling -- I'm sorry.  Go ahead.

5     A.     Mr. Stubblefield felt that he had ample time

6  to complete those assignments.

7     Q.     All right.

8     A.     And I recall him telling me Frank, he says,

9  we're going to have to do the 941s because Charles,

10  and I can't remember his exact language, is either

11  unwilling or unable to do them.

12     Q.     Big difference.

13     A.     There is a big difference, but I can't

14  remember the language, so I remember Mr. Stubblefield

15  starting doing some of -- a piece of it, passing them

16  on to me and we would go back and forth until it was

17  completed, or he would do it and then he would pass on

18  a different assignment to me that he needed.

19     Q.     You're mixing me up with all the pronouns.

20  He would do it or he would pass it on.

21     A.     In other words, he would.

22     Q.     Who's he?

CHARLES ROYALL                              FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 11, 2006

Page 107

1      A.    Ron --

2      Q.    Yes.

3      A.    -- would then take Mr. Royall's work, the

4  940, 941.

5      Q.    Yes.

6      A.    He would do the research, pull the reports,

7  complete the form, and say Frank, I don't have time to

8  do my own work.  You do it, I have to do Charles'

9  work.

10     Q.    I understand.  And how many times did this

11 occur?

12     A.    At least twice that I can recall clearly, as

13 clearly as I can get.

14     Q.    Did you ever go to Mr. Royall and tell him

15 look, you've got to pick up more of the slack here?

16     A.    Me?

17     Q.    Yeah.

18     A.    No.

19     Q.    You write in the next sentence that his

20 analytical skills are poor.  What did you base that

21 on?

22     A.    The speed, the learning curve, the time it

CHARLES ROYALL                               FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 11, 2006

Page 108

1    took him to actually complete one of his filings.

2       Q.    One in particular or --

3       A.    Any of them.  It just took a long time.

4       Q.    To do the 941s.

5       A.    Or to file state taxes or to download

6    reports from J.D. Edwards or to tie them out.  I

7    recall he had difficulty printing out the reports,

8    picking which report to print out, and then I believe

9    I assisted him with some of that.

10      Q.    How long did it take him to do a 941?

11      A.    I don't believe he ever did one.

12      Q.    Okay.  How long did it take him to do a

13   state form?

14      A.    I never actually took the time to -- I never

15   timed him on it.

16      Q.    Well, how long should a state form take?

17      A.    Some of them should take no longer than two

18   or three minutes.

19      Q.    All right, and those that only took two or

20   three minutes, how long did Mr. Royall take?

21      A.    I don't know.  He didn't do them.  I did

22   them.

CHARLES ROYALL                          FRANCIS ALEXANDER SCLAFANI
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS
                                                July 11, 2006

                                                        Page 113
1      ROYALL VS. NATIONAL ASSOCIATION OF LETTER CARRIERS

2

3              ACKNOWLEDGEMENT OF DEPONENT

4

5          I, FRANCIS ALEXANDER SCLAFANI, do hereby

6    acknowledge that I have read and examined pages 4

7    through 112, inclusive, of the transcript of my

8    deposition taken on Tuesday, July 11, 2006, and that:

9              (check appropriate box)

10

11         [] the same is a true, correct, and complete

12   transcription of the answers given by me to the

13   questions therein recorded.

14

15         [✓] except for the changes noted in the

16   attached errata sheet, the same is a true, correct,

17   and complete transcription of the answers given by me

18   to the questions therein recorded.

19

20

21   _____        7/28/06.
                                      _____
22         signature                       date

                     SLR REPORTING
                     (301) 340-0042

7e0fb434-d366-4491-b78c-68b1e5628b08

# ERRATA SHEET

## 7/11/06 DEP: FRANCIS A. SCLAFANI

Review the transcript, complete and distribute signed errata sheet
and acknowledgement to all parties, including SLR Reporting, within
30 days. Any changes should be listed below and not made upon the
transcript itself.

<u>P A G E     L I N E</u> _____     CHANGE/REASON

92  11-13  My first four years in the accounting field.
I worked as an accountant with the Department of
the Navy.

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

SIGNATURE (DATE

SLR REPORTING (301) 340-0042

ERRATA~1.RTF.1

July 24, 2006 5:52 pm

```
1            CERTIFICATE OF NOTARY PUBLIC

2            I, Karen Young, a Notary Public in and for

3     the District of Columbia, before whom the foregoing

4     deposition was taken, do hereby certify that the

5     witness whose testimony appears in the foregoing pages

6     was duly sworn by me; that the testimony of said

7     witness was taken by me in shorthand at the time and

8     place mentioned in the caption hereof and thereafter

9     reduced to typewriting under my supervision; that said

10    deposition is a true record of the testimony given by

11    said witness; that I am neither counsel for, related

12    to, nor employed by any of the parties to the action

13    in which this deposition is taken; and, further, that

14    I am not a relative or employee of any attorney or

15    counsel employed by the parties thereto, nor

16    financially or otherwise interested in the outcome of

17    the action.

18

19

20    Karen Young
      Notary Public in and for
21    The District of Columbia

22    My commission expires:  July 31, 2009


              SLR REPORTING
              (301) 340-0042
```