# Exhibit E

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - x

CHARLES ROYALL,                    :

         Plaintiff,           :

     vs.                          :    Civil Action

NATIONAL ASSOCIATION OF            :    No. 05-1711 (RBW)

LETTER CARRIERS,                   :

         Defendant.           :

- - - - - - - - - - - - - - - x

                  Washington, D.C.

                  Friday, July 21, 2006

Deposition of:

         CHARLES ROYALL,

the Witness, called for examination by counsel for

Defendant, pursuant to notice, commencing at 9:27

a.m., at the offices of Sherman, Dunn, Cohen, Leifer &

Yellig, P.C., 900 Seventh Street, Northwest,

Washington, D.C., before Karen Young, Notary Public in

and for the District of Columbia, when were present on

behalf of the respective parties:

ORIGINAL

CHARLES ROYALL                                              CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS           July 21, 2006

Page 8

1     answer each time, a yes or a no, that kind of a thing,

2     or a verbal answer.

3          A.     All right.

4          Q.     You understand that?

5          A.     I do.

6                 MR. HERMAN:  Off the record.

7                    (Discussion off the record)

8                 BY MR. HERMAN:

9          Q.     Is there -- do you take any medication that

10    would affect your memory today?

11         A.     No.

12         Q.     Is there any other condition that you have,

13    medical or otherwise, that might impair your memory

14    today so that your memory today wouldn't be as good as

15    it might be on other days?

16         A.     No.

17         Q.     Have you ever been convicted of a crime?

18         A.     No.

19         Q.     Have you ever sued anybody?

20         A.     Yes.

21         Q.     Prior to this lawsuit.

22         A.     Yes.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 9

1    Q.    Okay.  Who have you sued?

2    A.    I sued Jamieson Science and Engineering, and

3 I also sued Chenega Technologies, who used to be MRC,

4 McLean Research Corporation.

5    Q.    Okay.  And why did -- what did you sue

6 Jamieson about?

7    A.    I sued Jamieson for wrongful discharge.

8    Q.    Okay.  You were fired by Jamieson; is that

9 right?

10    A.    Yeah.

11    Q.    And when was that?

12    A.    In August of '93, as I recall.

13    Q.    And was your deposition taken in that case?

14    A.    For Jamieson?

15    Q.    Yes.

16    A.    Yeah.  I mentioned the other deposition when

17 I was working there.

18    Q.    Yeah.

19    A.    And then there was another one taken during

20 this case when I sued Jamieson, yes.

21    Q.    So Jamieson's attorneys deposed you; is that

22 right?

CHARLES ROYALL                                        CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 21, 2006

Page 10

1        A.      At Gary Simpson's home, yes.

2        Q.      And was Gary Simpson your attorney?

3        A.      No, Jamieson's attorney.

4        Q.      Jamieson's attorney?  And what was the

5    outcome of that lawsuit?

6        A.      It was eventually dismissed, or I lost.

7        Q.      What were you claiming in that lawsuit?

8        A.      What I was claiming in that lawsuit, that I

9    was terminated without any real cause, and in addition

10   to that, that they had said some very negative things

11   about me after I left that possibly caused me to not

12   get some positions that I applied for.

13       Q.      And in that lawsuit against Jamieson, did

14   you make any claim that you were fired because of your

15   race?

16       A.      No, there was no discrimination at all.

17       Q.      And where was that lawsuit filed?  In

18   federal court or state court?

19       A.      In state court in the state of Maryland, in

20   Rockville, as I recall.

21       Q.      All right.  And where's Gary Simpson's

22   office?

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 21, 2006

Page 11

1        A.      In Bethesda, isn't it?  Yeah, Bethesda.

2                MR. GAGLIARDO:  Let me clarify something.  I

3    knew Gary Simpson.  He's deceased.  He had a home

4    office in Bethesda.

5                BY MR. HERMAN:

6        Q.      Was there anybody -- was there a firm that

7    represented Jamieson?

8        A.      Gary Simpson.

9        Q.      Okay.

10               MR. GAGLIARDO:  Don't be misled by the fact

11   that he had a home office.

