CHARLES ROYALL                                    CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 64

1    guess she told Myra to escort me out of the building,

2    because Myra Warren escorted me out of the building

3    after I cleaned out my office.

4        Q.    And that was the last time you were present

5    at the NALC?

6        A.    Yes.

7        Q.    Anything else that you recall about what you

8    said or what Ms. Broendel said on this occasion?

9        A.    I can't recall anything else.

10       Q.    Did you say anything to Ms. Broendel when

11   you were in her office on the 27th about that she was

12   going to have to explain herself in court?

13       A.    No.

14       Q.    You didn't say anything about a legal action

15   or anything --

16       A.    No.

17       Q.    -- connected with that?

18       A.    No.

19       Q.    On this occasion, Ms. Broendel didn't say

20   anything about your race, did she?

21       A.    No.

22       Q.    Did Ms. Broendel ever make any comments

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 65

1 about your race?

2     A.    No.

3     Q.    Did Mr. Young ever make any comments about

4 your race?

5     A.    No.

6     Q.    Did Mr. Stubblefield ever make any comments

7 about your race?

8     A.    No.

9     Q.    Did any of them ever make any derogatory

10 comments about blacks or African Americans in general

11 that you heard?

12     A.    No.

13     Q.    And again, I'm referring to Stubblefield,

14 Broendel and Young; is that right?

15     A.    Right.  I don't know why you're saying

16 Stubblefield, but no.

17          MR. HERMAN:  Let's mark this as 13.

18          (Royall letter to Broendel, 9/5/02, marked

19 for identification as Deposition Exhibit No. 13.)

20          BY MR. HERMAN:

21     Q.    Is Exhibit 13 a letter you wrote to

22 Ms. Broendel on -- on or about September the 5th?

CHARLES ROYALL                                         CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 76

1      Q.     Where is that?

2      A.     It should be there in the office.  I filed

3  everything away.

4      Q.     Well, let's just in general ask, how did it

5  come to be that you have these documents in your

6  possession?  And these documents, I'm referring to the

7  documents that pertain to when you were employed with

8  the NALC that you just gave us today.

9      A.     Okay, how I have these documents is this.  I

10 had made up my mind early on that I was going to go in

11 I guess around late June sometime, that I was going to

12 go in and negotiate a raise, and I made copies of

13 these little notes and stuff and put them in a folder

14 in my office, and the day Jane Broendel fired me and

15 told me to clear out my office, I grabbed this folder

16 and left the office with it that day with these

17 documents.

18     Q.     Did you consider it appropriate to be

19 removing NALC documents after you'd been terminated?

20     A.     Appropriate, I'm going to say -- what can I

21 say about -- two things.  I'd just been fired, which

22 was, I mean, an outrageous lie, claims I had not done

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 77

1    my job.

2        Q.    Just answer the questions.

3        A.    I'm going to get there.  I'm going to get

4    there.  Give me a minute to get there.  The

5    appropriateness of this I did question, because as you

6    can see, there are social security numbers, there are

7    bank numbers, but -- I mean, I was almost in shock

8    being terminated, and to be told that I was not doing

9    my job was one of the most outrageous things I think I

10   heard during the whole time that I worked at NALC.  So

11   did I give it some careful thought, no.  I was asked

12   to leave and I left, and I grabbed -- I got my degree

13   off the wall, my membership with the Institute of

14   Management Accountants, I had some pictures there

15   where I had been in Paris and London, and I just

16   grabbed everything and left.

17       Q.    I'm not talking about your personal stuff

18   like your degree and stuff.  These are NALC documents

19   I'm talking about.

20       A.    And I'm telling you again, I mean, for

21   somebody to sit there or stand there -- sit there and

22   tell you you're fired because you're not doing your

CHARLES ROYALL                                              CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                    July 21, 2006

Page 78

1    job, when I say, the most outrageous statement I've

2    heard --

3        Q.    I understand you were upset on that day --

4        A.    -- when I worked there.  Well, I'm telling

5    you, you know, that I grabbed these documents because

6    I said, you know, what can I do?  I'm not going to

7    leave here with not something to prove that the

8    outrageous lie that she just got through telling.

9        Q.    In other words, you took NALC documents

10   because you were upset and you were considering doing

11   something about it; is that right?

