# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
CHARLES ROYALL,                                    )
                                                   )
                      Plaintiff,                   )
                                                   )
          v.                                       )          Civil Action No. 05-1711 (RBW)
                                                   )
NATIONAL ASSOCIATION OF                            )
LETTER CARRIERS, AFL-CIO,                          )
                                                   )
                      Defendant.                   )
                                                   )
_____)


## MEMORANDUM OPINION

Charles Royall ("the plaintiff") brings this action against the National Association of

Letter Carriers ("NALC" or "the defendant") pursuant to 42 U.S.C. § 1981 (2000) ("Section

1981"), alleging that he was unlawfully terminated from his position as the accounting manager

for the NALC's finance department because of his race.  Complaint ("Compl.") ¶¶ 1, 6-10.  In

response, the defendant asserts that it discharged the plaintiff from the position after six months

of at-will employment as a result of his unsatisfactory job performance.  See Answer ¶ 6.

Currently before the Court is the defendant's motion for summary judgment ("Def.'s Mot.").[1]

For the reasons set forth below, the defendant's motion is granted.

_____

[1]  The following papers have been submitted in connection with this motion: (1) Memorandum of Points
and Authorities in Support of Defendant National Association of Letter Carriers, AFL-CIO's Motion for Summary
Judgment ("Def.'s Mem."); (2) Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's
Motion for Summary Judgment ("Pl.'s Opp."); (3) Defendant National Association of Letter Carriers, AFL-CIO's
Reply Memorandum of Points and Authorities in Further Support of its Motion for Summary Judgment ("Def.'s
Repl."); (4) Defendant National Association of Letter Carriers, AFL-CIO's Statement of Material Facts As To Which
There is no Genuine Issue ("Def.'s Stmt."); and (5) Plaintiff's Statement of Material Disputed Facts ("Pl.'s Stmt.").

# I. Factual Background

The following facts are undisputed except where otherwise noted by the Court.[2]  In January 2002, the defendant, a national labor union representing letter carriers employed by the United States Postal Service, advertised a vacancy in the position of accounting manager in the finance department of its Washington, D.C., headquarters.  Def.'s Stmt. ¶¶ 2, 5.  The principal duties of this position are as follows:[3]  (1) supervising the timely and accurate production of payroll; (2) ensuring the timely and accurate filing of payroll-related tax reports; (3) ensuring the timely and accurate payment of payroll taxes; (4) assisting the Director of Finance with the general supervision of employees in that department; (5) assisting the Director of Finance and the Accounts Payable clerk with duties related to the Accounts Payable software system; (6) ensuring that accurate payroll deductions were taken from employees' paychecks; and (7) ensuring the "timely payment of Postal Service premiums for benefits for NALC officers."[4]  Def.'s Stmt. ¶ 16; Pl.'s Stmt. at 3 (not disputing the duties of the position as described by the defendant); see Def.'s Mem., Exhibit ("Ex.") E (Deposition of Charles Royall) ("Royall Dep.") at 38:13-18 (agreeing that the accounting manager "had principal authority and responsibility for payroll").  At the time the defendant publicized its advertisement seeking applicants for the accounting manager

---

[2]  "In deciding whether there is a genuine issue of material fact [precluding a grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c)], the [C]ourt must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record."  Dist. Intown Props. Ltd. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) (citation omitted).

[3]  Although there was apparently no written job description for the accounting manager position either at the time the vacancy was advertised or at the time the plaintiff was hired, the plaintiff makes no representation that the duties were not communicated clearly or that he failed to understand any aspect of his responsibilities in the position. See Def.'s Stmt. ¶ 17; Pl.'s Stmt. at 4.

[4]  In addition, the plaintiff alleges, and the defendant does not dispute, that the accounting manager became responsible for the actual production of the payroll, as well as general payroll-related data entries, upon the resignation of another NALC employee in June 2002.  Pl.'s Stmt. at 3.

2

vacancy, the position had been vacant for approximately five months, from August 31, 2001, to January 2002. Pl.'s Stmt. at 3; see Def.'s Stmt. ¶ 15. As a result of the length of time the position was vacant, a backlog of payroll- and accounting-related work had built up in the finance department. Def.'s Stmt. ¶ 15; Pl.'s Stmt. at 3. The defendant contends, and the plaintiff does not dispute, that the vacancy was advertised in an attempt to remedy this situation. See Def.'s Reply at 15 (stating that "[t]he position of accounting manager was vacant for some time prior to [the] plaintiff's employment, and there was no individual to hold accountable for late-filed taxes").

In response to the defendant's advertisement, the plaintiff, an African-American male, applied for the accounting manager position. Def.'s Stmt. ¶¶ 1, 6; Compl. ¶¶ 3, 6. The plaintiff, along with several other applicants, was selected for an interview, and on February 12, 2002, he was interviewed by a panel consisting of William Young, at that time Executive Vice-President of the NALC, Ronald Stubblefield, at that time Director of Finance for the NALC, and Jane Broendel, Secretary-Treasurer of the NALC.[5] Def.'s Stmt. ¶¶ 6-7; Pl.'s Stmt. at 2; Royall Dep. at 32:5-11. Young was the primary decision-maker participating in the interview, having been delegated the responsibility over all personnel matters pertaining to the NALC finance department, including hiring and firing, by the NALC's then-President, Vincent Sombrotto. Def.'s Stmt. ¶ 8; see also Def.'s Mem., Ex. A (Deposition of William Young) ("Young Dep.") at

---

[5] Stubblefield is African-American, and Young and Broendel are both Caucasian. Pl.'s Stmt. at 2. Young now serves as the President of the NALC. Def.'s Stmt. ¶ 3. Stubblefield was terminated from his position as Director of Finance on September 27, 2002. Def.'s Mem., Ex. F (Responses of National Association of Letter Carriers, AFL-CIO to Plaintiff's First Set of Interrogatories and Request for Production of Documents) ("Def.'s Stmt.") at 3. Frank Sclafani, an individual who was employed as a temporary assistant to Stubblefield during the course of the plaintiff's employment at the NALC, replaced Stubblefield as Director of Finance after Stubblefield's termination. See Def.'s Mem. at 21.

5:14-10:13. After all of the candidates had been interviewed, the panel conducted an internal

discussion regarding the hiring decision. Young Dep. at 10:4-6. According to Young, there were

three candidates in particular for the position, including the plaintiff, who he considered equally

qualified. Id. at 15:16-19 (stating that he "couldn't make a distinction between the candidates

personally. . . . [because he] liked them all"). Ultimately, however, he was persuaded by

Stubblefield—with whom the new accounting manager would be working most closely—that the

plaintiff "had some abilities in spreadsheets that the other two didn't have."[6] Id. at 15:20-21; see

id. at 10:7-10 (stating that "I made the decision [to hire the plaintiff], but I let Stubblefield decide

because I knew that he had to have somebody that he was compatible with in order for us to get

back, because not only was there a lot of work to do, but there was a backlog there"); 16:1-3

(stating that Stubblefield "ended up convincing [Broendel] and I that because of [the plaintiff's]

abilities with these spreadsheets[,] he was the right guy for the job"); 16:4-7 (recollecting that he