12       A.      Yeah, when I first met him, he had another

13   office there in Bethesda, yeah.

14       Q.      Was there any other lawyer that represented

15   Jamieson besides Mr. Simpson?

16       A.      Not to my knowledge, no.

17       Q.      Okay.  And where is Jamieson's home

18   headquarters?

19       A.      Where's the office?

20       Q.      Yeah, the office.

21       A.      It was in Bethesda.

22       Q.      What about the lawsuit involving, just to

CHARLES ROYALL                                      CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 12

1    simplify, McLean, yeah, what was that lawsuit about?

2         A.    There was discrimination.

3         Q.    Okay.  You claimed they discriminated

4    against you?

5         A.    Yeah, racial discrimination, exactly.

6         Q.    And when was that lawsuit?

7         A.    It was filed I think in 2002, I think.  I'm

8    not sure.

9         Q.    And where was that lawsuit filed?

10        A.    I think it was filed in -- it was filed in

11   Virginia courts.  I don't know, state courts,

12   somewhere in Alexandria.  I don't know exactly.

13        Q.    And what was the nature of the claim of

14   racial discrimination?

15        A.    Well, several things.  I'd been passed over

16   for positions there.  I got -- been not called racial

17   names, but disparaging names about my race, and I was

18   paid probably lower than anybody else for my position

19   and experiences.  I just felt like I was being

20   discriminated against.

21        Q.    How did your employment cease with McLean?

22        A.    I was terminated.  I wrote the president

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 21, 2006

Page 13

1       slash operations manager, Robert Bowe, a letter.

2           Q.      How do you spell Mr. Bowe's name?

3           A.      His first name is Robert.   The last name is

4       B-O-W-E, and I just told him how -- about the way I

5       felt I was being treated here.

6           Q.      This was before or after you were

7       terminated?

8           A.      No, this was before I was terminated.

9           Q.      And then you were terminated?

10          A.      I was terminated, uh-huh.

11          Q.      Do you have a copy of that letter?

12          A.      I think so.

13          Q.      That's okay.   You can look for it during the

14      break, okay?

15          A.      Okay.

16              MR. GAGLIARDO:   Let me just have it.

17          BY MR. HERMAN:

18          Q.      What was the outcome of that lawsuit?

19          A.      That lawsuit, unfortunately, I had probably

20      one of the worst attorneys in the world.   I don't know

21      what he did.   It was dismissed or I don't know.   We

22      took depositions.   During the deposition, my attorney

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 14

1    said almost nothing, so -- didn't even --

2        Q.    All right.  So the case was dismissed?

3        A.    Right.

4        Q.    Is that right?

5        A.    Exactly.

6        Q.    And when were you terminated by McLean?

7        A.    June of 2001, as I recall.  Yeah, June 7th,

8    2000 -- oh, 2000.  I'm sorry.

9            MR. GAGLIARDO:  Yeah, we have a copy of the

10   letter.  I mean we have the original of the letter.

11           MR. HERMAN:  All right, I'll take a look --

12           MR. GAGLIARDO:  I will say on the record,

13   although it's out of school, it must have been a bad

14   attorney given what this letter says.

15           MR. HERMAN:  Well, why don't you save the

16   comments for off the record, okay?

17           MR. GAGLIARDO:  Then strike it from the

18   record.  When you read the letter --

19           MR. HERMAN:  Okay.  Let's not have further

20   comments on the record.

21           MR. GAGLIARDO:  Okay, sure.

22           MR. HERMAN:  But I would like a copy of the

CHARLES ROYALL

CHARLES ROYALL

vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

July 21, 2006

Page 15

1    letter.

2            MR. GAGLIARDO:  I'll keep it right here.

3            BY MR. HERMAN:

4       Q.    All right.  Have you sued anybody else?

5       A.    No.

6       Q.    All right.  Have you ever been sued?

7       A.    By a company, no.

8       Q.    By anybody else.

9       A.    No.

10      Q.    So you've never been sued at all?

11      A.    No, I never go into court for a suit, no.

12      Q.    Except for the ones you just told us about.

13      A.    Right.

14      Q.    And by the way, what firm represented McLean

15   in the McLean lawsuit?