12       A.    Not necessarily doing something at that

13   time, because I didn't know that I could do something

14   until I talked to an attorney, but one thing about it,

15   I felt that I had been done wrong and I was going to

16   talk to somebody, an attorney, a friend or somebody

17   and see if there's anything I could do.

18       Q.    Well, after you calmed down after some

19   period of days or however long it took you to calm

20   down --

21       A.    Uh-huh.

22       Q.    Did you consider again whether it was

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 81

1    Q.    Did you ever -- you never filed an EEOC

2    charge against the NALC, did you?

3    A.    No, I don't recall doing it, no.

4    Q.    Now, in your complaint, which is Exhibit 7,

5    sir --

6    A.    Okay, back to that.  Go ahead.

7    Q.    You claim that you were terminated by the

8    NALC because of your race, which is African American,

9    it says in the complaint, black, right?

10    A.    Right.

11    Q.    What evidence do you have that you were

12    terminated because of your race?

13    A.    Well, you know, I listed a whole list of

14    reasons why I think I was terminated because of my

15    race.  I'm going to go through them for you.

16    Q.    Okay.  Well, why don't you give me a copy of

17    that list.

18    A.    I will.  You would have to make a copy.

19    Q.    All right, we'll make a copy.

20    A.    I start out, number one, Ms. Broendel, Jane

21    Broendel, said I was not doing my job, and we -- and I

22    know now and we know that -- actually, I say we, that

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 82

1    that's not true.  The only evidence she's presented

2    that showed I was not doing my job was two late

3    payments to a -- two late tax deposits for payroll,

4    and during the time that I was there, I know for a

5    fact that Ms. Broendel signed checks for I don't know

6    how many late penalties and interest for payroll tax.

7    It became almost commonplace for her to do that

8    because the -- my job, that position, has been vacant

9    for almost six months before I came there.

10         Secondly, she said unqualified to do the

11   job, which is not true.  I have a degree in

12   accounting.  I've worked, God, now for almost 30

13   years.  All the work that I was doing in the

14   accounting department I've done on numerous occasions,

15   filing taxes, doing all that kind of work.

16         She stated that I was unhappy working at my

17   job, and I told you earlier that if I was unhappy, I

18   wouldn't have asked for a raise and wanted to --

19   stated that I wanted to be there for a long time in

20   the future.  Also, the other week, last week when Suk

21   was deposed, she mentioned that I was eager to learn.

22   I didn't seem unhappy or anything like that.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 83

1       I also recall an incident, I was in

2  Mrs. Jane Broendel's office during the summer of 2002

3  and we were going over some union work and her son put

4  his feet on the desk, which I felt very inappropriate,

5  his little feet.  He didn't wash them in a year or so.

6  She didn't ask him to remove his feet off the desk.  I

7  sure as heck wasn't going to ask him.  I didn't say

8  nothing.  I thought it was just absolutely outrageous

9  and sort of disrespectful in a racial nature.  Also

10  too, Ron Stubblefield, who at the time I worked there

11  --

12      Q.    Well, let me just pause on the feet on the

13  desk for a minute.  You said disrespectful in a racial

14  nature.  Why do you think that?

15      A.    I mean, here's this little white boy's going

16  to put his little dirty feet up on her desk during the

17  time -- after we started discussing union work.

18      Q.    This was her desk; isn't that right?

19      A.    It's her desk, but it doesn't matter whether

20  it's her desk or the pope's desk.  This is her son.

21  This was totally inappropriate, and she said nothing.

22  She sort of -- when he did it, she sort of looked down

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 84

1    as if she didn't want to see it.

2        Q.    Did she or her son make any reference to

3    your race on that occasion?

4        A.    No.

5        Q.    Okay.  Go ahead.

6        A.    The next thing, Ron Stubblefield told me --

7    and when Ron was there, as I recall, about 57, 58

8    years old, and he said he was having a conversation

9    with Mrs. Broendel, Jane Broendel, and it was a

10   disagreement, and the way he described it to me was he

11   was having the last word, and she said to him, "Don't

12   get lippy with me."