---

[6] The defendant maintains that "[t]he decision to hire [the plaintiff] was made by Young, with the concurrence of Broendel and Stubblefield. Def.'s Stmt. ¶ 10; see also Young Dep. at 9:22-10:13; Def.'s Mem., Ex. B (Deposition of Jane Broendel) ("Broendel Dep.") at 11:17-12:17. By contrast, the plaintiff asserts that "Young's role in [the process] was pro forma," Pl.'s Opp. at 8, and that "[t]he decision to hire [him] was primarily made by [Stubblefield]," Pl.'s Stmt. at 2; see also Pl.'s Opp. at 8 (suggesting that Young merely acted as a "rubber stamp," giving "perfunctory approval for an [employment decision] explicitly recommended by [Stubblefield]") (internal quotation marks and citation omitted). While it may be true that Young relied on Stubblefield's judgment, as the immediate supervisor of the accounting manager, to essentially break the tie between three equally qualified candidates for the position, see Young Dep. at 15:16-16:7, the evidence emphatically does not support the plaintiff's version of events, as it is clear that Young both participated actively and substantively in the hiring process at all times and, more importantly, made the ultimate decision to hire the plaintiff based on his own criteria, which he articulated in his deposition. Moreover, the "rubber stamp" theory relied upon by the plaintiff is seemingly inapplicable to the present situation, as its application takes root in employment discrimination cases where "a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." Pl.'s Opp. at 8 (internal quotation marks and citation omitted) (emphases added); see, e.g., Poland v. Chertoff, ___ F.3d ____, ____, 2007 WL 2069651, at *5 (9th Cir. July 20, 2007) (stating that "an employer is liable for the discriminatory acts of a subordinate in cases where the biased subordinate is, as a practical matter, the actual decisionmaker") (citation omitted); EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484-85 (10th Cir. 2006) (same), and the plaintiff does not allege that his hiring was an adverse decision or that Stubblefield was a biased subordinate. Nevertheless, because the Court concludes that the defendant is entitled to summary judgment regardless of the extent to which Stubblefield was responsible for the decision to hire the plaintiff as the NALC's accounting manager, it is unnecessary to resolve the applicability of the "rubber stamp" theory.

told Stubblefield: "You've been pushing for this position, and it's important that you have somebody. If that's what you think, then that's what we'll go with"). The plaintiff was then invited back for another interview with Young, at which time he was offered, and accepted, the accounting manager position. Def.'s Stmt. ¶ 9; Royall Dep. at 35:2-10.

On February 25, 2002, the plaintiff commenced employment at the NALC. Def.'s Stmt. ¶ 12; Royall Dep. at 35:16-36:6. During his time as the NALC's accounting manager, the plaintiff was supervised by Stubblefield, who in turn reported to Broendel. Def.'s Stmt. ¶¶ 18-19. As an at-will employee, the plaintiff "had no written or implied employment contract with [the defendant,] . . . [n]or was he covered by a collective bargaining agreement while he was employed [as the NALC's accounting manager]," Def.'s Stmt. ¶ 13, and it is therefore undisputed that "the NALC could terminate [him] at any time without cause, . . . [and] for any reason at all," Royall Dep. at 54:15-22.

The plaintiff remained employed by the NALC for a period of six months.[7] Compl. ¶¶ 6, 8; Def.'s Stmt. ¶ 74; Pl.'s Stmt. at 9. At the outset of his employment, the plaintiff was "given a list . . . of duties that had to be completed that had not been completed since the prior accounting manager left." Royall Dep. at 41:12-15. According to Young, however, it eventually became clear to Stubblefield, Broendel, and himself that the plaintiff "was not able to do all of the functions of the position that he was hired to do, and [the NALC] couldn't get the finance department in order without someone who was able to do the things he was supposed to do." Young Dep. at 50:16-20; see also id. at 27:16-28:2 (stating that Young concluded, based on his

---

[7] The parties agree that "[d]uring the time that [the] plaintiff was employed at [the] NALC, the finance department consisted of approximately seven employees, five of whom were African-American," including the plaintiff. Def.'s Stmt. ¶ 14; Royall Dep. at 58:14-22.

observations of the plaintiff as well as his discussions with Stubblefield, that "[the plaintiff] was absolutely incapable of fulfilling the position"); Def.'s Mem., Ex. B (Deposition of Jane Broendel) ("Broendel Dep.") at 85:5-11 (concurring in Young's judgment that the plaintiff's job performance warranted termination).

Specifically, Young states that (1) he was notified of penalties that the NALC had occurred as a result of the plaintiff's failure to timely pay certain payroll taxes, Young Dep. at 17:3-7; see id. at 20:22-21:2 (relating Young's personal knowledge of "a number of occasions after [the plaintiff] was hired [in which] there were tax penalties that had to be paid");[8] see also Def.'s Stmt. ¶¶ 57 (alleging that "[the] NALC was required to pay a penalty of $1,163.00 to the Internal Revenue Service ("IRS") for late-paid federal employment taxes for the tax period ending June 30, 2002," a payment which "should have been made on April 29, 2002"), 58 (alleging that "[the] NALC was required to pay a penalty of $2,796.79 to the IRS for late-paid federal employment taxes for the tax period ending March 31, 2002," a payment which "should have been made on March 29, 2002"); Pl.'s Stmt. at 12 (not disputing that payments were made delinquently); (2) he was told by Stubblefield on "five to ten" occasions that the plaintiff wasn't adequately performing his job,[9] Young Dep. at 17:8-14 (stating that Stubblefield told him "that

---

[8] In this regard, Young also states that the individual who held the accounting manager position before it became vacant in August 2001 "never had a problem with [making timely payments of payroll tax]." Young Dep. at 20:6-8.

[9] The plaintiff disputes this statement, claiming that Young "[has] no notes of any of these discussions" and asserting that Young and Stubblefield "did not have between five and ten meetings . . . regarding why things were not getting done." Pl.'s Stmt. at 4. It is clear, however, that the plaintiff's mere denial of the existence of these conversations, without any evidence contradicting Young's sworn testimony, does not create a genuine issue of material fact sufficient to withstand the entry of judgment as a matter of law in favor of the defendant. See Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (stating that the non-moving party cannot rely on "mere allegations or denials" to survive a motion for summary judgment) (internal quotation marks and citation omitted); Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (stating that "conclusory allegations

(continued...)

6

he had to do what [the plaintiff] was supposed to do . . . and that he was right back where he was

before"), 23:14 (stating that Stubblefield told him that the plaintiff was "struggling with [the

position]");[10] (3) the plaintiff did not possess, and did not acquire over the course of his

employment, the requisite familiarity with the database program used by the NALC's finance

department, id. at 28:2-19 (alleging that the NALC "had chaos with [its] W-2s because [the

plaintiff] didn't make entries in [the database] that would make the W-2s automatic at the end of

the year"); (4) he received complaints from NALC employees and various third parties regarding

the finance department's failure to timely pay its bills during the plaintiff's tenure as accounting

manager, see id. at 29:15-31:18 (stating that a vendor told him that "the NALC was losing its

---

[9](...continued)
unsupported by factual data will not create a triable issue of fact") (internal quotation marks and citation omitted).
The plaintiff presumably could have chosen to depose Stubblefield in an attempt to test the accuracy of Young's
statements, but he did not do so.  Failing that, the plaintiff cannot now meaningfully dispute Young's account merely
by remarking upon the fact that the discussions were apparently not memorialized.