16      A.    Oh, boy.  I don't know.  Is it in there?

17      Q.    All right.  If you can find it --

18      A.    Yeah, because I don't remember the guy's

19   name.

20      Q.    Okay.  And what was the name of the lawyer

21   that was no good according to you?

22      A.    Mr. Nathan Johnson.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 16

1      Q.     Okay.  And where are his offices?

2      A.     His office is in Waldorf.  Waldorf,

3    Maryland.

4      Q.     All right.  You mentioned that you were

5    fired by Jamieson and you were fired by McLean.  Have

6    you ever been fired by anybody -- any other employer

7    except for the NALC?

8      A.     God, I can't think of any -- any

9    terminations right now, no.

10     Q.     And I just -- I may have asked you this but

11   just want to be clear.  In your lawsuit against

12   McLean, you claimed that you were terminated on the

13   basis of racial discrimination?

14     A.     Yes.

15     Q.     Now, what's your age, sir?

16     A.     Fifty-five.

17     Q.     So you were born in 1951?

18     A.     Right.

19     Q.     And are you single?

20     A.     Yes.

21     Q.     Have you ever been married?

22     A.     No.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 20

1       Deposition Exhibit 1.

2                (Curriculum Vitae, marked for identification

3       as Deposition Exhibit No. 1.)

4                MR. GAGLIARDO:   Off the record for a second.

5                (Discussion off the record)

6                BY MR. HERMAN:

7           Q.    For the record, the document's Bates stamped

8       NALC 27 and 28.   Is this a copy of your, you know,

9       curriculum vitae that you presented at the time you

10      applied to the NALC?

11          A.    It is.

12          Q.    And let me just ask a couple background

13      questions, something I'm not sure of.   How did you

14      learn about the position in the NALC?

15          A.    Advertisement in The Washington Post.

16          Q.    Was it advertised -- did you contact Bond

17      Beebe about that position?

18          A.    Yes, I did.

19          Q.    Or the NALC directly?

20          A.    Bond Beebe.

21          Q.    So they were putting forth the advertisement

22      --

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 21

1    A.    Right.

2    Q.    -- about a position at the NALC?

3    A.    Yes.

4    Q.    And who did you contact at Bond Beebe, if

5    you recall?

6    A.    I don't remember.

7    Q.    You looked this over quickly, or however

8    long you need.  Is everything true and accurate on

9    this Exhibit 1 at the time you gave it to the NALC?

10   A.    To the best of my knowledge, yes.

11   Q.    When did you graduate from Howard?

12   A.    1993.

13   Q.    When did you start your college education?

14   A.    I started in 1974 and dropped out and went

15   back in '93 and completed my degree.

16   Q.    Okay.  How long were you in college in '73?

17   A.    No, I said 1974.

18   Q.    '74.  I apologize.

19   A.    I was in the military in '73.

20   Q.    How many years were you in college in '74?

21   A.    I was there in 1974 until the fall of 1978,

22   somewhere around there.

CHARLES ROYALL                                              CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                     July 21, 2006

Page 29

1    is that right?

2        A.      Uh-huh.

3            MR. GAGLIARDO:  Yes or no.

4        A.      Yes.  I'm sorry.

5        Q.      And you list your present employer as

6    unemployed; is that correct?

7        A.      Yes.

8        Q.      So at the time you applied, you were in fact

9    unemployed; is that right?

10       A.      I was, I was.

11           MR. HERMAN:  Let's mark this as Exhibit 3.

12           (Royall letter to Bond Beebe, 1/22/02,

13   marked for identification as Deposition Exhibit No.

14   3.)

15           BY MR. HERMAN:

16       Q.      I may have asked you this, and if so, I

17   apologize, but do you know the name of the law firm

18   that represented McLean when you sued them?

19       A.      No, I don't.  It was --

20           MR. GAGLIARDO:  Off the record.

21           (Discussion off the record)

22           BY MR. HERMAN:

CHARLES ROYALL                                     CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 30

1      Q.     But again, was that lawsuit brought in the

2   Virginia courts, you say, and you don't know whether

3   it was in state or federal; is that correct?