13        So we talked about it, and he said now,

14   would she have said something that ridiculous to me if

15   I was a white man?  I said no.  In other words, she's

16   -- it's like she's saying to you because you're black,

17   you're not going to talk to me in a certain way, and

18   -- well, me and Ron, probably similar in that nature,

19   if you say something off the wall and crazy to us or

20   do something like that, I'm going to say something to

21   you and you're not going to do that to us, and I know

22   that's the way he felt.  And for her to say don't get

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 85

1    lippy with me?  That's something you say to a child or

2    something; not to an adult.

3        Q.    Let me ask a couple questions about that

4    one, okay?

5        A.    Uh-huh.

6        Q.    Were you personally there when this

7    happened?

8        A.    No.

9        Q.    And this was something that was said

10    allegedly to Mr. Stubblefield.

11        A.    Right.

12        Q.    Is that right?

13        A.    Okay.

14        Q.    And did Mr. Stubblefield say that

15    Ms. Broendel made any explicit reference to his race?

16        A.    No, he did not say that.

17        Q.    So it was just the use of the word "lippy"?

18        A.    Yes.

19        Q.    Okay.  Go ahead.

20        A.    Also too, we had asked Broendel, Jane

21    Broendel, for training on J.D. Edwards, and I can show

22    you, I think I gave it to you, all the different

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 86

1   training that I received from Suk, Keith Proctor, I

2   think Tarbrake and other people in the office, but we

3   never received training on J.D. Edwards.  We were in

4   Philadelphia working, and somebody called down here to

5   the office for whatever reason and they told us that

6   Mr. Frank Sclafani, who was a temporary worker, was

7   being trained on J.D. Edwards, a white man, while we

8   were in Philadelphia working.  And all this time, the

9   two of us black, we never got training, we asked for

10  training, and here's a man been trained $200 an hour

11  40 hours of training, and he was a temp.  He didn't

12  even work for J.D. -- I mean J.D. Edwards.  Didn't

13  even work for the union, for NALC.

14       Q.    Let me ask just a couple questions about

15  that one.  First of all, who was it that told you

16  about that?

17       A.    I don't remember now.  I think it was Janice

18  Cain.  I can't remember.  I think it was Janet Cain.

19  I'm not sure.

20       Q.    And did you make your request to get J.D.

21  Edwards training in writing?

22       A.    Oh, yes, it was in writing.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 87

1    Q.    Do you have a copy of those requests?

2    A.    I don't have it.  I saw it in the

3  memorandums that Ron gave to Jane, because Ron

4  actually gave it to her in writing.

5    Q.    Did you yourself ever make a request in

6  writing?

7    A.    No, no.  We agreed that Ron would do it.

8    Q.    And you have no direct -- you have no

9  specific evidence that Sclafani was trained because he

10  was white and you were not trained because you were

11  black; isn't that correct?

12    A.    That -- well, yes, that is correct.

13    Q.    All right, go ahead.

14    A.    Also, we -- after I was terminated from

15  NALC, the union, I was replaced first by a white man,

16  Frank Sclafani.  Then I was replaced by another white

17  man, James Delio, then replaced by a white woman,

18  Carol Estabrook, and then finally by Mr. Steve McGhee,

19  who is also white, and Ron Stubblefield, upon his

20  termination, he was replaced by a white man.

21    Q.    Who was that?

22    A.    That was Frank Sclafani.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 88

1      Q.      And again, you have no direct evidence that

2   the fact that they subsequently held certain positions

3   was because they were white as opposed to any other

4   race, do you?

5      A.      No.   I mean, they could have interviewed

6   other people.   I don't know, but I do know we were

7   replaced by white people.

8      Q.      Aside from that bare fact, you have no

9   evidence that there was any discrimination involved,

10  do you?

11     A.      No.

12     Q.      Anything else?

13     A.      One other thing.   Brenda Wood, when we were

14  terminated, she said she had worked there since 1968,

15  and she was as shocked as I was that I was terminated

16  because she said that she can only remember one

17  person, other person that was fired, and that was a

18  Mr. Noble.   I don't remember Noble's first name, and

19  that, you know, the only reason he was terminated,

20  because he found that Vince Sombrotto and William

21  Young or somebody else in the union was doing

22  something illegal or wrong, and that was the only

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 89

1    reason that he was fired.

2        Q.    And when did you talk to Brenda?  And I'm

3    sorry.  I'm only calling Brenda because I can't

4    remember the last name.  Moore?  Is that right?