[10]  The plaintiff suggests in passing that the defendant's evidence of the plaintiff's allegedly deficient
performance—and, specifically, Young and Broendel's sworn testimony of complaints and issues pertaining to the
plaintiff that had been brought to their attention during the plaintiff's tenure at the NALC—is "based largely on
[inadmissible] hearsay [and is] entirely uncorroborated."  Pl.'s Opp. at 2; see also, e.g., Pl.'s Stmt. at 6 (stating that
"[o]ther than the uncorroborated, hearsay testimony of William Young, there is no evidence that two or three other
NALC officers complained about errors by [the plaintiff]").  This, however, misapprehends the purpose to which the
statements in question are being put.  Third-party statements are only hearsay, of course, if they are being "offered in
evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  The testimony of Young and Broendel as
to the third-party statements concerning the plaintiff's performance are offered not for the truth of the matters
asserted therein, but as an explanation of why Young and Broendel believed that terminating the plaintiff's
employment with the NALC was necessary and appropriate.  See Crockett v. Abraham, 284 F.3d 131, 134 (D.C. Cir.
2002) (finding that an employer's account of a committee's view of candidates for a position, as it had been reported
to her, was not hearsay where the employer's decision not to promote the plaintiff "was under challenge, and she
explained it on the basis of the information she received"); see also, e.g., Maday v. Pub. Libraries of Saginaw, 480
F.3d 815, 819-20 (6th Cir. 2007) (affirming the admission of third-party statements regarding the job performance of
the plaintiff where the statements were offered "to show the reason why the employer took the action it did"); Garner
v. Missouri Dep't of Mental Health, 439 F.3d 958, 960 (8th Cir. 2006) (finding that the employer's testimony as to
an unsubstantiated allegation made by third parties against the plaintiff "was offered to explain why [the employer]
suspended [the plaintiff]" and thus was not hearsay) (also noting that "[e]vidence demonstrating the employer's state
of mind is of crucial importance in wrongful discharge cases") (internal quotation marks and citation omitted);
Luckie v. Ameritech Corp., 389 F.3d 708, 716 (7th Cir. 2004) (finding that third-party statements were not hearsay
because they were "offered to show [the employer's] state of mind at the time she was evaluating [the plaintiff's]
performance").  The Court therefore holds that Young and Broendel's testimony regarding the third-party statements
relied on in making the decision to terminate the plaintiff are not inadmissible hearsay.

reputation as being an organization that paid its bills on time"), 54:7-57:16 (stating that issues

were raised about the plaintiff's performance "almost every single day" and providing examples

of the plaintiff's alleged failure to timely pay Postal Service premiums and to properly forward

payroll deductions).  Young summarizes his state of mind regarding the plaintiff's job

performance as follows:

> It seemed like every day I came to work, there was another issue with somebody complaining about lack of performance out of that finance department, and I felt like I was . . . having Broendel up to my office, it seemed like, almost every day.  It probably wasn't, but that's what it seemed like.  It would be one thing right after another after another.

Id. at 59:13-21.  Indeed, the defendant asserts, and the plaintiff does not dispute, that all three

individuals who participated in the decision to hire the plaintiff as accounting manager

subsequently expressed their belief that his employment should be terminated for performance-

related reasons.[11]  See Broendel Dep. at 82:20-83:4 (stating that Stubblefield came to Broendel

and recommended that the plaintiff be terminated, and that she went to Young and recommended

---

[11]  As mentioned above, Broendel concurred in Young's decision to terminate the plaintiff's employment. See Broendel Dep. at 13:20-14:10 (stating that the plaintiff could not be counted on to "promptly look into" complaints once they were relayed to him), 15:7-15 (stating that Broendel was unsatisfied with the plaintiff's performance in every substantive respect), 15:16-16:3 (stating that it became clear to Broendel by May 2002 that "[t]here were a few things that weren't getting done in a timely manner, and they weren't getting done correctly"), 19:2-21:14 (relating complaints Broendel received regarding the plaintiff's job performance), 39:2-52:17 (relating discussions between Broendel and Sclafani regarding the plaintiff's job performance), 57:2-58:16 (stating that the plaintiff failed to properly make monthly benefits payments to the United Way), 61:22-62:11 (stating that the plaintiff failed to timely make quarterly benefits payments of the Postal Service benefits), 65:10-67:5 (stating that the plaintiff failed to timely make cost of living adjustments to the pay of certain NALC employees), 67:6-14 (stating that the plaintiff had significant problems learning the database software used in the finance department), 73:3-75:13 (stating that the plaintiff's payroll assistant complained that the need to go over the database system with the plaintiff "over and over again" was slowing her down), 75:18-77:2 (stating that another finance department employee told Broendel "that the department was falling apart because of [the plaintiff]"), 84:7-85:11 (stating that Stubblefield told Broendel that the plaintiff was not following directions and should be fired), 88:15-90:12 (stating that an NALC employee informed Broendel that the plaintiff was not timely forwarding annuity trust fund payments), 98:11-99:22 (relating other complaints about the plaintiff from NALC employees); see also Def.'s Mem., Ex. C (Deposition of Suka Neidlinger) ("Neidlinger Dep.") at 13:3-11, 29:12-18 (stating that Neidlinger talked to Broendel about her perception that the plaintiff "didn't have much knowledge" of the payroll system).

that the plaintiff be terminated).  Accordingly, on August 27, 2002, upon the direction of Young,

Broendel informed the plaintiff of his termination.  Def.'s Stmt. ¶ 74; Pl.'s Stmt. at 9; see Young

Dep. at 26:17-27:21 (stating that he made the decision that the plaintiff's employment should be

terminated after speaking to Broendel and Stubblefield); Broendel Dep. at 83:5-13 (same).[12]

      The plaintiff's immediate successor in the accounting manager position was James Delio,

who is Caucasian.  See Def.'s Reply, Ex. C (Deposition of James Delio) ("Delio Dep.") at 5:2-

7:18; Young Dep. at 36:20-39:20.  At the time that the plaintiff was terminated, Delio was

employed as a computer programmer in the NALC's information technology department.  See

Delio Dep. at 6:8-10; Young Dep. at 37:19-21.  Delio, who had some experience with the

database software used by the finance department, see Young Dep. at 37:21-38:3, offered to take

over as accounting manager on a trial basis when another individual who had been hired for the

position failed to report to work, Delio Dep. at 6:12-7:1; Young Dep. at 38:11-12 (remembering

Delio saying that he wanted to "take a shot at [the accounting manager] job").  Within one or two

months, however, it became clear to Delio that he was not suited for the position, and he was

transferred back to his computer programmer job at his request.  See Delio Dep. at 5:10-6:11,

8:11-19; Young Dep. at 39:2-14 (representing that Delio told him that he didn't "have the

---

[12]  The plaintiff contends that in deciding to terminate his employment, Young was merely acting as the
"cat's paw" for a biased subordinate, Frank Sclafani, the temporary employee who eventually replaced Stubblefield
as Director of Finance.  Pl.'s Opp. at 2 (stating that "the decision to terminate [the plaintiff] was largely based on a
report by Mr. Sclafani"), 8 (stating that "'cat's paw' refers to a situation in which a biased subordinate, who lacks
decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory
employment action") (quoting BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 484-85 (internal quotation
marks omitted); see also Pl.'s Stmt. at 14 (alleging that "Mr. Sclafani was the driving force in terminating [the
plaintiff]").  However, aside from the fact, discussed further below, that the plaintiff proffers no support whatsoever
for his imputation of discriminatory motives to Sclafani, there is no evidence that Young relied on Sclafani's
perception of the plaintiff's job performance in any way in making his decision to fire the plaintiff.  See Young Dep.
at 26:17-27:21; Broendel Dep. at 83:14-18 (stating that Sclafani did not participate in the decision to terminate the
plaintiff's employment).

accounting skills to do the job" and that he could "handle the software, but it's not working

out"). At present, Delio remains employed with the NALC as a computer programmer. Delio

Dep. at 4:13-20.