4      A.     I don't remember, no.

5             MR. GAGLIARDO:  Off the record.

6             (Discussion off the record)

7             BY MR. HERMAN:

8      Q.     When you brought the name -- when you

9   brought the lawsuit, it was Royall against -- what did

10  you call the company in the lawsuit, if you remember?

11     A.     I think that it was Chenega Technologies,

12  formerly MRC, McLean Research Corporation.

13     Q.     Okay.  Looking at Exhibit 3 --

14     A.     Uh-huh.

15     Q.     Is this the letter that you sent to Bond

16  Beebe that you testified about earlier in connection

17  with their Washington Post ad for the position at the

18  NALC?

19     A.     It is.

20     Q.     And the little -- the very top of the page

21  which has a sort of Charles M. Royall and it's got

22  kind of a logo there or some kind of drawing --

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 31

1      A.     Yes.

2      Q.     Is that -- and that's -- that's your home

3      address and phone.  Isn't that below the drawing?

4      A.     Yes.

5      Q.     Is that logo something that's on sort of

6      your personal letterhead?

7      A.     Yeah, something I put together, yes.

8      Q.     Okay.  And subsequent to writing the letter

9      to Bond Beebe, you did have an interview with the

10     NALC; isn't that right?

11     A.     I did.

12            MR. HERMAN:  Let's mark this as Exhibit 4.

13            (Royall letter to Broendel, 2/12/02, marked

14     for identification as Deposition Exhibit No. 4.)

15            MR. HERMAN:  And all of these documents have

16     been previously produced by the NALC.

17            MR. GAGLIARDO:  Acknowledged.

18            BY MR. HERMAN:

19     Q.     Now, this document appears to be dated

20     February the 12th, 2002.  Did you write this letter to

21     Ms. Broendel at the NALC?

22     A.     I did.

CHARLES ROYALL                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS            July 21, 2006

                                                        Page 32

1        Q.    And do you see where it says, "I'd like to

2    take the opportunity to thank you for the time you

3    gave me for the interview this morning"?

4        A.    Yes.

5        Q.    So the interview was on the 12th of February

6    2002?

7        A.    Yes.

8        Q.    And isn't it correct that you were

9    interviewed by William Young, by President Young, by

10   Ms. Broendel and by Mr. Stubblefield?

11       A.    Yes.

12       Q.    Did anybody else interview you besides those

13   three?

14       A.    No.

15       Q.    By the way, do you consider Mr. Stubblefield

16   African American?

17       A.    He is African American.  I don't even like

18   to use the term African American.  I prefer the term

19   black.  He's black.

20       Q.    That's fine.  I was just using the

21   terminology that was used in your complaint in that

22   lawsuit.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 35

1      A.      They did identify, all three.

2      Q.      And did you have a subsequent interview or

3  were you hired there?

4      A.      I had a subsequent interview with Bill

5  Young.

6      Q.      How long did that --

7      A.      It was not very long because he made me an

8  offer and that was it.

9      Q.      And did you accept the offer?

10     A.      I did.

11             MR. HERMAN:  Let's mark this as Exhibit 5.

12             (Notification of Personnel Action, 2/25/02,

13  marked for identification as Deposition Exhibit No.

14  5.)

15             BY MR. HERMAN:

16     Q.      This document is called "Notification of

17  Personnel Action," and it shows that you were hired on

18  February the 25th, 2002 in the position of accounting

19  manager, and it gives a weekly salary of a thousand

20  dollars and an annual salary of $52,000; is that

21  correct?

22     A.      That's correct.

CHARLES ROYALL                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS          July 21, 2006

Page 36

1      Q.    And March 25th was in fact your first day at

2  the job, right?

3      A.    No, February 25th.

4      Q.    February.  I'm sorry.  You're right.

5  February 25th.

6      A.    Right.

7            MR. HERMAN:  Let's mark this as Number 6.

8            (Broendel memo to NALC Officers, Staff and

9  Employees, 2/27/02, marked for identification as

10  Deposition Exhibit No. 6.)

11            BY MR. HERMAN:

12      Q.    This was a document that I gave to you

13  previously, Mr. Gagliardo, at I think Mr. Young's

14  deposition.  Do you recall seeing this in late

15  February 2002?

16      A.    No, I never saw this before.

17      Q.    But you have no reason to think it wasn't in

18  fact circulated to the officers, staff and employees

19  of the NALC as indicated.