5        A.    No, Brenda Wood.

6        Q.    Wood.

7        A.    I talked to her the same day after I left

8    that day.  I think it was the same day.

9        Q.    Did you speak to her at the NALC or off the

10   property?

11       A.    At the NALC, same day when I was leaving.

12       Q.    Okay.  So after your encounter with Jane --

13   after your meeting with Jane Broendel, how long did

14   you stay at the NALC in the building?

15       A.    I was there a good 10, 15 minutes, maybe

16   longer.

17       Q.    And in that 10 or 15 minutes, you not only

18   took these documents, but you had a conversation with

19   Brenda Wood?

20       A.    Brenda Wood and Myra Warren, who escorted me

21   out.  And one of the things that Myra said, that she

22   was shocked to find out I was terminated as well.  She

CHARLES ROYALL                                        CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 90

1    at that time held the position of assistant secretary/

2    treasurer, and I told her the reason I was fired and

3    she said God, you know, I come to you and ask you for

4    different things and you gave it to me almost

5    immediately without hesitation.  She said also, I

6    hadn't heard anything about misconduct or anything.

7    And this was the conversation we were having as we

8    went to the elevator, down the elevator into the area

9    that I park my car in the building.

10        Q.    Did you talk to anybody else while you were

11   still at the NALC?

12        A.    No.

13        Q.    So it was Ms. Wood and Myra Warren, right?

14        A.    Right.

15        Q.    And again, neither of them said anything

16   about -- that you were being terminated because you

17   were black, did they?

18        A.    Brenda -- Brenda mentioned to me that we're

19   the first blacks who held that position and -- you

20   know, but she didn't say I was being terminated

21   because I was black, no.

22        Q.    And neither did Myra, right?

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 91

1    A.    No, no.

2    Q.    Anything else?

3    A.    That's -- one other thing -- well, those are

4  the only things I can think of.  I just think the

5  timing of my termination was a little ridiculous to

6  say the least, I mean, because Mrs. Broendel stated

7  during her deposition that she knew as early as May

8  that I would not be able to continue to work there and

9  perform the duties of the accounting manager, but why

10 didn't she fire me in May?

11          Instead of firing me in May, I continued to

12 work, went up there to Philadelphia at the biannual

13 conventions and performed my duties very well, and it

14 was not until the second day that we were back from

15 the convention that she walked in to fire me.  I'll be

16 damned.  I mean, that was just -- you know, just the

17 timing of it was just unbelievable.

18    Q.    Okay.  And is that the sum total of the

19 facts on which you base your claim that you were

20 terminated because of your race?

21    A.    Yes, I can't think of anything else right

22 now.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 92

1          MR. GAGLIARDO:  That's the sum total of his

2    testimony.  As you know, that doesn't preclude us from

3    introducing other evidence, and we do have other

4    evidence of racial discrimination.

5          BY MR. HERMAN:

6      Q.    What other evidence of racial discrimination

7    is there?

8      A.    I don't have anything else right now.

9      Q.    Do you have knowledge of anything else?

10     A.    Not right now, no.  Again, I just -- I went

11   through this list and listed these things.

12     Q.    Okay.  When did you prepare that list?

13     A.    Last evening.

14          MR. HERMAN:  It might be a good idea to just

15   take a short break and make a copy of that so we can

16   put it in the record.

17              (Recessed at 11:19 a.m.)

18              (Reconvened at 11:22 a.m.)

19          (Notes by Mr. Royall, marked for

20   identification as Deposition Exhibit No. 17.)

21          BY MR. HERMAN:

22     Q.    I direct your attention to Exhibit 17.  Sir,

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 93

1    is that a copy of the list that you prepared last

2    night that you just testified about and that form the

3    basis of -- or that you were looking at -- let me

4    start that over.  Is this a copy of the list that you

5    just testified you prepared last night?

6         A.    Yes.

7         Q.    And were you looking at that list when you

8    just gave your testimony about race just before?

9         A.    Yes, yes.

10        Q.    Do you know what your lawyer was just

11   talking about when he said he had other evidence of

12   racial discrimination?

13             MR. GAGLIARDO:  You can say no.

14        A.    No.

15        Q.    So you don't know what he meant by that.

16        A.    No.

17        Q.    Do you know anybody in the Keystone branch

18   in Philadelphia?