     The plaintiff brought this action on August 26, 2005, alleging that the defendant

unlawfully terminated his employment because of his race in violation of Section 1981. Compl.

at 1. On September 18, 2006, the defendant moved for the entry of summary judgment in its

favor, arguing that the plaintiff (1) has not demonstrated that his termination gives rise to an

inference of discrimination and (2) has failed to provide evidence sufficient to rebut the

defendant's assertion that it terminated his employment as a result of his unsatisfactory job

performance.[13] Def.'s Mem. at 1-2. In response, the plaintiff asserts that "it is certain that a

---

[13] The plaintiff asserts that "[t]he only testimonial evidence [of his unsatisfactory job performance] are the self-serving post-litigation accusations by [Young, Broendel, and Sclafani] . . . [and that] [a]bsent from this discussion is any evidence—documentary or testimonial—from [his] immediate supervisor, Ron Stubblefield." Pl.'s Opp. at 5. Of course, as noted earlier, see supra n.9, there is no indication that the plaintiff could not have deposed Stubblefield during the discovery period, and yet he chose not to do so. His objections regarding the lack of testimonial evidence from Stubblefield therefore strike this Court as rather disingenuous.

reasonable jury can properly infer that his employment was terminated because of his race."[14] Pl.'s Opp. at 1.

## II. Standard of Review

Courts will grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a Rule 56(c) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving

---

[14] The plaintiff's brief in opposition to the defendant's motion for summary judgment leaves much to be desired, replete as it is with conclusory assertions and containing almost no application of the relevant caselaw to the facts of this particular case. See generally Pl.'s Opp. Indeed, the majority of the plaintiff's opposition consists of large swathes of verbatim passages from judicial opinions, none of which specifically reflect the law of the District of Columbia Circuit. See id. at 7-8 (spending two full pages of an eleven-page brief quoting from Mischer v. Erie Metro Hous. Auth., 168 Fed. Appx. 709, 716 n.4 (6th Cir. 2006); Keri v. Bd. of Trs. of Purdue Univ., 458 F.3d 620, 648 (7th Cir. 2006); and BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 484-85). Given the marked frequency at which the District of Columbia Circuit continuously addresses the subject of employment discrimination, see, e.g., Fields v. Office of Eddie Bernice Johnson, 459 F.3d 1 (D.C. Cir. 2006); Barnette v. Chertoff, 453 F.3d 513 (D.C. Cir. 2006); Mastro v. Potomac Elec. Power Co., 447 F.3d 843 (D.C. Cir. 2006); Chappell-Johnson v. Powell, 440 F.3d 484 (D.C. Cir. 2006); Hussain v. Nicholson, 435 F.3d 359 (D.C. Cir. 2006); Holcomb v. Powell, 433 F.3d 889 (D.C. Cir. 2006); George v. Leavitt, 407 F.3d 405 (D.C. Cir. 2005); Murray v. Gilmore, 406 F.3d 708 (D.C. Cir. 2005); Salazar v. Wash. Metro. Transit Auth., 401 F.3d 504 (D.C. Cir. 2005); Carter v. George Wash. Univ., 387 F.3d 872 (D.C. Cir. 2004); Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139 (D.C. Cir. 2004); Stewart v. Ashcroft, 352 F.3d 422 (D.C. Cir. 2003); Taylor v. Small, 350 F.3d 1286 (D.C. Cir. 2003); Lathram v. Snow, 336 F.3d 1085 (D.C. Cir. 2003); Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647 (D.C. Cir. 2003); Ben-Kotel v. Howard Univ., 319 F.3d 532 (D.C. Cir. 2003), the plaintiff has little reason—and little excuse—to rely so heavily on en masse quotations from other courts of appeal, particularly when such quotations deal with wholly unexceptional propositions of law and are accompanied by little, if any, original analysis. Indeed, the Court notes that the plaintiff's submission mentions none of the District of Columbia Circuit decisions listed above, instead citing (briefly and without any elaboration) only two cases from this Circuit, Griffin v. Wash Convention Ctr., 142 F.3d 1308 (D.C. Cir. 1998), and Aka v. Wash. Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998) (en banc). See Pl.'s Opp. at 8-9.

party, however, cannot rely on "mere allegations or denials," <u>Burke v. Gould</u>, 286 F.3d 513, 517

(D.C. Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 248) (internal quotation marks omitted), and

"must do more than simply show that there is some metaphysical doubt as to the material facts,"

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (citation omitted).

Simply put, "conclusory allegations unsupported by factual data will not create a triable issue of

fact." <u>Pub. Citizen Health Research Group v. FDA</u>, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal

quotation marks and citations omitted). Rather, to withstand a properly supported motion for

summary judgment, the non-moving party "must set forth specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]here is no [genuine] issue for trial unless

there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that

party," <u>Anderson</u>, 477 U.S. at 249 (citation omitted), and if the Court concludes that the evidence

adduced by the non-moving party "is merely colorable . . . or is not significantly probative," <u>id.</u>

(citations omitted), or if the non-moving party has otherwise "failed to make a sufficient showing

on an essential element of [his] case with respect to which [he] has the burden of proof," <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), then the moving party is entitled to summary

judgment.

### III. Legal Analysis

Section 1981 "protects the equal right of all persons within the jurisdiction of the United

States to make and enforce contracts," including contracts for employment, "without respect for

race." <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. §

1981(a)) (internal quotation marks and bracketing omitted); <u>see also</u> <u>Murray v. Gilmore</u>, 406

F.3d 708, 713-15 (D.C. Cir. 2005) (examining the merits of a wrongful termination claim under

Section 1981). As with claims of racial discrimination in employment under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (2000), courts evaluating Section 1981

claims of wrongful termination are concerned only with whether the employer intentionally

discriminated against the plaintiff, see Reeves, 530 U.S. at 142-43, and thus do not, and should

not, act as "super-personnel department[s] that reexamine[] an entity's business decisions,"

Holcomb, 433 F.3d at 897 (internal quotation marks and citations omitted); see also Arraleh v.

County of Ramsey, 461 F.3d 967, 976 (8th Cir. 2006) (stating that "the employment

discrimination laws have not vested in the federal courts the authority to sit as super-personnel

departments reviewing the wisdom or fairness of the business judgments made by employers,

except to the extent that those judgments involve intentional discrimination") (internal quotation

marks and citation omitted). In this regard, "the ultimate burden of persuading the trier of fact

that the [employer] intentionally discriminated against the plaintiff remains at all times with the

plaintiff." Reeves, 530 U.S. at 143 (internal quotation marks and citation omitted).