20      A.    No.

21      Q.    All right.  Now, your position as accounting

22  manager -- in your position of accounting manager, who

CHARLES ROYALL                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 38

1    what your job duties were?

2         A.    Yeah.

3         Q.    Okay.   How did you come to that

4    understanding?

5         A.    I looked at a description of -- a list of

6    work that had to be completed, and from that, I got a

7    pretty good idea of what I had to do in there.

8         Q.    Okay, but you're saying that -- did

9    Ms. Broendel ever describe to you what your job duties

10   would be?

11        A.    She said it would be accounting and human

12   resources.   That's as much as she said.

13        Q.    Did she say that you had principal authority

14   and responsibility for payroll?

15        A.    Oh, absolutely.   I don't recall her using

16   those exact terms.

17        Q.    I'm not -- but in substance.

18        A.    Yes.

19        Q.    So you understood that.

20        A.    Right.

21        Q.    And did Mr. Stubblefield ever give you any

22   guidance or instructions on what your duties were?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 41

1     Q.     -- which says you consistently performed

2     your assigned duties in a manner acceptable to

3     defendant.  On what basis do you say that you

4     performed your duties in a manner acceptable to

5     defendant?  By defendant, that's the NALC.

6     A.     Well, I say that because -- excuse me for

7     one second.  Can I go through these documents and show

8     you?

9     Q.     Well, not right now because it's going to

10    take too long because we just got these documents, but

11    tell me in general terms what you mean by that.

12    A.     In general terms, I was given a list, as I

13    stated earlier, of duties that had to be completed

14    that had not been completed since the prior accounting

15    manager left in August, at the end of August of 2001.

16    He'd been gone for over six months.  One of those

17    duties was the bonds, and I got the bonds caught up.

18    Mrs. Broendel sent an e-mail to Mr. Stubblefield

19    thanking him for doing the bonds, and Mr. Stubblefield

20    brought it to me and said that she gave me this by

21    error, great job, good job, I'm glad you did the work.

22    Q.     So Stubblefield complimented you on this

CHARLES ROYALL                                        CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 42

1    job.

2         A.    Yes.

3         Q.    Is that right?  Okay.

4         A.    Uh-huh.

5         Q.    All right.  And let's -- just so that we

6    read this sentence in paragraph 7 as a whole, it says

7    that not only you performed your duties in a manner

8    acceptable to the NALC, but on several occasions, you

9    were complimented for your performance.

10        A.    Right.

11        Q.    You just told us about I guess when

12   Mr. Stubblefield complimented you on your performance.

13   What are some other occasions?

14        A.    And other occasions, he complimented me on

15   cleaning the office up, because when I went in there,

16   I could barely get in the office there was so much

17   paper and junk in the office.  He also complimented me

18   on getting the tax returns done on time.  They were

19   caught up at last.  In addition to that, Mrs. Broendel

20   praised me for doing the work that she requested I did

21   in a timely manner.

22        Q.    When was that?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 43

1    A.    Again, on insurances -- on the insurances,

2  for example, they were -- had people that were dead

3  and they were still paying the premiums for them, and

4  I cleaned that up.  She requested we were paying

5  another insurance to -- I can't recall now.  You have

6  a document over there.  She said she wanted backup,

7  she wanted to know a list of all the people they were

8  paying insurance to.  She gave me it one day.  I

9  completed it that afternoon, gave it back to her.  She

10  thanked me for getting it done.

11    Q.    And when you say she thanked you on those

12  two occasions --

13    A.    Uh-huh.

14    Q.    Did she thank you in person or writing?

15    A.    No, she wrote it, wrote it on the document I

16  gave her.

17    Q.    Okay.  Anything else about your work being

18  complimented?