19        A.    No.  I probably met people when I was in

20   Philly, but I don't remember at this point, no.

21        Q.    Do you know a Sheila Dunning?

22        A.    Oh, yeah.

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS                July 21, 2006

Page 109

1     A.     I'm telling you what I think it is.  When I

2  left there, I was very upset, embarrassed to even tell

3  my family that I just got through -- I was fired, and

4  you know, and then having to go through two whole

5  years of being unemployed.  I remember going on an

6  interview and the gentleman said to me, "You got fired

7  from a union shop?"  And he sit there in total

8  disbelief.  Who in the hell gets fired from a union

9  job?  And I mean --

10     Q.     You weren't represented by a labor union,

11  were you?

12     A.     I was not represented by a labor union, but

13  I was working in a union shop.

14     Q.     All right.  So can you explain what you're

15  asking for in terms of this compensatory damages?

16     A.     When you say explain, what do you mean?  A

17  dollar amount or --

18     Q.     Well, what are you talking about?  Are you

19  talking about the fact that you were upset?

20     A.     No, I'm not talking about the fact I was

21  upset.  I'm talking about --

22          MR. GAGLIARDO:  His lawyer is though.

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 110

1    A.    Well, I mean, not upset, but I mean, I was

2  just distraught.  I mean, you think about it, this

3  woman's going to sit here and tell me I'm not doing my

4  job, fired me.

5    Q.    I don't mean --

6    A.    And I mean, you go through a lot of pain and

7  suffering, I mean, and then all the advertisements

8  that come through, I sent out resume after resume.

9    Q.    Well, let me ask you this.

10   A.    You're not getting a job.

11   Q.    After you left -- after you left the NALC,

12  did you see a psychiatrist or a psychologist about --

13   A.    No.

14   Q.    -- any mental distress?

15   A.    No, no, I did not.

16   Q.    Did you see a medical doctor about any

17  prescriptions for pills or anything like that?

18   A.    No.

19   Q.    Who is your doctor?  Do you have a doctor?

20   A.    Yes, I have a doctor that I see for physical

21  examinations, what, every two years.  Knock on wood, I

22  haven't been sick.  I don't take any pills currently.

CHARLES ROYALL                                          CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS              July 21, 2006

Page 115

1    about in the deposition?

2         MR. GAGLIARDO:  Well, it's my decision who

3    to call as witnesses.  We haven't made those

4    decisions.

5         MR. HERMAN:  I understand, but --

6         MR. GAGLIARDO:  We're not withholding --

7    we're not trying to withhold anything.

8         BY MR. HERMAN:

9    Q.    Are there witnesses that we haven't

10   referenced in these depositions that you know at this

11   point in time you intend to use as a witness?

12   A.    No.

13   Q.    And in the initial disclosures, similarly,

14   you're supposed to identify documents that you intend

15   to use to support your claims, and you produced

16   certain documents today actually.  Are there any other

17   documents that you're aware of that you intend to use

18   to support your claims?

19   A.    No.

20        MR. GAGLIARDO:  I don't know of any either.

21        BY MR. HERMAN:

22   Q.    And again, I'm going to ask just because I

Page 116

1    can't ask your lawyer.  Do you have any idea what he

2    meant when he told us today that he had additional

3    evidence of racial discrimination?

4          MR. GAGLIARDO:  You actually asked him that,

5    but go ahead.

6          THE WITNESS:  I told you before, I didn't

7    know.

8          MR. HERMAN:  Okay.  I guess I would ask that

9    in the spirit of discovery and disclosure, you advise

10   us what you're talking about.

11         MR. GAGLIARDO:  Well, off.

12         MR. HERMAN:  Yeah, we can go off the record.

13         (Discussion off the record)

14         MR. HERMAN:  Again I'm going to ask you --

15   why don't we take a short break and try to look

16   through some of this stuff just to see if there's

17   anything else I want to mark today, okay?

18         MR. GAGLIARDO:  Sure.

19         (Discussion off the record)

20         MR. HERMAN:  I guess I'd like to mark this

21   whole batch of documents, meaning the documents

22   pertaining to his employment with NALC that he just

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 128

1    Q.    Okay.  Again, you're referring to the

2    document which has the International Painters' letter

3    as the first page dated April 24th, 2002?