Where, as here, the plaintiff has not proffered any direct evidence of intentional

discrimination,[15] his race discrimination claims under Section 1981 are evaluated pursuant to the

burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792,

803-805 (1973). See Ash v. Tyson Foods, Inc., 546 U.S. 454, 455 (2006) (per curiam) (applying

McDonnell Douglas framework to Section 1981 claim); Carter v. George Wash. Univ., 387 F.3d

---

[15] "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference. Such evidence includes any statement or written document showing a discriminatory motive on its face." Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.) (internal quotation marks, citations, and ellipsis omitted) (emphases in original). The plaintiff does not argue—nor, based on the evidence before the Court, could he do so—that the factual record in this case contains any such direct evidence of discrimination. See Pl.'s Opp. at 3; see also Royall Dep. at 64:19-65:5 (conceding that neither Broendel nor Young ever made any comments about his race and failing to identify any other NACL employees as having done so).

872, 878 (D.C. Cir. 2004) (same).  Under this framework, the plaintiff "bears the initial burden of

establishing a prima facie case [of discrimination] . . . by a preponderance of the evidence."

Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006) (internal quotation marks and citation

omitted).  To establish such a prima facie case, the plaintiff must demonstrate "that[] (1) [he] is a

member of a protected class; (2) [he] suffered an adverse employment action; and (3) the

unfavorable action gives rise to an inference of discrimination."  Vickers v. Powell, ___ F.3d

____, _____, 2007 WL 1952369, at *5 (D.C. Cir. July 6, 2007) (internal quotation marks and

citation omitted); see O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996)

(stating that "[a] prima facie case requires evidence adequate to create an inference that [the

adverse] employment decision was based on an illegal discriminatory criterion") (internal

quotation marks, citation, and bracketing omitted).

　　　　Once the plaintiff has made out a prima facie case of discrimination, the burden shifts to

the defendant "to articulate some legitimate, non-discriminatory reason for its actions."  Vickers,

___ F.3d at _____, 2007 WL 1952369, at *5 (internal quotation marks and citation omitted); see

Carter, 387 F.3d at 878 (stating that in this circumstance "the employer must produce admissible

evidence that, if believed, would establish that its action was motivated by a legitimate,

nondiscriminatory reason") (internal quotation marks and citation omitted).  "If the defendant

satisfies [this] burden, the McDonnell Douglas framework—with its presumptions and

burdens—disappears, and the only remaining issue is" whether the defendant intentionally

discriminated against the plaintiff.  Jackson v. Gonzales, ___ F.3d ____, ____, 2007 WL

2275215, at *2 (D.C. Cir. Aug. 10, 2007) (internal quotation marks and citation omitted).  "At

that point, the plaintiff can survive summary judgment only by showing that a reasonable jury

14

could conclude that he was terminated for a discriminatory reason," notwithstanding the defendant's proffered nondiscriminatory explanation.  Id. (internal quotation marks and citation omitted); see Weber v. Battista, ___ F.3d ____, ____, 2007 WL 2033254, at *3 (D.C. Cir. July 17, 2007) (stating that "the plaintiff must [ultimately] demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory") (internal quotation marks and citation omitted); George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir. 2005) (stating that "[o]nce [an] employer has articulated a non-discriminatory explanation for its action, the issue is not the correctness or desirability of [that explanation] but whether the employer honestly believes in the reasons it offers") (internal quotation marks and citation omitted).  The plaintiff may attempt to demonstrate the pretextual nature of the employer's stated motive "either directly by persuading the [C]ourt that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  George, 407 F.3d at 413 (internal quotation marks and citation omitted).  If the plaintiff is "unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff]."  Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997) (citation omitted).

   Here, it is clear that the plaintiff's claim of racial discrimination in connection with his termination from the position of accounting manager in the NALC's finance department satisfies the first two prongs of the prima facie test: "[he] is a member of a protected class," and "[he] has suffered an adverse employment action."  Vickers, ___ F.3d at _____, 2007 WL 1952369, at *5 (internal quotation marks and citation omitted).  To fulfill the third prong of this test, the plaintiff

must show that his termination "gives rise to an inference of discrimination," id. (internal quotation marks and citation omitted), something he may do either "by demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class," Czekalski v. Peters, 475 F.3d 360, 365-66 (D.C. Cir. 2007) (internal quotation marks and citation omitted), or by "show[ing] that the discharge was not attributable to the two most common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether," id. at 366 (internal quotation marks, citation, and bracketing omitted).

The plaintiff argues that he was treated differently than his immediate successor, James Delio, who was allegedly "entirely unqualified and unable to retain the position[,] . . . [yet] was not terminated."  Pl.'s Opp. at 2; see also id. at 9.  However, the evidence plainly demonstrates the material distinctions between the plaintiff's circumstances and what happened with Delio. See Young Dep. at 36:20-39:20; Delio Dep. at 5:2-7:18.  Specifically, Delio was transferred to the accounting manager position from another position in the NALC on a trial basis in the wake of the plaintiff's departure, Young Dep. at 38:11-12; Delio Dep. at 6:12-7:1, and when it became clear to him, within two months, that he could not properly perform the job, he asked for (and was granted) a return to his prior position, where he apparently remains today, Young Dep. at 39:2-14 (representing that Delio told him that he didn't "have the accounting skills to do the job" and that he could "handle the software, but it's not working out"); Delio Dep. at 4:13-20, 5:10-6:11, 8:11-19.  Thus, unlike the plaintiff, Delio did not specifically apply for the accounting manager position when coming to work for the NALC, nor did he affirmatively represent that he could handle its duties in anything but a trial capacity.  More importantly, Delio asked to be

16

removed from the position, whereas the plaintiff was terminated.  If Delio had shown comparable difficulties as the plaintiff in timely and properly paying bills and performing other payroll- and accounting-related duties, yet was permitted to remain in the accounting manager position for longer than six months (rather than the two months he held the position before asking to be reassigned), then the plaintiff might plausibly assert that he had been treated differently from a similarly situated employee who was not in his protected class.  As it is, however, he cannot do so, nor does he adduce any evidence that he was treated differently from any purportedly similarly situated employees other than Delio.  Accordingly, the Court concludes that the plaintiff has not established a prima facie case of discrimination in this respect.[16]

---

[16]  The plaintiff's statement during his deposition that he had been told by another NALC worker that only one other person had been terminated from a position at the NALC headquarters in the previous thirty-five years, Royall Dep. at 88:13-90:9, without any actual details about past employees in situations similar to his who could have been terminated but were not, is inadequate on its face.

Similarly, the plaintiff offhandedly argues, without any evidentiary support, that "the lapses in performance attributable to [him] had been previously tolerated by [the] [d]efendant," Pl.'s Opp. at 5, and that "[w]ithholding taxes which were to be remitted during several periods before [his] employment began were ignored for months, without consequence to any NALC employee," id. (emphasis in original); see also id. at 5 (asserting, without elaboration, that the plaintiff "was held to a different standard and expectation of performance than . . . his predecessors").  Such "conclusory allegations unsupported by factual data will not create a triable issue of fact" sufficient to survive summary judgment.  Pub. Citizen Health Research Group, 185 F.3d at 908 (internal quotation marks and citations omitted).  However, even if the Court were to accept these unsupported allegations as true, this argument fails to take into account the uncontroverted fact that the accounting manager position was vacant for five months before the plaintiff was hired, see Pl.'s Stmt. at 3; Def.'s Stmt. ¶ 15, a situation that left no one—other than, arguably, Stubblefield, who is of the same protected class as the plaintiff—directly accountable for unremitted payroll taxes.  See Young Dep. at 9:2-8 (stating that "things were just getting worse" while the position was vacant and suggesting to the then-President that the NALC "had to get an account[ing] manager, that there was just too much work there for one person").