19    A.    Also, they mentioned I think earlier during

20  their deposition that the tax filings -- I think they

21  showed one that I was late on, and I gave

22  Mrs. Broendel a copy of the tax deposit I had made.

CHARLES ROYALL                                                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                                          July 21, 2006

Page 44

1    It was on time.  The check to cover payroll was on

2    time, and I let her know that it was going to be on

3    time, and this would be what would happen in the

4    future, and she thanked me and put an exclamation

5    point behind it.

6         Q.     So you're saying there was this one occasion

7    where the tax was not paid on time; is that right?

8         A.     Right.

9         Q.     And then you said that in the future, it

10   would be paid on time?  Is that what you're saying?

11        A.     Yes.

12        Q.     And when you were referring to a document,

13   just to make sure that -- you referred to a document

14   in the earlier depositions.

15        A.     Uh-huh.

16        Q.     This was previously identified as McGhee

17   Deposition Exhibit Number 1.  It's now Bates stamped

18   115 through 118, and is this what you're referring to,

19   sir, as the one time that you had a late payment?

20        A.     Yes, this is it.

21        Q.     And that's your handwriting on the second

22   page of that document?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 45

1    A.    On the second and the fourth page.

2    Q.    All right.  Anything else about people

3 complimenting you on your work, NALC officials

4 complimenting you on your work?

5    A.    Other than the fact that Suk, when during

6 her deposition last week, I completed her payroll.

7    Q.    No, I'm talking about when they complimented

8 you while you were employed; not something --

9    A.    Well, I'm telling you, that's what I'm

10 saying, that she complimented me on completing her

11 payroll and getting it done while she was on vacation.

12    Q.    Okay.  Did you -- anything else?

13    A.    I can't think -- oh, I do recall, we had an

14 account payable clerk called Chris Tarbrake.  I found

15 out that when Ronald Stubblefield went to get an eye

16 exam -- he started work there, as I recall, September

17 2001.

18    Q.    You're talking about Stubblefield?

19    A.    Stubblefield.

20    Q.    Okay.

21    A.    And he had signed -- completed his papers

22 and everything with Spectra I think it's called for

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 46

1    the eye insurance, and I went over and talked to Chris

2    Tarbrake and he had never paid the bill.  When the

3    bill came in, Ronald Stubblefield's name was not on

4    there.  He never brought it to my attention, he never

5    called Spectra and asked them why Ronald

6    Stubblefield's name was not on there.

7         And in addition to that, when I went over to

8    check it out, I found out that Linda Stewart had

9    started work earlier I think in July, as I recall, of

10   2001, and she had signed up for the same insurance,

11   and Chris Tarbrake had received the invoice.  Their

12   name was not on it, but he didn't research it, he

13   didn't call and ask or do anything.

14        Q.    But what I was asking you about was who else

15   complimented you on your work.

16        A.    Well, I'm telling you, they complimented me,

17   Ron and Stewart, because finally they was getting the

18   insurance they had signed up for.  They were very

19   pleased about that.

20        Q.    Anything else you can think of, people

21   complimenting you on your work?

22        A.    Not right now, I can't think of anything

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 21, 2006

Page 49

1    you were employed there?

2        A.    Oh, my God.    Almost every day.    Quite a bit.

3    Quite a bit.

4        Q.    And what were the subjects when you spoke

5    with her almost every day?

6        A.    Well, in the beginning, it was the getting

7    the taxes caught up, getting the taxes filed.    As I

8    would do them and have them ready for filing, I

9    presented them to her, along with the check that

10   Mr. Stubblefield cut, written so she could sign it and

11   get those taxes paid.

12       Q.    And your testimony is under oath today that

13   in all that almost daily interchange with Jane

14   Broendel, you never heard a word of criticism from

15   her?

16       A.    No, never.

17       Q.    Were you the supervisor of Suk, S-U-K?

18       A.    Yes, Suk Neidlinger.

19       Q.    And at the time you were employed by the

20   NALC, you were completely unaware, is that your

21   testimony, that Suk had some problems with you?

22       A.    Suk had no problems with me as far as I

CHARLES ROYALL                                       CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 50

1    know.

2        Q.    And that she did not view that you

3    understood the payroll system adequately?  You were

4    completely unaware of that?