4    A.    I am, sir, and that's it.

5    Q.    Thank you, sir.  Now, I want to ask you, are

6    these documents you've given us today all the

7    documents that you took from the NALC?

8    A.    They are.

9        MR. GAGLIARDO:  Object to the form of the

10   question.

11       BY MR. HERMAN:

12   Q.    Except for purely personal documents.

13   A.    What?

14       MR. GAGLIARDO:  Still object to the form of

15   the question, but he can answer.

16       BY MR. HERMAN:

17   Q.    Now, earlier, you -- I asked you and you

18   gave an answer about all the evidence on which you

19   base your claim that you were racially discriminated

20   against.  Is there anything you want to add to that?

21   A.    Well, one thing that's on there, I didn't

22   mention it, I'd sent Jane several memorandums and

CHARLES ROYALL                                              CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS           July 21, 2006

Page 129

1    stuff.  She almost completely ignored me, and Ben

2    Hanson, who is black or Afro-American, he said that he

3    had not really -- she had not really responded to him

4    in any way at all when he had requested to talk to her

5    or sent her e-mails or memorandums, so other than

6    that.

7        Q.    Okay.  Did he -- so you say -- and let me

8    just try to understand your testimony.  You said that

9    you sent certain memoranda to Jane Broendel which you

10   felt were ignored; is that right?

11       A.    Uh-huh.

12       Q.    And Jane Broendel never said anything to you

13   that she was ignoring any memoranda, did she?

14       A.    No.

15       Q.    She didn't say anything about she was

16   ignoring any memoranda because you were black, did

17   she?

18       A.    No, I got no response at all from her.

19       Q.    And Ben Hanson said that he had told you

20   that he had had a similar experience?

21       A.    Uh-huh.

22       Q.    Did he ever tell you that Jane Broendel had

CHARLES ROYALL                                CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS         July 21, 2006

Page 130

1    said anything to him concerning his race?

2         A.    No.

3         Q.    Anything else you want to add?

4         A.    No, nothing else.

5         MR. HERMAN:  Okay.  I'll try to do us all a

6    favor.  I think I'd like to sort of -- off the record

7    for a second.

8              (Discussion off the record)

9         BY MR. HERMAN:

10        Q.    When you were interviewing at the NALC, did

11   the subject of J.D. Edwards software come up?

12        A.    I don't recall.

13        MR. HERMAN:  As we just said off the record,

14   I don't have any more questions at this time.  In view

15   of the fact we got a lot of documents today, I'm going

16   to leave the record open just in case we need to

17   continue the deposition.

18        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

19        BY MR. GAGLIARDO:

20        Q.    I previously notified Mr. Herman I wouldn't

21   object to his doing so.  I just have a couple of

22   questions.  Mr. Royall, is there any policy, written

CHARLES ROYALL
vs. NATIONAL ASSOCIATION OF LETTER CARRIERS

CHARLES ROYALL
July 21, 2006

Page 131

1    or otherwise, at NALC regarding removal of documents?

2         A.    None that I know of.

3              MR. GAGLIARDO:  That's all I have.

4              MR. HERMAN:  Thank you, Mr. Royall.

5              (Whereupon, the deposition was adjourned at

6    12:38 p.m.)

7                   (signature waived)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, Karen Young, a Notary Public in and for

3    the District of Columbia, before whom the foregoing

4    deposition was taken, do hereby certify that the

5    witness whose testimony appears in the foregoing pages

6    was duly sworn by me; that the testimony of said

7    witness was taken by me in shorthand at the time and

8    place mentioned in the caption hereof and thereafter

9    reduced to typewriting under my supervision; that said

10   deposition is a true record of the testimony given by

11   said witness; that I am neither counsel for, related

12   to, nor employed by any of the parties to the action

13   in which this deposition is taken; and, further, that

14   I am not a relative or employee of any attorney or

15   counsel employed by the parties thereto, nor

16   financially or otherwise interested in the outcome of

17   the action.

18

19   *Karen Young*

20   Karen Young
     Notary Public in and for
21   The District of Columbia

22   My commission expires:  July 31, 2009


                         SLR REPORTING
                         (301) 340-0042