Finally, the plaintiff suggests in his deposition that Sclafani, who is Caucasian, was allegedly given database training that the plaintiff and Stubblefield, who are African-American, had asked for and not received, Royall Dep. at 85:20-87:12.  Specifically, the plaintiff states that he was told by another NALC employee, Janice Cain, that Sclafani "was being trained on [the database software used by the finance department] while [he and Stubblefield] were in Philadelphia working."  Id. at 86:6-8.  This assertion is unavailing.  First, because Cain is a third party who has not herself been identified as a witness, her statement is inadmissible hearsay to the extent that the plaintiff seeks to offer it into evidence for its truth.  See Fed. R. Evid. 801(c).  Second, the plaintiff does not pursue this argument in his opposition to the defendant's motion for summary judgment, and it may thus be deemed conceded.  See Def.'s Mem. at 21-22 (responding to the plaintiff's argument regarding the alleged disparity in database training); Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (stating that "[i]t is well-understood in this Circuit that when a plaintiff files an opposition to a [dispositive motion] addressing only certain

(continued...)

The plaintiff also claims that his termination "was not attributable to . . . [his]

performance below the employer's legitimate expectations," a "common legitimate reason[] for

discharge" which, if not refuted, would prevent the plaintiff from establishing a prima facie case

of race discrimination. Czekalski, 475 F.3d at 366 (internal quotation marks, citation, and

bracketing omitted); see Pl.'s Opp. at 4 (stating that "[t]he quality of his performance is very

much disputed"). The plaintiff's allegedly poor job performance, of course, is the crux of the

defendant's non-discriminatory explanation for his termination. See Def.'s Mem. at 16-27.

"[O]nce a defendant has proffered such [an] explanation, it has 'done everything that would be

required of it if the plaintiff had properly made out a prima facie case,'" Czekalski, 475 F.3d at

364 (quoting United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)),

and therefore "the only question is 'whether the defendant intentionally discriminated against the

plaintiff,'" id. (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253

(1981)). Thus, because this Court is mindful that "the plaintiff's burden of establishing a prima

facie case of discrimination . . . is 'not onerous,'" Mastro v. Potomac Elec. Power Co., 447 F.3d

843, 852 (D.C. Cir. 2006) (quoting Burdine, 450 U.S. at 253), it will "assume that a prima facie

case [has been] established and proceed to analyze whether [the] plaintiff has demonstrated that

[16](...continued)
arguments raised by the defendant, a court may treat those arguments that the plaintiff has failed to address as
conceded") (citations omitted). Third, even assuming the truth of the plaintiff's allegation, the Court concludes that
he has not demonstrated, by a preponderance of the evidence, that he and Sclafani were "similarly situated" for the
purpose of making out a prima facie claim of discrimination, Czekalski, 475 F.3d at 366 (internal quotation marks
and citation omitted), nor has he even attempted to do so, see generally Pl.'s Opp. In addition, as discussed further
below, the plaintiff's allegation that the defendant provided database training to Sclafani and not the plaintiff, if true,
nevertheless does not constitute sufficient evidence to refute the defendant's non-discriminatory explanation for the
plaintiff's termination in the eyes of a reasonable juror. See Paquin, 119 F.3d at 27-28 (stating that if the plaintiff is
"unable to adduce evidence that could allow a reasonable trier of fact to conclude that [the defendant's] proffered
reason was a pretext for discrimination, summary judgment must be entered against [the plaintiff])" (citation
omitted).

[the defendant's] proffered reason is a pretext for discrimination," <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989, 993 (D.C. Cir. 2002) (internal quotation marks and citation omitted). For the reasons that follow, the Court concludes that the plaintiff has not done so.

The defendant has proffered sworn testimony from two individuals, Young and Broendel, intimately involved in the decisions to hire the plaintiff as NALC accounting manager and, six months later, to terminate him from that position. <u>See generally</u> Young Dep.; Broendel Dep. This testimony recounts in considerable detail Young's and Broendel's reasons for believing that the plaintiff's performance as accounting manager merited termination, including (1) the plaintiff's failure to timely pay certain payroll taxes and benefits payments, incurring penalties for the NALC and causing it to "los[e] its reputation as being an organization that paid its bills on time," Young Dep. at 29:22-30:2; <u>see also id.</u> at 17:3-7, 20:22-21:2, 54:7-57:16; Broendel Dep. at 57:2-58:16, 61:22-62:11, 65:10-67:5, 88:15-90:12; and (2) numerous complaints received about the plaintiff, or about the declining performance of the finance department, by Young and Broendel from the plaintiff's direct supervisor, other NALC employees, vendors, and benefits recipients, <u>see</u> Young Dep. at 59:13-21 (stating that "[i]t seemed like every day [Young] came to work, there was another issue with somebody complaining about lack of performance out of that finance department. . . . [and that] [i]t would be one thing right after another after another"); <u>see also id.</u> at 17:8-14, 29:15-31:18, 54:7-57:16; Broendel Dep. at 19:2-21:14, 39:2-52:17, 73:3-75:13, 75:18-77:2, 82:20-83:4, 84:7-85:11, 98:11-99:22. In short, the defendant states that the plaintiff understood the duties and responsibilities of the position (something that the plaintiff does not dispute) and simply failed to perform them in a satisfactory manner. <u>See</u>, <u>e.g.</u>, Young Dep. at 27:16-28:2 (stating that Young concluded, based on his observations of the plaintiff as

19

well as his discussions with Stubblefield, that "[the plaintiff] was absolutely incapable of

fulfilling the position"), 50:16-20 (stating that the plaintiff "was not able to do all of the

functions of the position that he was hired to do, and [the NALC] couldn't get the finance

department in order without someone who was able to do the things he was supposed to do").

Moreover, as the plaintiff concedes, because he was an at-will employee, "the NALC could

terminate [him] at any time without cause, . . . [and] for any reason at all," as long as its motives

in doing so were not impermissibly discriminatory.  Royall Dep. at 54:15-22.  Because failure to

perform satisfactorily is one of the "most common legitimate reasons for discharge," Czekalski,

475 F.3d at 366 (internal quotation marks, citation, and bracketing omitted), the Court concludes

that the defendant has satisfied its burden by "produc[ing] admissible evidence that, if believed,

would establish that its action was motivated by a legitimate, nondiscriminatory reason," Carter,

387 F.3d at 878 (internal quotation marks and citation omitted).

    In his opposition to the defendant's motion for summary judgment, the plaintiff argues

that the defendant's nondiscriminatory reason for his termination is unworthy of credence for the

following reasons:[17]  First, although the plaintiff concedes that he failed on multiple occasions to