5        A.    I mean, I completed the payroll when she was

6    on vacation, and one of the things she told me before

7    she went on vacation is that when Chris Tarbrake did

8    the payroll when she was on vacation before, that he

9    called her and interrupted her vacation.  And I told

10   Suk I will not call you, I don't need to call you

11   because I know how to do payroll, and I did not call

12   her.  When she come back, I had successfully completed

13   payroll.  So yes, I understood payroll.

14       Q.    Now, were you familiar -- when you started,

15   were you familiar or unfamiliar with the J.D. Edwards

16   system?

17       A.    Had no knowledge of it.  Absolutely none.

18       Q.    And you heard Suk's testimony I believe that

19   she had to give you a fair amount of instruction on

20   J.D. Edwards.  Would you agree with that?

21       A.    Absolutely, she did, yes.

22            MR. HERMAN:  Let's mark this as Exhibit 8.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 51

1          (Notice from IRS, marked for identification

2      as Deposition Exhibit No. 8.)

3          BY MR. HERMAN:

4      Q.     Now, you see this document, which again, was

5      produced, now Bates stamps 120 and 121, previously in

6      this case before the depositions.  You see on the

7      first page that this IRS statement refers to the --

8      the document refers to the tax period of June 30th,

9      2002?  Do you see that in the top right corner?

10     A.     Yes.

11     Q.     And if you turn to the second page, about,

12     you know, a quarter of the way down, do you see that

13     there was a penalty assessed for a late payment of

14     taxes?  Do you see that?

15     A.     I see that, yes.

16     Q.     And the due date was, as stated in this

17     document, is April the 29th, and the payment date was

18     April the 30th according to the document; is that

19     right?

20     A.     Yes, sir.

21     Q.     And again, that was during the period of

22     time when you worked at the NALC, right?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 52

1    A.    Yes, sir.

2          MR. HERMAN:  Let's mark this as Exhibit 9.

3          (Fax from Mr. Royall, 7/9/02, marked for

4    identification as Deposition Exhibit No. 9.)

5          BY MR. HERMAN:

6    Q.    Again, that's sort of about a third of the

7    way down this page, is that the same letterhead that

8    we discussed earlier in connection with your letter to

9    Bond Beebe?

10   A.    Yes.

11   Q.    And is that your handwriting directly below

12   that?

13   A.    Yes.

14   Q.    9th of July?

15   A.    It is July 9th, yes.

16   Q.    And this document indicates that it was

17   being faxed on July the 9th to an address but did not

18   go through, to a fax number.  Who were you faxing this

19   to on July 9th?

20   A.    I was faxing this to a job opportunity that

21   I saw in The Washington Post.

22   Q.    Okay.  And what was that job opportunity?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 54

1    do, and at the same time, I continue to look for a

2    position if I see an opportunity, because I'm an

3    at-will employee.  After 90 days, after six months,

4    they can say we don't need you any longer here.

5        Q.    Okay, and did you interview for another

6    position at this time?

7        A.    During the time I was there, I did not have

8    an interview.

9        Q.    But you did send out or you tried to send

10   out this letter of an application; is that right?

11       A.    Yes.

12       Q.    Okay.  And you don't remember who you sent

13   it to?

14       A.    No.

15       Q.    Now, you mentioned that you were an at-will

16   employee, and that's correct; isn't that right?

17       A.    Yes.

18       Q.    So that the NALC could terminate you at any

19   time without cause, isn't that right, for any reason

20   at all?

21       A.    Yes, that's what at will means.  That's my

22   understanding.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 55

1    Q.    And you weren't aware of any 90-day review

2    or six-month review at the NALC, were you?

3    A.    As far as I knew, I thought it was a 90-day,

4    standard.   That's as far as I know.

5    Q.    Okay, but as far as --

6    A.    But as far as seeing it in writing --

7    Q.    Yeah.

8    A.    No, I didn't see it in writing.

9    Q.    Did anybody ever tell you that there was a

10   90-day review or six-month review?

11   A.    I can't recall someone telling me that, no.

12   Q.    So that was just your assumption, right?

13   A.    Yeah.   I mean, it's pretty standard.

14   Q.    I just want to make sure, you understood

15   that the NALC did not have to have specific cause to

16   terminate your employment; isn't that correct?