---

[17]  The plaintiff also raises several issues in his deposition that he does not subsequently address in his
opposition to the defendant's motion for summary judgment.  See Royall Dep. at 83:1-88:11, 128:21-130:2; Def.'s
Mem. at 22-26 (addressing issues raised in the plaintiff's deposition).  Specifically, in support of his claim that the
defendant's nondiscriminatory explanation for his termination was pretextual, the plaintiff contends in his deposition
that (1) when meeting with the plaintiff in her office, Broendel on one occasion allowed her son to place his bare feet
on her desk, something which the plaintiff believed to be "just absolutely outrageous and sort of disrespectful in a
racial nature," Royall Dep. at 83:1-84:4; (2) Stubblefield related to the plaintiff an incident in which he and Broendel
were having a disagreement, and Broendel told Stubblefield not to "get lippy" with her, id. at 84:6-85:18; (3) each of
the successive replacements in the plaintiff's position have been Caucasian, id. at 87:14-88:11; (4) Stubblefield, who
is African-American, was terminated from his position as Director of Finance soon after the plaintiff and replaced
with Sclafani, who is Caucasian, id. at 87:14-88:11; and (5) the plaintiff was told by another NALC employee that
Broendel had ignored certain of his memoranda and e-mails, id. at 128:21-130:2.  Because the plaintiff did not
pursue these arguments in his opposition to the defendant's motion for summary judgment, they may be deemed
conceded.  See Hopkins, 238 F. Supp. 2d at 178 (stating that "[i]t is well-understood in this Circuit that when a

(continued...)

make timely payments of the NALC's payroll tax, Pl.'s Opp. at 4-5, he claims that he

nevertheless performed his job well, citing in support of this claim several instances in which he

completed assigned tasks or was praised for his good performance, see id. at 5; see also, e.g.,

Pl.'s Stmt. at 4 (citing a memo from Stubblefield to the plaintiff "assigning a task on one day on

which it is indicated that the task was completed the following day"), 7 (stating that the plaintiff

"spent an entire day helping [another NALC employee] to reorganize the accounts payable files

and . . . to carry old files to the basement"), 8 (citing e-mails from Stubblefield and Broendel

"thanking [him] for completing . . . work"), 11 (citing "[s]amples of work complete[d] in a

timely manner").  Second, the plaintiff contends that other than his failure to timely pay

withholding taxes, the defendant has not produced any documentation of his alleged

---

[17](...continued)
plaintiff files an opposition to a [dispositive motion] addressing only certain arguments raised by the defendant, a
court may treat those arguments that the plaintiff has failed to address as conceded") (citations omitted).  Moreover,
even if these arguments were to be considered on their merits, there are several reasons why they neither raise a
genuine issue of material fact as to whether the defendant intentionally discriminated against the plaintiff nor
constitute evidence that would allow a reasonable juror to conclude that the defendant's asserted explanation for the
plaintiff's termination is merely a pretext to shield its true discriminatory intent.  See Jackson, ___ F.3d at ____,
2007 WL 2275215, at *2.  First, both Stubblefield's statement and the statement of the other NALC employee
regarding Broendel's alleged conduct are inadmissible hearsay to the extent they are being offered for the truth of the
matters asserted therein.  See Fed. R. Evid. 801(c).  Second, the mere fact that an African-American employee is
replaced by a Caucasian employee is not, and cannot be, adequate to survive summary judgment without some
evidence of discriminatory intent or some specific reason "that the employer's proffered explanation is unworthy of
credence."  George, 407 F.3d at 413 (internal quotation marks and citation omitted); cf. Aka, 156 F.3d at 1295 n.11
(noting that concrete "evidence that the defendant employs [members of the plaintiff's protected class] at rates far
below their numbers in the applicant pool and the general population may well help [the plaintiff's] case [of
intentional discrimination]").  Otherwise, no employer would be able to replace an employee of a protected class
with an employee not in that protected class without being forced to proceed to trial on a claim of racial
discrimination, a result that surely was not contemplated by the drafters of Section 1981.  Third, none of the conduct
attributed to Broendel by the plaintiff is suggestive of racial animus, nor does it indicate that Broendel did not
genuinely believe that the plaintiff was not performing satisfactorily in his capacity as accounting manager.  Finally,
the plaintiff nowhere argues that Broendel was the individual directly (or even primarily) responsible for his
termination, thus rendering these allegations of her purported bias—which, again, the plaintiff has utterly failed to
support—even less pertinent to the question before the Court.  See Pl.'s Stmt. at 14 (asserting that Sclafani "was the
driving force in terminating [the plaintiff]").  In short, the evidence of discriminatory animus cited by the plaintiff in
his deposition "go[es] far beyond reasonable inference and into the realm of unfettered speculation."  Holcomb, 433
F.3d at 901.

shortcomings and performance issues.  See, e.g., Pl.'s Opp. at 2, 4-5; Pl.'s Stmt. at 1-2 (alleging

that "[t]he only documented errors occurred months before [the plaintiff's] termination" and that

"[c]laims of other errors are based largely on hearsay[] [and] are entirely uncorroborated").

Third, the plaintiff argues that the circumstances of his termination were too sudden and that he

was not told about the alleged deficiencies in his performance beforehand nor given an

opportunity to attempt to remedy them.  See, e.g., Pl.'s Opp. at 2, 5 (contending that "there is no

documentary evidence that [the plaintiff] was counseled or warned [about any of the deficiencies

alleged by Young]"); Pl.'s Stmt. at 1-2, 8 (stating that "neither [Stubblefield] nor [Broendel] ever

told [him] that there was a problem paying bills late"), 11-12.  Fourth, the plaintiff suggests that

any lapses in his performance were attributable to the difficulty inherent in resolving "the

backlog and delinquencies created by others" prior to his arrival.  Pl.'s Opp. at 5; see also Pl.'s

Stmt. at 3 (stating that "the backlog related primarily to tax reporting and filings for 2001 for

which [the] [p]laintiff could not have been responsible in creating" and that the plaintiff "was

required to negotiate and settle late penalties and interest that had accumulated on unpaid payroll

taxes and other state filings").  Finally, the plaintiff alleges that Sclafani's "animus toward [the]

[p]laintiff" is responsible for the plaintiff's termination.  Pl.'s Opp. at 5; see Pl.'s Stmt. at 14

(asserting that Sclafani "was the driving force in terminating [the plaintiff]").  In sum, the

plaintiff disputes the defendant's stated reason for his termination—an overall dissatisfaction

with his job performance—by highlighting certain aspects of his job that were performed

correctly and by contending that he was terminated (purportedly at the behest of Sclafani)

without being given an adequate chance to remedy his failings.  The Court is unpersuaded, based

on the actual evidence adduced by the plaintiff, that a reasonable jury could conclude that the

defendant's stated reason for the plaintiff's termination "was pretextual and that the true reason

was discriminatory." Weber, ___ F.3d at ____, 2007 WL 2033254, at *3 (internal quotation

marks and citation omitted).

The plaintiff cannot create a genuine issue of material fact as to whether the NALC

"honestly believes in the reasons it offers" for his termination simply by contesting some portion

of the defendant's account of his performance or citing certain instances in which he correctly

performed the duties of his job. George, 407 F.3d at 415 (internal quotation marks and citation

omitted). It is nonsensical to suppose that a plaintiff should be able to demonstrate that an

employer's stated reason for its adverse action is pretextual merely because the employer cannot

prove that the plaintiff was deficient in every aspect of his job performance. Rather, because it is

not the role of the federal courts to "review[] the wisdom or fairness of the business judgments

made by employers, except to the extent that those judgments involve intentional

discrimination," Arraleh, 461 F.3d at 976 (internal quotation marks and citation omitted),

employers are surely "entitled to determine that the deficiencies in [an employee's] performance

outweighed [his] accomplishments," Dunn v. Nordstrom, Inc., 260 F.3d 778, 787 (7th Cir. 2001)

(internal quotation marks and citation omitted). As the defendant observes, "[the] [p]laintiff's

mere disagreement with [the] NALC's negative evaluation of his performance is not evidence

that he performed at or near the level legitimately expected by [the] NALC," Def.'s Mem. at 15,

and "the ultimate burden of persuading the trier of fact . . . [that his termination was founded on

intentional discrimination] remains at all times with the plaintiff," Reeves, 530 U.S. at 143

(internal quotation marks and citation omitted). A reasonable jury could believe that the plaintiff

performed certain aspects of his job correctly yet nevertheless decline to infer that the employer's

stated explanation is false and "that the employer is dissembling to cover up a discriminatory purpose." Waterhouse, 298 F.3d at 993 (quoting Reeves, 530 U.S. at 147) (internal quotation marks omitted).