17   A.    I was at will.

18   Q.    And that's what that means; isn't that

19   right?

20   A.    That's what that means as far as I know.

21   MR. HERMAN:   Let's mark this as Exhibit 10.

22   (Royall memo to Broendel, 8/9/02, marked for

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 58

1    with the staff at the home office; isn't that right?

2        A.    At NALC?

3        Q.    Yes, at the NALC.

4        A.    Yes, yes.

5        Q.    And you were aware, are you not, that there

6    are numerous African American or black employees

7    there; isn't that correct?

8        A.    At NALC?  I don't know how many.  I didn't

9    give it much of a thought.  I don't know.

10       Q.    Okay.  Thinking about it now, were you aware

11   that there were a large number of black employees at

12   the NALC?

13       A.    I still don't know.  I really don't.

14       Q.    Okay.  Well, in the finance department, were

15   there any African American -- black employees besides

16   Mr. Stubblefield?

17       A.    There were me, Mr. Stubblefield.  I think

18   there were three others.

19       Q.    Three others?

20       A.    So there were five of us including myself.

21       Q.    And how big was the finance staff?

22       A.    I think it was seven of us total.

CHARLES ROYALL                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 59

1      Q.     And you may not know this but I'll ask it

2      anyway.  You're well aware that there are a large

3      number of blacks, women, Native Americans and so on in

4      the membership force of the letter carriers' union;

5      isn't that correct?

6      A.     I would imagine so.  I don't know.  I really

7      don't know.

8      Q.     There's no reason to think that's not the

9      case.

10     A.     No.

11     Q.     Let's turn back to Exhibit 10.  Did you

12     communicate this memo to Ms. Broendel around August

13     the 9th, which is the date of the memo?

14     A.     No, that's the date that I wrote that memo

15     right there, no.

16     Q.     So you didn't give it to her on that day.

17     A.     No, I did not.

18     Q.     Why not?

19     A.     Well, I felt that it was inappropriate.

20     During that time, we were getting ready for the

21     biannual convention in Philadelphia, and I wrote it on

22     the 9th and I thought about presenting it to her that

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 60

1    day, and because we were getting ready for the

2    convention -- in fact, I think I left on the 12th of

3    August for Philadelphia, and it was just inappropriate

4    to do it at that time, so I didn't do it.

5              MR. HERMAN:  Let's mark this as 11.

6              (Authorization to Travel for National

7    Officers, 3/18/02, marked for identification as

8    Deposition Exhibit No. 11.)

9              BY MR. HERMAN:

10        Q.    This is again a voucher concerning the

11   authorization for you to travel to that convention

12   that you just mentioned; isn't that right?

13        A.    Yes, sir.

14        Q.    And you said that you left on August the

15   12th; is that right?

16        A.    Somewhere around there.  I can't remember

17   exactly.

18        Q.    12th or the 13th?

19        A.    12th or the 13th.

20        Q.    Okay, and you were away in Philadelphia

21   until the 24th, something like that?

22        A.    Yes.

CHARLES ROYALL                                      CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 63

1       Q.      Okay.    And what happened next?   Who said

2    that?

3       A.      Jane told me -- she pulled out this and she

4    said that she was not going to give me an increase, I

5    was not worth it, blah blah blah.    I can't remember

6    exact words, and that in fact, my employment was being

7    terminated because I was not doing my job, I was not

8    qualified to do my job and I was unhappy working

9    there, and she put that in the termination letter, as

10   I recall, and should I go on and tell you --

11      Q.      Well, what did you say when she said that?

12      A.      Well, I was really shocked that I was being

13   terminated, and I told her that I was doing my job.   I

14   told her I was happy working here, and because of

15   those two reasons is the reason I asked for an

16   increase.   If I wasn't happy here, was doing my job, I

17   wouldn't be stupid enough to ask for an increase.   It

18   wouldn't make any sense, and she said none of that

19   mattered, that I was being terminated, it was her

20   decision, that I was not doing my job, and she asked

21   me to leave the office.   And she got up, I got up and

22   we walked to the door and I left, and she told -- I