For similar reasons, the plaintiff's charge that the defendant has not adequately documented his shortcomings falls far short of the mark. The defendant need only "produce admissible evidence that, if believed, would establish that its action was motivated by a legitimate, nondiscriminatory reason," Carter, 387 F.3d at 878 (internal quotation marks and citation omitted), which it has done through the sworn testimony of Young and Broendel. Because the plaintiff was an at-will employee, terminable at any time for any permissible reason, Def.'s Stmt. ¶ 13; Royall Dep. at 54:15-22, the defendant was under no onus to keep detailed records supporting its concerns regarding the plaintiff's performance, and the plaintiff cannot survive summary judgment merely by showing that such records do not exist. It is undisputed that the duties and responsibilities of the accounting manager position were known to the plaintiff when he assumed the post, see Def.'s Stmt. ¶ 17; Pl.'s Stmt. at 4, and Young and Broendel have enumerated the grounds for their "reasonable belie[f] that [the] plaintiff had performance difficulties in these areas," Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 10 (D.D.C. 2000) (citation omitted), aff'd, 298 F.3d 989 (D.C. Cir. 2002). The plaintiff must therefore cast doubt upon the credibility of this explanation by setting forth specific facts to show that a reasonable jury could conclude "that the [defendant's] stated reason was pretextual and that the true reason was discriminatory." Weber, ___ F.3d at ____, 2007 WL 2033254, at *3 (internal quotation marks and citation omitted). This he has not done.

24

Additionally, while "evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence," Griffin v. Wash. Convention Ctr., 142 F.3d 1308, 1312 (D.C. Cir. 1998) (citations omitted), there is no evidence before the Court to suggest that Sclafani harbored any racial animus against the plaintiff, even assuming that he was, as the plaintiff claims, "the driving force" behind his termination, Pl.'s Stmt. at 14.[18] As support for his conclusory allegation regarding this purported animus, the plaintiff adverts to Sclafani's "scurrilous accusation that [the] [p]laintiff impugned Secretary Treasurer Blondell [sic], [the] [d]efendant's second highest officer, and the officer having direct oversight of [the] [p]laintiff's work." Pl.'s Opp. at 5-6. Not only can the Court find no reference to any such "scurrilous accusation" in the evidence adduced by the plaintiff, but as support for Sclafani's supposed bias against the plaintiff, this argument fails on its face, given that it has—as far as the Court can discern—absolutely nothing to do with the plaintiff's race. Cf. Pub. Citizen Health Research Group, 185 F.3d at 908 (noting that "conclusory allegations unsupported by factual data will not create a triable issue of fact") (internal quotation marks and citations omitted).

At best, then, the plaintiff has demonstrated that, notwithstanding the deficiencies in his performance enumerated by Young and Broendel, the NALC "should not have terminated [him] because there were extenuating circumstances"—the backlog of work that undoubtedly made the plaintiff's job more difficult—as well as "some positive attributes to [his] performance." Waterhouse, 298 F.3d at 995. But, as the District of Columbia Circuit has made clear, "courts

---

[18] As noted earlier, supra n.12, the plaintiff has not proven that Sclafani had any significant influence over the decision to terminate his employment. See Young Dep. at 26:17-27:21 (stating that he made the decision that the plaintiff's employment should be terminated after consulting with Broendel and Stubblefield); see also Broendel Dep. at 83:14-18 (stating that Sclafani did not participate in the termination decision).

are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive," id. (internal quotation marks and citation omitted), and the plaintiff "offer[s] no grounds for a rational juror to conclude that the reason [he] was fired was racial discrimination rather than poor performance," id. (citation omitted).  It may be that the decision to terminate the plaintiff was overly sudden or even, on balance, unfair, but the plaintiff has provided no evidence at all that it was motivated by his employer's discriminatory intent, and that is the question that the Court must answer.  Forman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001) (stating that "[c]onsistent with [federal] courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the [C]ourt is limited to whether [the plaintiff] produced sufficient evidence of . . . discrimination, not whether he was treated fairly") (citations omitted); Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (stating that in rebutting an employer's non-discriminatory explanation, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible") (internal quotation marks and citation omitted); see also Riggs v. Airtran Airways, Inc., ___ F.3d ____, ____, 2007 WL 2258826, at *7 (10th Cir. Aug. 6, 2007) (stating that "[courts] do not ask whether the employer's reasons were wise, fair[,] or correct . . . [as long as] the employer honestly believed its reasons and acted in good faith upon them") (internal quotation marks and citation omitted).  Thus, even if the defendant's nondiscriminatory explanation for its actions is based on incorrect assumptions or unrealistic expectations, to survive summary judgment the plaintiff must demonstrate "both that the explanation is incorrect and that the employer's real reason was discriminatory."  Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1998) (en banc) (emphasis in original).  Here, the plaintiff has failed to

"offer sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision." Waterhouse, 298 F.3d at 994 (quoting Reeves, 530 U.S. at 140) (internal quotation marks omitted), and "conclude that he was terminated for a discriminatory reason," Jackson, ___ F.3d at ____, 2007 WL 2275215, at *2 (internal quotation marks and citation omitted). Accordingly, the Court must grant the defendant's motion for summary judgment.

## IV. Conclusion

For the reasons stated above, the Court concludes that the plaintiff has provided absolutely no evidence that would allow a reasonable jury to infer that his termination occurred as a result of any improper discriminatory motive by Young, Broendel, Sclafani, or anyone else at the NALC. Nor does he credibly contest Young's stated reasons for believing that his performance as accounting manager warranted termination. See Young Dep. at 50:16-20 (stating that "the only reason [the plaintiff's] employment was terminated [was that] he was not able to do all of the functions of the position that he was hired to do, and [the NALC] couldn't get the finance department in order without someone who was able to do the things he was supposed to do"). Instead, as the defendant observes, the plaintiff's response to the motion for summary judgment "essentially boils down to the type of 'just cause' argument that might be offered in a discharge labor arbitration under a collective bargaining agreement, but that is irrelevant on a race discrimination claim, especially in the absence of any evidence of racial animus." Def.'s Reply at 10. While the plaintiff's termination from his accounting manager position may have been sudden or even unfair, there is no evidence that it was motivated by improper discrimination rather than legitimate concerns about the quality of the plaintiff's job

performance.  The defendant is therefore entitled to summary judgment on the plaintiff's Section 1981 claim of unlawful discrimination.

**SO ORDERED** this 29th day of August, 2007.


REGGIE B. WALTON
United States District Judge